UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                                              :

MATTHEW MILLER,                            :        Case No. 1:25-cv-08606
Individually and as Principal of        :
STRATEGIC RISK LLC,                :

                                            :        **COMPLAINT**

                                            :

                          Plaintiff,       :        **JURY TRIAL DEMANDED**

                                            :

                   -- against --         :

1847 HOLDINGS LLC, 1847 PARTNERS LLC,  :
ELLERY W. ROBERTS., LOUIS A. BEVILACQUA,  :
BEVILACQUA PLLC, JOSEPH D. WILSON,    :
ERIC VAN DAM, VERNICE HOWARD, EDWARD  :
TOBIN, GLYN MILBURN,                  :
and DOES 1-10,                        :

                                     :

                        Defendants.     :
                                            :
------------------------------------------------------------------------ x

       Plaintiff Matthew Miller ("Mr. Miller"), individually and as principal of Strategic Risk

LLC ("SR"), "Plaintiff" *infra*, through his counsel, The Galbraith Law Firm, brings this action

against Defendants 1847 Holdings LLC ("1847H"), 1847 Partners LLC, ("1847P") Ellery W.

Roberts ("Mr. Roberts"), Louis A. Bevilacqua ("Mr. Bevilacqua"), Bevilacqua PLLC

("Bevilacqua PLLC"), Jospeh D. Wilson ("Mr. Wilson"), Eric Van Dam ("Mr. Van Dam"),

Vernice Howard ("Ms. Howard"), Edward Tobin ("Mr. Tobin"), Glyn Milburn ("Mr. Milburn"),

and Does 1-10, "Defendants" collectively. The bases for his claims are detailed below.

## PRELIMINARY STATEMENT

       This civil action is brought under the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. §§ 1961–1968, a statute enacted to combat organized crime. Under RICO, a

"racketeering enterprise" is, by definition, a criminal enterprise, even when the claims are pursued through civil enforcement. Accordingly, throughout this Complaint, the word "criminal" is used in its plain and statutory sense to describe conduct that meets the definition of racketeering activity under federal law, regardless of whether formal criminal charges have yet been brought.

This case arises from one of the most brazen and sustained micro-cap frauds in recent memory—a decade-long racketeering scheme that looted hundreds of millions of dollars, likely exceeding $700 million, from 1847 Holdings LLC ("1847 Holdings"), its spin-off Polished.com Inc. ("Polished"), and their subsidiaries. The scheme, revealed through public filings, capital raises, loans, and other financial transactions, operated through a deliberately interwoven network of shell entities and sham agreements. No reliable financial report has ever been issued in the history of these companies; every filing has been marred by material weaknesses, inadequate internal controls, and an admitted inability to detect fraud. The enterprise was systemic, intentional, and repeatable—built on a blueprint of toxic financing, fabricated disclosures, and orchestrated bankruptcies designed to guarantee that investors, creditors, and legitimate stakeholders always lost while insiders always won.

Far from operating as a legitimate holding company, 1847 Holdings functioned as a theft enterprise cloaked in the appearance of lawful investment. The "holding company" model touted to investors was a façade for systematic looting: acquisitions of decades-old, profitable businesses followed by asset-stripping through inflated management fees, related-party loans, insider compensation, and sham consulting agreements. Liabilities, operational collapse, and bankruptcy were left behind, while assets and cash flowed to the enterprise's principals. Once in the enterprise's control, companies were used to secure asset-backed loans whose proceeds were diverted to insiders rather than reinvested. Even under the assumption of profound incompetence,

such repeated collapses across multiple profitable businesses could not plausibly occur without theft.

The scheme's foundation was laid in 2013—before 1847 Holdings was publicly traded—through a Management Services Agreement ("MSA") authored by defendant Louis A. Bevilacqua. The MSA eliminated fiduciary duties, indemnified the Manager for nearly all conduct, and vested sweeping control in the external manager, 1847 Partners LLC. This was the fraud blueprint: guaranteed management fees, related-party transactions, and near-total immunity for insiders.

Public filings further confirm that Bevilacqua held a direct ownership interest in 1847 Partners LLC, the very entity he empowered through the MSA. Specifically, he owned approximately 9 percent of 1847 Partners Class A Member LLC and 10 percent of 1847 Partners Class B Member LLC. These equity interests gave Bevilacqua a direct financial stake in the management entity that collected guaranteed fees from every subsidiary of 1847 Holdings, placing him squarely on both sides of the transactions he structured and approved. When Plaintiff later requested an internal forensic audit to trace missing funds and related-party transfers, Bevilacqua and his law firm responded with intimidation rather than transparency—threatening Plaintiff with criminal prosecution and civil litigation to deter further inquiry and preserve the scheme. These threats, made under color of legal authority, served no legitimate purpose other than to protect the fraudulent enterprise and delay its exposure.

The scheme operated with the mechanics of both a pyramid scheme and a Ponzi scheme, dressed in the trappings of a publicly traded holding company. Like a pyramid, each newly acquired business was used to fund payouts and enrich the upper tier—1847 Partners LLC and its principals—rather than to create sustainable value. Like a Ponzi, capital from new investors,

lenders, capital raises, loans with convertible debt, and sham consulting agreements was deployed using every available tool to extract as much value as possible for insiders.

The enterprise's distinguishing feature, however, was its access to the public markets, which transformed an ordinary Ponzi into a bottomless pit. The model was simple but devastating: raise capital under the pretense of acquiring a legitimate business, then immediately use that acquisition's assets as collateral to obtain new loans. Those loan proceeds—rather than being reinvested—were funneled to 1847 Partners LLC and its principals through management fees, related-party transactions, and insider disbursements. The acquired company's working capital was rapidly drained, leaving it dependent on further debt and additional capital raises to survive. Once stripped of liquidity, the same company was used to justify new securities offerings or additional loans with convertible debt—structured to delay dilution until default, ensuring that the next collapse would fall squarely on shareholders.

As defaults mounted, the enterprise would seek out new lenders to take over existing loans, layering fresh debt with even more predatory terms. These refinancing arrangements did not rescue the business—they extended its life just long enough for insiders to extract more fees and for 1847 Partners to cycle in another round of capital. The refinancing served the same function as a Ponzi reinvestment: a temporary infusion that disguised insolvency while deepening the eventual collapse.

When operational cash flow inevitably ran dry, the endgame was always the same. The subsidiary would begin to default on its vendor payments, prompting suppliers to halt delivery of inventory. At that point, the business's entire revenue engine would seize—paralleling the dynamic of a Ponzi scheme in which investor withdrawals suddenly exceed the remaining slush fund. Just as the Ponzi operator collapses when redemptions outpace inflows, 1847 Holdings'

subsidiaries collapsed when vendors stopped shipping product, exposing the absence of real capital behind the façade of debt-fueled growth. Bankruptcy would swiftly follow—sometimes disguised as an "assignment for the benefit of creditors"—allowing insiders to shed liabilities, preserve ill-gotten gains, and move on to the next acquisition cycle.

In every iteration, shareholders and creditors were wiped out while 1847 Partners and its affiliates emerged wealthier. There was never any legitimate value creation within 1847 Holdings—only manipulation, extraction, and the systematic transfer of wealth from investors to insiders, masked as corporate development. The enterprise was never structured to achieve profitability or long-term growth. Its very design ensured failure for everyone but its operators. Because the company's purpose was exploitation rather than production, no amount of new capital, debt restructuring, or management change could have brought it into a favorable financial position. It was not a mismanaged business—it was a machine for looting.

Spartan Capital Securities, LLC ("Spartan") and its long-time outside counsel, Sichenzia Ross Ference Carmel LLP ("SRFC"), were not passive observers but active enablers of this racketeering enterprise. While Spartan Capital only conducted one cash raise for Polished.com Inc., it played an integral role in facilitating the same pattern of toxic financing that later defined 1847 Holdings. The same individuals behind Polished.com—including Ellery Roberts, CEO of 1847 Holdings LLC, and members of 1847 Partners LLC—were the true architects of the scheme, merely recycling it through new entities. Spartan's participation in the Polished.com raise was not an isolated engagement but part of a continuous sequence of fraudulent offerings executed through 1847 Holdings and its affiliates, all structured to give the illusion of separation between issuers that were, in reality, one and the same.

SRFC has represented Spartan Capital both in structuring and papering its cash raises and in defending the firm and its principals against a long history of regulatory actions and investor-misconduct disputes. Through that dual role, SRFC has long known that Spartan Capital's business model depends on toxic financings, pump-and-dump trading, and abusive sales practices. Spartan's record is littered with FINRA sanctions, customer arbitrations, and SEC proceedings—including findings of willful disclosure failures, excessive trading, unsuitable recommendations, and exploitation of elderly investors. Yet SRFC continued to defend the firm reflexively, dismissing every regulatory action and customer complaint as "frivolous" or "without merit." The irony is striking: a law firm that calls every allegation baseless while its client repeatedly settles, pays fines, and admits to supervisory failures. SRFC's posture has not been one of skepticism but of complicity. It drafted new offering documents for Spartan even as regulators sanctioned the firm for prior misconduct, treating each enforcement action as just the cost of doing business. By continuing to paper these transactions, SRFC became an essential co-conspirator—providing the legal veneer that allowed serial fraud to continue under color of legitimacy.

Although Spartan Capital's direct involvement with Polished.com was limited to a single capital raise, 1847 Holdings—Spartan's true vehicle—was the repeated beneficiary of the same toxic financings that sustained the broader scheme. Spartan facilitated offering after offering for 1847 Holdings, built around cashless warrants and deep discounts that guaranteed dilution while generating lucrative placement fees for the firm. SRFC, in turn, drafted, reviewed, and approved the accompanying legal documentation despite obvious red flags and mounting evidence of fraud. Both entities knew that 1847 Holdings was operating as a fraudulent scheme but nonetheless chose to further that scheme by continuing to provide it with capital, legitimacy, and professional cover. Rather than distance themselves, Spartan and SRFC doubled down—treating the company's

criminality not as a deterrent but as an opportunity to profit from a recurring cycle of deceit. Together, they provided the financial and legal scaffolding necessary to perpetuate and expand the racketeering enterprise.

They were also fully aware that every Spartan-brokered deal inevitably ends with retail investors destroyed—that the very structure of Spartan's financings guarantees catastrophic losses for ordinary shareholders while insiders and preferred investors exit at profit. These were not unforeseen consequences but deliberate design features of Spartan's model, which depended on artificially inflated stock runs followed by rapid dilution and collapse.

The very structure of 1847 Holdings' financing model made legitimate institutional investment implausible. The company's operating pattern—characterized by serial reverse splits, relentless toxic dilution, and near-total shareholder wipeouts occurring every four to six months— was plainly designed to reset and replay the same fraudulent cycle. No bona fide institutional investor or reputable client of Spartan Capital would participate in such offerings absent explicit or implicit assurances of profit through market manipulation. As detailed in Section F of this Complaint, Spartan's own Head of Listings admitted that the firm's financing strategy depended on "putting out news, creating an artificial run, and then pricing an offering at half off that run." These statements confirm that the October and December 2024 financings were not conducted to raise genuine growth capital, but to facilitate orchestrated pump-and-dump exits for preferred investors and to provide liquidity for pending warrant conversions—further evidence that Spartan's role was not advisory or incidental, but central to the continuation of the racketeering enterprise.

Multiple pending federal lawsuits in the Eastern District of New York further corroborate the scope and persistence of this misconduct:

- *Maschhoff v. Polished.com Inc*., Case No. 1:22-cv-06606 (E.D.N.Y.)—a federal securities class action alleging that Polished.com's IPO registration statement and subsequent SEC filings contained material misstatements and omissions, masking severe internal-control deficiencies, overstated revenues, and looming restatements.

- *Wong v. Moore*, Case No. 1:23-cv-00559 (E.D.N.Y.)—a shareholder-derivative action alleging that Polished.com's officers and directors breached their fiduciary duties by permitting false disclosures and gross mismanagement.

- *Gossett v. Moore*, Case No. 1:23-cv-01168 (E.D.N.Y.)—also a derivative action naming 1847 Partners LLC as a defendant for aiding and abetting those fiduciary breaches.

These civil proceedings run in parallel with active SEC and DOJ investigations into Polished.com's false reporting and undisclosed related-party transactions, confirming that the wrongdoing is neither in the past nor isolated.

On July 10, 2025, 1847 Holdings filed Amendment No. 2 to its Form S-1 (Registration No. 333-286427), registering 778,524,571 common shares for resale by the holders of Series A and Series B warrants issued in the December 2024 financing round. The filing further disclosed additional convertible instruments—including preferred shares and pre-funded warrants—indicating that the total post-conversion float could approach 830 million shares, an amount so dilutive that existing investors would be virtually wiped out.

On October 3, 2025, 1847 Holdings LLC filed a Form 8-K announcing that it "expects to begin trading on the OTC Pink Limited tier within the next one to four business days," and expressed its intention to "ultimately relist on a senior U.S. exchange." In that filing, the company publicly boasted of alleged "record" results and operational progress—none of which were audited, verified, or independently reviewed. The sequence of events—filing the S-1/A to register

hundreds of millions of resale shares, followed by the October 8-K announcing imminent relisting—shows deliberate coordination to facilitate those warrant conversions while concealing the pending RICO litigation. 1847 Holdings was fully aware of this pending action yet chose to omit it from its public filings. By attempting to beat Plaintiff to the punch and relist before this Complaint was filed, defendants sought to create the false appearance of stability while evading the market impact of a material RICO lawsuit—an omission that itself constitutes securities fraud and further evidence of ongoing racketeering conduct.

Following that failed relisting, 1847 Holdings has now changed its ticker symbol from EFSH to LBRA. There is no regulatory requirement that a delisted or OTC-bound issuer change its ticker symbol; doing so serves no legitimate market purpose. The only plausible rationale is to distance the company from its extensive history of fraud, regulatory failures, and investor harm— to bury prior misconduct under a new symbol. The company is now attempting to re-enter the market under the guise of a different name, despite its proven history as a racketeering enterprise. 1847 Holdings has no legitimate business to ever trade again, and any individual or entity deeply involved in this scheme—including 1847 Partners LLC—should never again have any proximity to the public markets. As of the date of this filing, LBRA remains in the grey market and is not trading, further confirming that 1847 Holdings has been effectively exiled from regulated exchanges and continues to pose unresolved compliance and fraud risk.

All defendants named in this action represent the full spectrum of enablers that make public-market racketeering possible. From the issuers who weaponized the public markets to exploit investors, to the counsel who made himself a preferred shareholder in a company he knew to be a sham; from the executives who ignored obvious red flags and continued to collect paychecks for rubber-stamping fraud, to the investment banks that raised capital for the same

fraudulent enterprise with direct knowledge of its criminal nature, and to the lawyers for those banks who knowingly papered over the misconduct—each played an indispensable role. Collectively, these actors demonstrated a complete disregard for the harm inflicted on the investing public. To them, the looting of a fraudulent issuer is not an aberration but a business model— conducted with impunity and sustained only by the complicity of professionals who should have been gatekeepers, not co-conspirators.

This Complaint is not only the personal claim of a defrauded shareholder. It is a call for accountability and exposure of an ecosystem that has long operated in the shadows under the guise of "helping small companies raise capital." The individuals and entities named herein have abused that premise—turning the process of capital formation into a mechanism for systematic theft. What they present as entrepreneurial support for emerging issuers is, in truth, the industrialized exploitation of the public markets at the expense of ordinary investors. This conduct must be scrutinized, confronted, and ultimately dismantled if the integrity of the capital markets—and the protection of retail investors—is to mean anything at all.

## NATURE OF THE ACTION

Plaintiff seeks to redress extensive financial harm caused by defendants' operation of an ongoing racketeering enterprise that systematically looted public companies, defrauded investors, and deprived Plaintiff of both his invested capital and his livelihood. Plaintiff suffered direct, traceable losses totaling $749,462.80, representing funds used as working capital for his trading business. The depletion of that capital—his primary source of income—disrupted his ability to trade for a living, resulting in sustained business interruption and loss of income opportunity. Plaintiff therefore seeks recovery of those losses, together with treble damages in the amount of $2,248,388.40, and additional consequential damages arising from the disruption of his trading

operations, along with attorney's fees, costs, and all statutory remedies available under 18 U.S.C. § 1964(c).

## JURISDICTION AND VENUE

1.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), as Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act. The Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2.  Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's investment, Defendants' communications and representations, and other material acts underlying this action.

## THE PARTIES

3.  Plaintiff Matthew Miller is a resident of New York. He invested over $980,000 in 1847 Holdings and became its largest shareholder following his participation in the July 2023 private placement.

4.  Plaintiff Strategic Risk LLC is a New York limited liability company with its principal place of business in New York, NY. It is owned and managed by Matthew Miller and was the investing entity through which Mr. Miller acquired interests in 1847 Holdings LLC.

5.  Defendant 1847 Holdings LLC is a Delaware limited liability company formerly listed on the NYSE American. Its principal office is located at 260 Madison Avenue, 8th Floor, New York, NY 10016. 1847 Holdings is a publicly traded holding company that owns and operates multiple subsidiaries.

6.  Defendant 1847 Partners LLC is a Delaware limited liability company that serves as the external manager of 1847 Holdings LLC pursuant to a Management Services Agreement. It

is managed by Ellery W. Roberts. The members of record include Mr. Roberts, Louis A. Bevilacqua, and Edward J. Tobin.

7.     Defendant Ellery W. Roberts is an individual believed to reside in or around Rancho Santa Fe, California. He is the founder and Chief Executive Officer of 1847 Holdings LLC and the sole manager of 1847 Partners LLC.

8.     Defendant Louis A. Bevilacqua is an attorney residing in Naples, Florida. He is the founder and managing member of Bevilacqua PLLC and the co-founder, President, and General Counsel of Digital Offering LLC, a FINRA-registered broker-dealer.

9.     Defendant Bevilacqua PLLC is a law firm organized in the District of Columbia, with its principal office in Washington, D.C. It provides legal services in the areas of securities, capital markets, and corporate transactions.

10.     Defendant Spartan Capital Securities, LLC is a FINRA-registered broker-dealer organized under the laws of New York, with its principal office located at 45 Broadway, New York, NY 10006.

11.     Defendant Sichenzia Ross Ference Carmel LLP is a law firm organized under the laws of New York, with its principal office located at 1185 Avenue of the Americas, 31st Floor, New York, NY 10036.

12.     Defendant Eric Van Dam is an individual who has served in executive roles within 1847 Holdings LLC and its affiliated subsidiaries, including Chief Operating Officer of 1847 Holdings and Chief Executive Officer of Wolo Manufacturing Corp. Upon information and belief, he resides in the State of Michigan.

13.     Defendant Vernice Howard has served as Chief Financial Officer of 1847 Holdings LLC since approximately September 2021. Upon information and belief, she resides in the State of New York.

14.     Defendant Glyn Milburn has served as Vice President of Operations of 1847 Holdings LLC and as a member of its Board of Directors. He has also served on the Board of Directors of Polished.com Inc. Upon information and belief, he resides in the State of California.

15.     Defendant Edward J. Tobin is an individual residing in Paris, France. He is a member of 1847 Partners LLC and holds ownership interests in affiliated entities.

## STATEMENT OF FACTS

### A. Deceptive Capital Raise And Reverse Split

16.     On July 3, 2023, Plaintiff invested $365,000 in a private placement offered by 1847 Holdings LLC. He did so based on personal assurances from CEO Ellery W. Roberts that there would be no capital raises for at least twelve months. Plaintiff, who became the company's largest shareholder and a beneficial owner of more than 10% of its outstanding shares at the time, relied on these representations before wiring the funds.

17.     In a text exchange dated on or around July 1, 2023, Plaintiff explicitly warned Roberts that further offerings would "put enormous pressure on the stock" and that he "would have to manage [his] risk more if there were more coming." Later that same day, Plaintiff asked for assurance that the latest offering would "provide enough cash to last you without having to raise anything more for at least a year." Roberts responded within minutes, stating definitively: "Our forecast does not show us raising equity for operating purposes. As stated publicly, we see ourselves building cash from here on out." Plaintiff relied on this explicit representation, made on

or about **July 1, 2023**, when committing funds—a representation that was later revealed to be false. A true and correct copy of this exchange is attached hereto as **Exhibit A**.

18.     Following the investment, Plaintiff grew concerned when the company failed to publicly announce the closing of the offering. However, the announcement conspicuously omitted any reference to the company's ability to "build on cash going forward"—language that had been explicitly promised to Plaintiff in a July 1st text exchange with Ellery Roberts. Plaintiff texted Roberts on July 13 to ask about the omission and stated that, given this position as a significant investor, the change from the earlier representation was material.

19.     Plaintiff understood from Roberts's statements that the July 3, 2023, raise would stabilize operations. According to information and belief, because the S-1 remained effective, additional offerings were already contemplated. Plaintiff had asked whether further offerings were planned; Roberts did not disclose any such plans.

20.     Plaintiff's concerns were validated the very next day, when 1847 Holdings announced a second capital raise on July 14—directly contradicting Roberts' earlier assurances. Afterward, Roberts admitted that even the two raises combined would not be sufficient because, according to him, attorney Louis A. Bevilacqua had entered incorrect information during the second offering, forcing the company to return a portion of the proceeds. In doing so, Roberts expressly assigned blame to Bevilacqua while continuing to operate alongside him and benefit from the same scheme.

21.     Roberts' explanation—that the company "still didn't get what they needed" because Bevilacqua had "entered the numbers incorrectly"— was inconsistent with prior statements and contributed to Plaintiff's concern about the fundraising process.

22.     Plaintiff later concluded, based on the totality of subsequent events and disclosures, that the company had no genuine intention of building cash; it operated as a pattern of repeated dilution, on information and belief, supported by overly optimistic narratives to mislead investors while lining up future financings.

23.     On August 29, 2023—just three days before announcing a 1-for-25 reverse stock split—Plaintiff spoke with Ellery Roberts in a phone call, which Plaintiff legally recorded. During this call, Roberts's tone was hesitant, stammering, and evasive, betraying discomfort as Plaintiff asked pointed questions. Plaintiff stated clearly:

"And we're not, and we're just, and we're not like at any exposure at any type of NYC delisting or any reverse split or anything like that. Like that's like…"

Roberts cut in:

"No."

Plaintiff followed:

"Okay."

Roberts then replied, haltingly:

"Not my lawyers, my lawyers, did not told me that at all. No. NYC, American is different rule than NYSE."

Plaintiff responded again, warning:

"Than NYSE, but like there's just gonna be no need to do like a reverse split, or that's… that's… cause that happens, you know, I lose everything. So I just want to make sure that that's not something that's on the table."

Roberts concluded:

"I have not, Matt, I have not, I have not been told that by anybody, quite honestly, you're more than welcome, you have our counsel's information. They know you are our largest shareholder; they see your filings. Even feel free to CC me and say, 'I don't know if you have spoken to Lou or An…'"

A true and correct copy and transcript of this call are attached hereto as **Exhibit B**.

24.     These statements were material misrepresentations. At the time of the call, the reverse split had already been authorized, and the statements had the effect of delaying or suppressing Plaintiff's objection. The split was publicly announced on September 1, 2023, four days later.

25.     During that same August 28 call, Plaintiff questioned the company's ballooning share count, noting it seemed manipulated to facilitate toxic conversions. Rather than answer transparently, Roberts grew defensive and accused Plaintiff of "creating a self-fulfilling prophecy" by raising concerns about dilution.

26.     When Plaintiff pressed on the financial impact of the dilution, Roberts downplayed Plaintiff's growing losses as "just a moment in time," and insisted that the company's position would "get better." These statements proved inaccurate; the company's position deteriorated.

27.     In an earlier conversation prior to the August 28 call, Roberts also offered Plaintiff an informal advisory role with the company, suggesting that Plaintiff could get his money back through that arrangement. Roberts further stated the compensation could be structured "in perpetuity." The offer was never put in writing, never disclosed to shareholders, and was not part of any governance process. It was a verbal inducement—an attempt to buy silence and keep the largest shareholder engaged just long enough to execute the next phase of the dilution cycle. Plaintiff viewed it as an improper inducement rather than a legitimate opportunity and declined. The timing and context of the offer suggest it was made in response to Plaintiff's inquiries regarding company specifics.

28.     The events surrounding the September 1 reverse split were planned and executed in a manner that misled shareholders and affected the market.  What follows is a breakdown of three interrelated components that expose the true nature of this staged and fraudulent maneuver:

29.     On September 1, 2023, 1847 Holdings announced and executed a 1-for-25 reverse stock split. The split had been planned to occur alongside defaults on outstanding promissory notes that were convertible into common stock—knowing full well that such defaults would give noteholders the right to convert at steep discounts. Plaintiff's ownership was slashed from approximately 19.7% to under 5% within days.

30.     That same day—September 1—the company's stock dipped below $0.10 for the first time. While this did not trigger any automatic trading restrictions from the exchange, Defendants later cited the sub-$0.10 price as if it were an unavoidable emergency requiring the reverse split to "protect" shareholders from delisting. In truth, the company's own defaults on convertible notes—not general market forces—drove the price collapse.

31.     Plaintiff notes that Defendants did not disclose any deficiency notice until after Plaintiff and other shareholders criticized the September 1 reverse split. Only then, on September 5, did Defendants produce a letter—purportedly received on August 31—claiming that the company was deficient. If the letter had truly been received on August 31, there is no clear explanation for omitting that fact from the September 1 disclosure, particularly when shareholders were being massively diluted. The disclosure appears to have been delayed.

32.     Moreover, Plaintiff questions, on information and belief, whether the letter was in fact received on August 31, as Defendants have never provided timestamped proof of receipt. The entire sequence appears staged to push through a reverse split without opposition.

33.     Upon information and belief, attorney Louis A. Bevilacqua may have leveraged his relationship with NYSE American to request of a deficiency notice—issuance either on August 31 or afterward—once shareholders began asking why the company would not attempt to restore the stock price organically.

34.     Even assuming the letter was authentic, its existence is no justification for the reverse split—it was not the result of general market conditions, but a direct consequence of 1847 Holdings defaulting on convertible notes. Those defaults occurred despite the company having just completed two capital raises, both marketed to investors as necessary to eliminate debt and stabilize operations. One of those raises included a significant cash investment from Plaintiff, who was led to believe that his funds were being used specifically to pay down the debt that later triggered the NYSE deficiency notice. Instead, Defendants defaulted anyway, concealed the resulting fallout, and then used the exchange's warning as a pretext for the reverse split to execute a reverse split they had previously contemplated.

35.     This was not an isolated event—1847 Holdings would go on to carry out three additional reverse splits in the next fourteen months, for a total of four reverse splits in that period. The misconduct lies not just in the reverse split itself, but in the manipulation of public disclosures, misrepresentation of financial intent, and betrayal of investor trust.

36.     It is also worth noting that on the morning of August 31, 2023—just one day before announcing the reverse split—1847 Holdings issued a press release claiming it had restructured debt with several of its lenders. This announcement framed the development as a positive step toward financial stability and briefly sparked buying activity in the stock. The restructuring claimed that remaining convertible notes had been modified in such a way that they would no longer be placing pressure on the stock price.

37.     This statement was misleading, as the company still had multiple harmful mechanisms in place, and the underlying financial condition remained unchanged. The press release caused the stock to spike by nearly 90% intraday, jumping from around $0.11 to as high as $0.19 before collapsing. This created a narrow but highly lucrative trading window, giving

insiders—particularly those within Ellery Roberts' and Louis Bevilacqua's circle—the ability to buy near the $0.11 mark and sell near $0.19.

38.    Upon information and belief, the release was intentionally timed and drafted to trigger this price movement, and that certain parties pre-loaded their positions in advance. It was a coordinated pump-and-dump scheme cloaked in the appearance of progress. The maneuver was not a legitimate restructuring—it was a staged event that allowed favored participants to exit at a profit just before the stock was crushed by the announced reverse split. The press release was devoid of any material improvement to the company's financial position, and the damage to the capital structure had already been done by previous defaults on convertible notes.

39.    The coordinated nature of the deception—Roberts' denials on a recorded call, the advisory role offer made before the split, and his refusal to engage afterward—demonstrate that the reverse split was not a financial necessity but a planned action inconsistent with prior assurances. The share collapse that followed was not a result of market forces but a direct outcome of the company's internal financing decisions and structure.

40.    At one point, prior to discovering the full extent of the fraud, Plaintiff had expressed genuine interest in joining the Board of Directors. As the company's largest shareholder and a veteran operator, Plaintiff believed he could contribute positively. However, once he uncovered the truth—that the company's leadership had knowingly enabled serial dilution, ignored audit concerns, and allowed the company to be looted—he made it clear he would never accept such a position.

41.    Plaintiff sold his position during the week of September 11, 2023, realizing a loss of $749,462.80. At the time of his July investment, he held 4,000,000 shares worth $980,000. By

April 2025, after four reverse stock splits and relentless dilution, that stake would have equaled just 200 shares worth approximately $14.

42.     Although Plaintiff exited early, this trajectory reveals the premeditated destruction of value that befell all shareholders. Roberts, Bevilacqua, and their affiliates executed a coordinated scheme that raised capital through misleading disclosures, used highly dilutive instruments, and concealed resulting losses through corporate processes.

**B. False Financial Projections and Internal Failures**

43.     From the outset of Plaintiff's involvement, 1847 Holdings presented financial projections that were materially false and designed to deceive investors. In its Q1 10-K filed in May 2023, the company reported over $15.4 million in quarterly revenue and over $1 million in net income for that single quarter. It projected full-year 2023 revenue of approximately $90 million. While no full-year profitability forecast was explicitly stated, the implication was that the company was scaling rapidly and had turned a corner. These representations were central to the company's marketing efforts, and they formed the basis of Plaintiff's $365,000 investment in the July 2023 private placement.

44.     In addition to his $365,000 private placement investment, Plaintiff also made significant open-market purchases of 1847 Holdings stock during July and August 2023, based on the same representations and private assurances from CEO Ellery Roberts.

45.     Plaintiff was repeatedly told that the company had sufficient funding, no plans for further dilution, and no need for a reverse split. These representations were reinforced through text messages, public filings, and investor events. Plaintiff relied on them in building and maintaining his position. At the time, he believed the company's fundamentals were strengthening, the capital structure was stabilizing, and the reported revenue projections were achievable.

46.     Throughout the summer of 2023, Defendants repeatedly reaffirmed the company's $90-million revenue projection in public statements. In a late September fireside chat, Ellery Roberts again assured investors that the company remained on track to meet that target.

47.     Upon information and belief, this statement was knowingly misleading—Roberts was aware at the time that the target was unattainable. By the end of Q3, the company had only reported approximately $55 million in revenue—though even that figure was never independently verified and likely included inaccurate or unsupported components.

48.     Internally, Defendants understood that they could not achieve $90 million but deliberately avoided issuing any retraction or corrective disclosure. Crucially, the $90 million projection reaffirmed through Q3 2023 explicitly excluded revenue from ICU Eyewear, which had not yet been integrated into the company's results. Had the projection been accurate, the ICU acquisition should have pushed 1847 Holdings well beyond the $90 million mark. Instead, the final reported figure was just $68 million—meaning the company not only failed to reach its target, it missed by over $20 million despite including ICU revenue.

49.     This confirms that the original projections were never tethered to reality and were made with intent to mislead the market. The company continued to issue false assurances while insiders positioned themselves for additional dilution events. Based on the timing of these projections, subsequent walk-backs, and sudden shifts in financial posture, it is evident that Defendants were inflating quarterly numbers to maintain the illusion of top-line growth, only reversing course after Plaintiff publicly challenged the legitimacy of their projections and demanded internal accountability.

50.     In September 2023, Plaintiff sent a formal request to senior company leadership demanding a full forensic audit of 1847 Holdings. The request was ignored.

51.    Shortly thereafter, Defendants began to revise the company's revenue guidance without informing the public. No acknowledgment of this revision was made until the company filed its 2023 annual results, which disclosed just $68 million in revenue—over $20 million below the previously announced $90 million projection, and shockingly low considering ICU's revenue was included. No explanation was provided. The inflated $90 million figure was never formally retracted or reconciled. It was used to raise capital, then revised without contemporaneous disclosure.

52.    In its April 11, 2023 Form 10-K, 1847 Holdings disclosed: "We have identified material weaknesses in our internal control over financial reporting. If we fail to develop or maintain an effective system of internal controls, we may not be able to accurately report our financial results and prevent fraud. As a result, current and potential shareholders could lose confidence in our financial statements, which would harm the trading price of our common shares."

53.    This admission was repeated in every quarterly filing going forward. Defendants never made any attempt to resolve the issue. Instead, they failed to remediate controls and misstate revenue, conceal internal transfers, and approve undisclosed related-party transactions.

54.    1847 Holdings relied on repeated "material weakness" disclosures, while overstating performance and issuing overly optimistic narratives, and justify performance-based compensation. The company relied on blanket disclaimers as a substitute for actual governance, and this enabled Bevilacqua, Roberts, and the Board to operate without oversight or consequence. Their continued failure to implement internal controls—despite acknowledging material weaknesses for years—further evidences the fraudulent intent underlying the company's public disclosures and financial projections.

**C. The Management Services Agreement as The Foundation for Fraud**

55.     From inception, the racketeering enterprise was built around a contractual shield designed to transfer operating control, extract guaranteed fees, and immunize insiders from liability. On April 15, 2013, Roberts's counsel Louis A. Bevilacqua drafted and executed an MSA between 1847 Holdings and 1847 Partners LLC, vesting substantial operational authority in the manager and disclaiming fiduciary duties to the company. Article XII, Section 12.1 stated: *"The relationship of the Manager to the Company is as an independent contractor and nothing in this Agreement shall be construed to impose on the Manager any express or implied fiduciary duties."*

56.     The MSA went further, requiring the Company to indemnify the Manager for nearly all claims arising from its own conduct in controlling the business. Article IX provided that the Company shall *"indemnify, reimburse, defend and hold harmless the Manager…from and against all losses (including lost profits), costs, damages…of any kind or nature whatsoever…in connection with, relating to or arising out of…the performance of any Services hereunder."* The only nominal exclusions were for "gross negligence, willful misconduct, bad faith or reckless disregard" or "fraudulent or dishonest acts." In practice, this indemnification scheme created a safe harbor so expansive that the Manager could ignore corporate governance norms, disregard conflicts of interest, and engage in transactions that would otherwise violate duties of loyalty, care, and candor—crossing every line the exclusions were meant to police.

57.     The 2013 MSA was not a conventional management contract. It was a preemptive legal firewall—drafted to bring a corporate vehicle to the public markets, siphon proceeds through management fees and related-party transactions, and render the insiders judgment-proof against foreseeable investor or creditor claims. By eliminating all fiduciary obligations and replacing them

with an indemnification regime in favor of the Manager, Bevilacqua embedded a structural conflict of interest into the company's governance before public investors were even solicited.

58.    Roberts worked closely with Bevilacqua in carrying out this structure. While Bevilacqua designed the contractual framework that reduced accountability to shareholders, Roberts served as the primary public representative of the company limiting unscripted interactions, avoiding earnings calls, and appearing mainly in pre-arranged interviews. This approach insulated him from direct investor scrutiny while he received substantial compensation, enabling the purchase of a $6.35-million home in May 2021.

59.    The scope of the MSA's delegated powers—covering everything from banking and hiring to strategic acquisitions and capital allocation—ensured that 1847 Partners LLC controlled all material corporate decisions while the public company's board and officers were functionally sidelined. The agreement expressly allowed the Manager to serve other clients, delegate services to affiliates, and charge the Company for virtually any expense "approved" by the Board it influenced.

60.    The fee structure was equally predatory: quarterly payments equal to the greater of a fixed cash amount or a percentage of "Adjusted Net Assets," calculated in a manner that rewarded asset inflation and acquisition activity, regardless of profitability. Payment obligations were enforced even during financial distress, with provisions allowing the Company to incur debt or liquidate assets solely to satisfy the Manager's fees.

61.    In 2019, the same actors replicated this structure wholesale when 1847 Holdings acquired 1847 Goedeker Inc. (later Polished.com Inc.). On April 5, 2019, 1847 Goedeker executed an "Offsetting Management Services Agreement" with 1847 Partners LLC, expressly tied to and incorporating the 2013 MSA. The 2019 agreement retained verbatim the fiduciary duty elimination

(*"nothing in this Agreement shall be construed to impose on the Manager any express or implied fiduciary duties"*) and the indemnification clause covering *"all losses (including lost profits)…arising out of…the performance of any Services hereunder."*

62.    By transplanting this indemnification-and-fiduciary-duty-waiver model into Polished.com, the enterprise ensured the same insulation against accountability. The agreement again subordinated operational needs to management compensation, diverted cash flows from the operating company to the Manager, and enabled rapid extraction of capital through acquisitions, consulting payments, and related-party transactions—all while hollowing out the issuer and leaving it vulnerable to collapse.

63.    The replication of the MSA in 2019 was not a coincidence—it was the continuation of a governance structure that had been operating for over a decade. From 2013 through the Polished.com collapse and beyond, the same contractual terms, the same control structure, and the same Roberts–Bevilacqua pairing were deployed across multiple entities, producing the same fraudulent outcomes. This continuity of purpose and method satisfies the "pattern" requirement under 18 U.S.C. § 1961(5) and provides direct evidence of an ongoing racketeering enterprise in which the elimination of fiduciary duties, blanket indemnification, and a two-pronged leadership model were central to executing and concealing the fraud.

**D. How 1847 Holdings Operated As A Publicly Traded Ponzi-Like Financing Structure**

64.    Ponzi schemes are typically unregulated operations that operate in the shadows of the financial system. What made 1847 Holdings so dangerous is that it exhibited features commonly associated with pyramid-style and Ponzi-like financing, despite its public-company status with a ticker symbol, SEC filings, and the apparent legitimacy of a national exchange. The

company presented itself as a holding company, but in reality it was a continuously recycling machine for capital, engineered to funnel value upward to 1847 Partners LLC and its principals.

65.    The structure functioned like a pyramid in that each acquisition was not a genuine growth opportunity but a new layer of collateral. Profitable businesses were acquired, stripped of working capital, encumbered with debt, and used to fund payouts and management fees. Rather than building sustainable value, the scheme was designed so that every new company fed the upper tier—Roberts, Bevilacqua, and their affiliates.

66.    At the same time, the enterprise operated with the mechanics of a Ponzi scheme. Capital from new investors, new lenders, harmful convertible debt, and sham consulting agreements was not deployed to create lasting business growth. Instead, it was recycled to satisfy old obligations, issue dividends unsupported by cash flow, and create the appearance of solvency. Promotional headlines that were not supported by results were used to lure the next round of investors needed to keep the cycle running.

67.    Unlike an ordinary Ponzi that collapses once investor trust evaporates, 1847 Holdings could repeatedly extend its life cycle by tapping public markets. The ability to issue securities, stage reverse splits, and draw on underwriters allowed the enterprise to sustain itself far longer than a private fraud. Each new round of capital came with predatory loan terms—interest rates so high that repayment was impossible without still more capital raises. This created a cycle without an endpoint: the more debt and dilution piled up, the more aggressively insiders had to mislead and raise again.

68.    Even the company's public messaging betrayed its true nature. Marketing language like "looking for the potential of above-average returns?" was indistinguishable from "boiler-room" pitches. These communications contained no audited performance data, no risk disclosures,

and no substantive detail—only aspirational hooks intended to prime new investors to supply fresh cash.

69.    The dividend issuances exemplify the deception. Rather than being funded by operating profits, they were paid directly out of newly raised capital—recycled contributions masquerading as returns. This created a false impression of financial health while directly eroding shareholder equity. Defendants acted with scienter, knowing these dividends were unsustainable but relying on them to maintain the illusion of legitimacy.

70.    Critically, 1847 Holdings was never profitable and never had excess cash flow from operations. Every dividend, every press release, and every "growth" narrative was dependent on a continuous flow of new money. Nearly every raise was conducted on predatory terms, with discounted convertible shares, cashless warrants, and other instruments structured for rapid extraction rather than long-term value.

71.    Other than Plaintiff, virtually no institutional investor participated in good faith with the intent to hold common equity long-term. The business model was engineered to benefit those with insider access, while public shareholders absorbed the dilution and collapse.

72.    To sustain the cycle, the company fabricated financials and engineered misleading disclosures. Projections were published with no intent to meet them, losses were concealed through acquisition accounting, and "material weaknesses" were invoked to excuse inconsistent numbers. Earnings reports included significant one-time adjustments, losses were concealed through acquisition accounting, and "material weaknesses" were invoked to execute inconsistent numbers. Press releases hyped acquisitions at inflated valuations, projections were published with no intent to meet them, and non-GAAP metrics were manipulated to obscure reality.

73.    The company's exchange listing was not proof of legitimacy; it was a mechanism that enabled continued capital access. By maintaining SEC registration, staging reverse splits, and filing regular reports, 1847 Holdings projected transparency while engaging in the same recycling of funds and concealment typical of Ponzi schemes.

74.    The result was a perpetual loop: raise, dilute, fabricate, extract, repeat. Offerings were staged just 30–45 days apart, dividends were issued from new capital, reverse splits reset the trading price to enable the next raise, and insiders enriched themselves at every turn.

75.    This model extended to subsidiaries such as Polished.com, ICU Eyewear, and Asien's Appliance, each of which was stripped, leveraged, and discarded into bankruptcy. The pattern was identical across entities, underscoring that the fraud was not incidental but structural.

76.    At the height of this cycle, while public investors absorbed catastrophic losses, Roberts purchased and resided in a $6.35 million Rancho Santa Fe home. He grew accustomed to extravagance that required perpetually drawing more from the scheme—borrowing, recycling capital, and taking on secondary loans with predatory terms whenever old obligations came due. A true and correct copy of the property records and related documentation is attached hereto as **Exhibit C.**

**E. February 2024 $2.5 Million Fraudulent Conveyance and Money Laundering Scheme**

77.    On February 7–8, 2024—just days after Bank of America froze the accounts of Polished.com and regulators notified the company that it was under formal SEC investigation— 1847 Holdings LLC abruptly transferred approximately $2.5 million in shareholder funds to four undisclosed entities: TraDigital Marketing Group, Alchemy Advisory, Sea Path Advisory, and Reef Digital.

78.     The timing was not coincidental. Defendants had just watched their three-year fraud at Polished.com collapse in real time: their accounts were seized, regulatory scrutiny had intensified, and the SEC had launched a formal probe. Both Polished and 1847 Holdings were under the control of 1847 Partners LLC. And with that shared management structure, Defendants knew the risk: if Bank of America could freeze one set of accounts, it might be able to reach the other. Rather than curtail spending, they accelerated it. The very next day, they paid $2.5 million out of 1847 Holdings into shell entities with no disclosed relationship to the company. There were no contemporaneous press releases, Forms 8-K, or board approvals cited.

79.     Upon information and belief, the payments were recorded as prepaid consulting fees without documented scopes of work. These transfers were made while the company faced liquidity pressure and regulatory scrutiny. A true and correct copy of the relevant financial records evidencing these transfers is attached hereto as **Exhibit D.**

80.     These entities were not mentioned in any prior SEC filings, nor had they been disclosed in earnings calls, MD&A reports, or governance updates. They had no known operational relationship with the company and no public deliverables. The payments were structured as lump-sum "prepaid consulting fees," but there was no record of services performed, scopes of work, or board-level approvals. Upon information and belief, there is no documentation of services performed or approvals by independent directors.

81.     At the time of the transfers, 1847 Holdings was already teetering on insolvency. The company had defaulted on several convertible notes, was operating at a loss, and had few remaining assets. The transfers—totaling $2.5 million—were not necessary expenditures. They were deliberate extractions made with full awareness that creditors, regulators, or whistleblowers might intervene.

82.     The transfers exhibit every indicator of fraudulent conveyance: they occurred at or near the time of insolvency; they lacked fair consideration; and they were made to parties whose identities and roles were obscured from public view.

83.     Upon information and belief, these entities were either pass-through shells or related-party recipients created to launder money through the appearance of professional services. Defendants intentionally concealed contractual documentation, performance metrics, and public disclosure to support the conclusion that the transactions were fraudulent.

84.     One of the largest disbursements—$1.4 million—was made to TraDigital Marketing Group, a firm publicly represented as being led by "MJ Clyburn." Upon investigation, Plaintiff is highly confident that "MJ Clyburn" is the same individual as McKyle Clyburn, a former FINRA-registered broker (CRD #2829182) with a long history of securities-law ~~fraud~~ violations.

85.     The Instagram account @clyburn.mckyle includes the name "MJ Clyburn" in its display field—clearly linking the alias to McKyle's legal name. Both individuals operate in the financial marketing space, have ties to Staten Island, New York, and share overlapping timelines and industry roles. McKyle Clyburn has not held a securities license since 2016, following suspension by FINRA, and no public record exists of any separate person named "MJ Clyburn" with relevant investor relations credentials. The logical conclusion, supported by available facts, is that "MJ Clyburn" is a sanitized professional alias adopted by McKyle Clyburn to obscure his past, and Defendants knowingly selected this recipient. A true and correct copy of the supporting documentation establishing these connections is attached hereto as **Exhibit E.**

86.     The public biography of MJ Clyburn further supports this conclusion. On TraDigital's website, "MJ Clyburn" is described as a "serial entrepreneur" and "the marketing whisperer for CEOs." He claims to have extensive experience in investor relations, capital markets,

and media strategy—traits directly aligning with McKyle Clyburn's known background prior to his securities fraud conviction. Notably, there is no listed educational or regulatory history, no legitimate IR credentials, and no verification of the purported experience. The deliberately vague, self-promotional nature of the biography fits a pattern often seen in individuals attempting to reinvent themselves following reputational collapse. Far from undermining the connection, the generic language used to describe MJ Clyburn only heightens the suspicion that this persona was constructed to evade scrutiny.

87.     In the wake of these revelations, the LinkedIn profile formerly listed under "MJ Clyburn" has now been changed to "MJ C," concealing the individual's last name entirely. This change occurred after Plaintiff began exposing the connection and is consistent with an effort to dissociate the name "Clyburn" from past fraud.

88.     McKyle Clyburn was a key participant in the Sky Capital securities fraud, a $140 million boiler-room scam prosecuted by the U.S. Attorney's Office for the Southern District of New York in *United States v. Clyburn*, No. 09-cr-598 (S.D.N.Y. 2009). Clyburn later became a cooperating government witness, admitting to falsifying credentials, lying to investors, and systematically participating in a racketeering scheme. The scandal was so significant that it became the season finale of CNBC's American Greed ("Sky Capital and the Money Con"), cementing Clyburn's role in one of the most widely publicized securities fraud cases of the 2000s. He has never publicly disclaimed his involvement, and Defendants deliberately concealed his identity from shareholders and regulators.

89.     Following his conviction, Clyburn re-entered the financial world under the name "MJ Clyburn" and founded TraDigital IR, which he positioned as a boutique investor relations firm. Upon information and belief, TraDigital did not deliver services commensurate with the $1.4-

million payment. There is no evidence TraDigital performed any legitimate investor relations work in exchange for this payment. No press release, earnings support, or shareholder engagement occurred that could justify the fee. Rather, this disbursement was a fraudulent conveyance—structured to move money into the hands of a trusted, fraud-adjacent party before insolvency.

90.     The SEC filing confirms that on February 7–8, 2024, 1847 Holdings prepaid these consulting agreements in full, totaling $2,498,000. The listed services are vague and generic: "investor relations," "business outreach," "digital marketing," "IT support," and "strategic advisory." There is no evidence that the company received any of these services in return. As of September 30, 2024, $111,000 of those prepaid expenses remained "outstanding," suggesting that the remainder had been either expensed without deliverables or written off. Defendants authorized these payments in the immediate aftermath of a $500-million fraud being exposed at Polished.com—the moment their accounts were seized and the SEC launched an investigation—knowing that their priority was to shield assets from seizure, not to invest in legitimate operations.

91.     The fact that this payment ultimately ended up in the hands of a convicted financial fraudster underscores the unlawful nature of the conduct. It was a calculated act of concealment and money laundering, carried out with full intent to defraud.

92.     The payment to TraDigital was not an isolated incident. It was a continuation of the racketeering scheme—executed through an IR front controlled by a man with a documented history of deceiving public investors.

93.     This transaction constitutes a predicate act under RICO, as well as an example of money laundering and knowing concealment. The fact that the enterprise entrusted a key financial role to a man who was once convicted in one of the most notorious penny stock scams in U.S.

history—and then hid that connection from shareholders and regulators—supports the allegation that the conduct was intentional and part of a broader pattern.

94.     The foregoing conduct constitutes multiple predicate acts under RICO. It qualifies as money laundering under 18 U.S.C. §§ 1956–1957, wire fraud under 18 U.S.C. § 1343, and mail fraud under 18 U.S.C. § 1341. It also represents fraudulent conveyance in violation of 18 U.S.C. § 152, given the insolvency of the company, the lack of fair consideration, and the timing of the disbursements.

95.     In addition, Defendants engaged in non-predicate acts that furthered the alleged scheme, including securities fraud in violation of Rule 10b-5, breaches of fiduciary duty, concealment of material facts from shareholders and regulators, and governance failures through undisclosed related-party transactions.

96.     These acts, taken together, demonstrate that the February 2024 disbursements were not isolated missteps but integral components of the racketeering enterprise. They illustrate the deliberate siphoning of shareholder funds, the concealment of transactions through aliases and shell entities, and the knowing reliance on convicted fraudsters to launder money. This conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**F. 1847 Holdings' Fraudulent Financings Facilitated By Spartan Capital and Brian Duddy**

97.     In late June 2023, Plaintiff first spoke with Spartan Capital banker Brian Duddy about 1847 Holdings. During that initial conversation, Duddy emphasized the idea that the company was undervalued relative to its market capitalization. At that time, Plaintiff had never previously worked with Spartan Capital and was unaware of its reputation for highly dilutive financings and manipulative offerings. Plaintiff entered the relationship believing that 1847 Holdings was a legitimate holding company, not a fraudulent vehicle.

98.     On July 3, 2023, Plaintiff invested approximately $365,000 in an offering for 1847 Holdings, which was coordinated through Spartan Capital Securities. Mr. Duddy acted as Plaintiff's principal contact and personally structured his participation in the transaction. (Plaintiff incorporates by reference the allegations in Section A regarding this investment, to avoid repetition.)

99.     Unlike other participants in 1847 Holdings' financings, who demanded cashless warrants and entered into undisclosed arrangements tied to pump-and-dump cycles, Plaintiff insisted on purchasing only common shares. Plaintiff made this choice because he believed 1847 Holdings was a legitimate business and did not want his investment to harm outside shareholders.

100.    On July 12, 2023, Duddy texted Plaintiff that he believed the stock "would get to $0.30–$0.40," knowing this was part of a prearranged pump-and-dump plan. At that time, Plaintiff was not a hidden participant but a filing investor, having already disclosed his position through both a Form 4 and a Schedule 13D. In contrast, the majority of institutional investors who participated in 1847 Holdings' harmful financings structured their positions to remain below the 4.99% threshold, deliberately obscuring their involvement. Plaintiff, however, made his holdings transparent because he genuinely believed 1847 Holdings was a legitimate holding company, not a fraudulent scheme, and consistently made it known that he did not participate in pump-and-dump activity.

101.    The fact that Duddy told Plaintiff in advance that a manipulation was planned limited Plaintiff's ability to sell without legal risks: had he sold into the morning run-up on July 14, 2023, he could have been accused of trading on inside information. This placed Plaintiff in a position where his transparency and integrity prevented him from mitigating his losses, while

Duddy and Spartan's other clients freely exploited the scheme. A true and correct copy of this text message exchange is attached hereto as **Exhibit F**.

102.    In mid-July 2023, Duddy sent Plaintiff further text messages describing the fraudulent playbook being applied to 1847 Holdings and other issuers. He advised Plaintiff to look at recent foreign IPOs such as HKIT, BANL, and MWG, boasting that "you rent the stock for hours to maybe a few days" and that the "same groups" were "running SAG." These admissions confirmed that Spartan was working with recurring pools of operators who recycled the same pump-and-dump tactics across multiple issuers.

103.    This conduct constitutes securities fraud. While securities fraud is not enumerated as a predicate act under RICO, it is nonetheless critical evidence of the racketeering pattern. Plaintiff subsequently reviewed the trading activity in these very tickers and confirmed that Duddy's statements were accurate: each of them engaged in classic pump-and-dump cycles, confirming both his insider knowledge and his direct connection to the fraudulent syndicate.

104.    In the first week of August 2023, Duddy induced Plaintiff to sign a release that permitted further dilution. Duddy told Plaintiff he would be "taken over the wall" as part of the financing process, but this was a ruse designed to trick Plaintiff into waiving protections that otherwise would have blocked 1847 Holdings from issuing additional dilutive securities. At that time, Plaintiff had already incurred substantial losses, making further dilution commercial unreasonable absent meaningful protections.

105.    This "over the wall" ("OTW") process was manipulated to coerce Plaintiff's consent. Duddy first called Plaintiff, stating he was about to be "taken over the wall," and then sent a follow-up email. Duddy required Plaintiff to agree in writing before any materials were provided. Once Plaintiff gave that written consent, Spartan and Duddy immediately disclosed

information and presented a release. Because confidential information had already been shared, Plaintiff was effectively bound—he could not retract his consent without risk of violating securities laws. This sequence left Plaintiff with no realistic choice but to sign the agreement, even though doing so waived protections. The process, mischaracterized by Duddy as beneficial, was in fact a pressure tactic that induced Plaintiff to consent to further dilution.

106.    The OTW process did not protect Plaintiff in any way. It required him to acknowledge strict confidentiality obligations under Section 10b-5 of the Securities Exchange Act and agree not to trade in the securities while the acknowledgment remained in effect. Duddy deliberately mischaracterized this process, presenting it as if it would work to Plaintiff's benefit when, in truth, it silenced him and cleared the way for further harmful financings.

107.    This conduct underscores Duddy's dual role: on the one hand, he posed as Plaintiff's banker, presenting the OTW process as protective; on the other hand, he was structuring transactions for Spartan Capital that enabled additional dilutive offerings. Without this misrepresentation about OTW, no reasonable investor already suffering nearly $500,000 in losses would have agreed to waive anti-dilution protections.

108.    On September 11, 2023, Duddy again sought to mislead Plaintiff by claiming he had personally "got in at $0.11 and lost money." This statement was intended to create false solidarity and diminish Plaintiff's concerns. In truth, Duddy was the banker structuring the offering and had privileged information unavailable to ordinary investors.

109.    In a later conversation, forgetting that he had already texted Plaintiff this admission, Duddy contradicted himself by stating that he had never purchased 1847 Holdings at all. This inconsistency further underscores his willingness to manipulate the truth depending on what he thought would placate Plaintiff in the moment. Moreover, if Duddy did in fact purchase shares at

$0.11 based on insider knowledge of an anticipated run, such conduct would constitute securities fraud in the form of insider trading.

110.    In September 2023, Duddy told Plaintiff that he "felt conned" by 1847 Holdings and expressed disbelief that the company had allowed its default to occur. Despite acknowledging that he too had been deceived, Duddy continued to participate in and facilitate new offerings for the issuer in the weeks that followed. A true and correct copy of this text message exchange is attached hereto as **Exhibit G.**

111.    In those same admissions, Duddy confirmed that pump-and-dump programs had already been carried out with the issuer in 2023. These statements are evidence of insider knowledge and participation in the racketeering enterprise.

112.    Throughout 2023 and 2024, Plaintiff was highly vocal on social media, publicly calling out misconduct at 1847 Holdings and warning other investors about dilution, manipulation, and fraudulent practices. Both 1847 Holdings and Spartan were aware of these posts and recognized that Plaintiff's disclosures posed a risk to their scheme.

113.    On October 16, 2024, Spartan Capital paid Plaintiff a settlement. The firm timed subsequent financings for 1847 Holdings to occur only after Plaintiff had accepted payment, thereby limiting his public commentary at a critical juncture.

114.    Just two weeks later, on October 31, 2024, 1847 Holdings conducted a new $11.1-million offering, again through Spartan Capital. Duddy was part of the placement process.

115.    On December 16, 2024, 1847 Holdings conducted another offering, raising approximately $11.4 million, once again with Spartan as the placement agent and Duddy involved. These offerings replicated the same three-part dilution stack—common or pre-funded shares, plus Series A and Series B warrants.

116.    These additional cash raises were not only a lifeline for the issuer, but also a profit center for Spartan Capital, which collected placement fees. The raises were followed by trading patterns that, on information and belief, benefited certain investors through pump-and-dump activity immediately after the offerings closed.

117.    On December 17, 2024, the day after the December offering closed, 1847 Holdings announced that it had finalized the acquisition of CMD. The sequence was as follows: common shares were first issued to Spartan's clients, and then, later that same evening, at approximately 7:15 p.m. in after-hours trading, 1847 Holdings issued a press release announcing the CMD acquisition. The late-hour release was timed in a manner that, on information and belief, obscured the effect on ordinary investors, ensuring the pump-and-dump activity would not be reflected on the regular trading tape, thereby reducing visibility to ordinary investors.

118.    This orchestrated pattern—raising capital, distributing shares to favored clients, and then issuing after-hours press releases to trigger pump-and-dumps—underscores that Spartan Capital and Duddy were not merely passive placement agents; they were active participants in a racketeering enterprise designed to defraud investors while enriching themselves and their associates.

119.    Prior to the FINRA mediation between Spartan Capital and Plaintiff, Plaintiff informed Spartan's then-Compliance Officer of Duddy's misconduct, including his admissions of pump-and-dump activity and his misrepresentations to investors. Plaintiff, who at first acted pro se, also raised these concerns directly with Spartan's outside counsel, SRFC. Despite receiving direct notice, neither Spartan nor SRFC took corrective action against Duddy. Instead, in February 2025, Spartan promoted him to Head of Listings, underscoring the firm's endorsement of his conduct.

120.    This history further explains why Plaintiff may reference and rely upon the October 16, 2024 settlement in this action. When Plaintiff notified Spartan Capital and SRFC that they would be added as defendants, they behaved as if it provided blanket immunity.

121.    Settlements cannot be used to conceal fraud, shield racketeering, or insulate defendants from liability for ongoing predicate acts. As the New York Court of Appeals has held: "an exculpatory clause is unenforceable when… the misconduct for which it would grant immunity smacks of intentional wrongdoing." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85 (1983). Similarly, the Court explained in *Gross v. Sweet*, 49 N.Y.2d 102, 106–07 (1979), that "whereas an exculpatory clause is enforceable against claims of ordinary negligence, such clauses are unenforceable with respect to claims of reckless or intentional conduct, as a matter of public policy." Courts have also consistently held that a release does not bar claims where the release itself was fraudulently induced or where defendants continue fraudulent conduct after execution. Here, Spartan and Duddy resumed highly dilutive capital raises and manipulative financings immediately after the settlement, proving it was only intended to silence Plaintiff while the enterprise continued harming the public.

122.    Moreover, this case is a matter of significant public interest. Protecting existing shareholders and the investing public requires not only exposing the post-settlement misconduct but also documenting the pre-settlement conduct to establish a clear and continuous pattern. The racketeering enterprise did not begin after October 16, 2024; it had been operating for years prior, through serial pump-and-dump financings, cashless warrant structures, and reverse splits that systematically wiped out shareholder value. Demonstrating this full continuum of misconduct— both before and after the settlement—is essential to show continuity, intent, and the ongoing danger to investors.

123.    While Plaintiff released claims for conduct up to September 2024, Defendants resumed and escalated fraudulent conduct immediately after the release, carrying forward the same harmful financing practices and manipulative schemes that had been warned about for years. These new financings and orchestrated pump-and-dump cycles caused new injuries, inflicted fresh harm on outside shareholders, and further destabilized the investing public's confidence.

124.    Defendants' decision to resume toxic highly dilutive warrant financings and manipulative press releases after October 16, 2024, constitutes new predicate acts under 18 U.S.C. § 1961(1). Each of these acts—fraudulent conveyances, manipulative offerings, and insider-orchestrated trading cycles—inflicted discrete harm on the investing public and were wholly outside the scope of any settlement agreement.

125.    Courts have consistently rejected the notion that a release can extinguish liability for future racketeering acts. In *County of Cook v. Bank of America Corp.* (N.D. Ill. 2015), the court held that a release did not bar RICO claims based on new conduct occurring after the release date. Likewise, in *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269 (2011), the New York Court of Appeals made clear that a release applies only to claims that have accrued as of the date of the agreement and cannot immunize parties for future fraud. To hold otherwise would undermine public policy by allowing ongoing misconduct to persist under the protection of a prior settlement.

126.    Plaintiff also expressly reserves the right to use the pre-release conduct to demonstrate pattern, intent, and scienter for the post-release acts. The settlement only extinguished damages claims for prior losses, but it cannot erase the factual record of what occurred. The pre-settlement pump-and-dump cycles, reverse splits, and toxic warrant financings remain highly relevant to show continuity of the enterprise, the deliberate nature of the misconduct, and the

conscious decisions by Spartan and Duddy to persist in these schemes even after formal notice and investor complaints. This record proves that the post-settlement acts were part of a continuous racketeering enterprise that has victimized shareholders across multiple offerings.

127.    The legal framework under RICO further confirms that these post-settlement acts are independently actionable. The Supreme Court has held that under the "separate accrual" rule, "the commission of a separate, new predicate act within the 4-year limitations period permits a plaintiff to recover for the additional damages that act caused." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997); *see also Rotella v. Wood*, 528 U.S. 549, 558 (2000). Each new act of fraudulent financing, market manipulation, or money laundering triggers a new injury and a fresh limitations period. Thus, even if Defendants argue that earlier conduct was released or time-barred, their post-settlement misconduct gives rise to new, distinct claims that cannot be extinguished by any prior agreement.

128.    Although 1847 Holdings was delisted from NYSE American on April 4, 2025, the fraudulent scheme did not end. The issuer has been unable to secure quotation on any other exchange or even the lowest tier of the OTC markets, leaving shareholders with no functioning market for their securities. Despite this, the company continues to preserve massive warrant liabilities that ensure the fraud remains ongoing. Its SEC filings disclose that approximately 778,524,571 common shares may be issued upon the exercise of Series A and Series B warrants. These instruments were structured with floor-price adjustments and cashless exercise provisions that guarantee continued dilution, even in the absence of an active trading market. In particular, the Series B warrants remain exercisable at an adjusted strike price of $0.054 per share, and the company itself disclosed that it stands to receive up to $22.8 million upon full exercise of those warrants following the Series A conversions. This potential inflow is not the product of legitimate

operations but of harmful financings arranged through Spartan Capital, ensuring that insiders and favored clients benefit while ordinary shareholders are left with worthless equity.

**G. Spartan Capital Regulatory History, Complaints, and Sanctions as Evidence of Scienter and Corporate Culture**

129.    Spartan Capital's facilitation of fraudulent financings for 1847 Holdings did not occur in a vacuum. The firm has a long and well-documented history of regulatory violations, sanctions, and customer complaints, establishing a corporate culture of non-compliance and significant compliance deficiencies undermining investor protection. This history is highly probative of scienter, pattern, and notice. It demonstrates that the fraudulent conduct alleged herein was consistent with, rather than aberrant from, Spartan's established practices.

130.    In 2023, FINRA fined Spartan Capital $600,000 and censured the firm for failing to timely amend or disclose customer arbitrations, written complaints, and financial events via Forms U4 and U5. The Order required Spartan to retain an independent compliance consultant and to correct outstanding disclosures for both the firm and its executive officers. This sanction directly implicated senior management, including the CEO and CCO, who were each personally suspended and fined for failing to disclose arbitration matters.

131.    FINRA also found that Spartan failed to timely respond to regulatory requests under Rule 8210 on at least three occasions between June 2021 and August 2023. The firm was compelled to respond only after repeated failures and was sanctioned with a $115,000 fine, a censure, and a requirement to retain an independent compliance consultant. Such failures to cooperate with FINRA investigations evidence a willful pattern of obstruction, further establishing the firm's reckless disregard of regulatory oversight.

132.    Numerous Spartan representatives have also faced FINRA sanctions for misconduct involving unsuitable recommendations, excessive trading, and churning—classic

hallmarks of unsuitable trading culture. FINRA and SEC records identify multiple arbitration claims dating from 2017 through 2019 in which customers alleged that Spartan brokers made unsuitable recommendations, engaged in unauthorized trading, and churned accounts. These claims were often not timely disclosed on the brokers' regulatory filings, leading directly to FINRA's censure of the firm.

133.    One of the most serious examples involved Spartan broker Mack Leon Miller, who was sanctioned for quantitatively unsuitable trading in the account of a 79-year-old retired client. FINRA found that Miller engaged in excessive trading with a turnover ratio and cost-to-equity burden that made it virtually impossible for the elderly client to realize a profit, resulting in losses of approximately $69,633 while generating high commissions for the broker.

134.    Other Spartan brokers have been disciplined for similar conduct. Broker Tranchina was suspended after engaging in excessive trading that generated over $60,000 in commissions while inflicting large losses on customers. Broker Venturino has faced customer complaints for "high frequency trading activity," a red flag for account churning. In 2025, FINRA also found that a Spartan representative violated Regulation Best Interest (Reg BI) by engaging in excessive trading in the accounts of senior clients, including two 66-year-old customers, again demonstrating that elderly investors were frequent targets of Spartan's abusive practices.

135.    These regulatory findings are not isolated. They establish a recurring pattern of misconduct spanning recent years, including precisely the period when Spartan facilitated the fraudulent financings at issue in this action.

136.    The firm's repeated failures to disclose arbitrations and complaints, coupled with documented instances of elderly account churning, unsuitable recommendations, and excessive trading, demonstrate a business model reflecting inadequate supervision and compliance controls.

This pattern is consistent with the misconduct alleged herein: structuring toxic financings, enabling pump-and-dump cycles, and silencing whistleblowers.

137.    The regulatory record therefore corroborates Plaintiff's allegations. Spartan Capital's history of sanctions, unsuitable recommendations, and supervisory failures proves that the firm operated with reckless indifference to fraud, consciously disregarded its duty to protect investors, and instead cultivated a culture that rewarded misconduct. This context is critical to understanding Spartan's role in the racketeering enterprise: rather than being a legitimate placement agent, its prior disciplinary history foreshadowed and contextualized the conduct alleged in connection with 1847 Holdings.

**H. SRFC's Knowledge, Participation, and Liability**

138.    SRFC went further, delivering threats rather than legal analysis. In its September 22, 2025 letter, SRFC accused Plaintiff of attempting to commit extortion, asserted that Plaintiff's claims were frivolous, defamatory, and sanctionable, and asserted that its response was protected by Rule 408 of the Federal Rules of Evidence. But this assertion fails: SRFC's response contained no genuine discussion of settlement, compromise, or resolution. Rule 408 does not protect such communications, which may properly be used to demonstrate SRFC's bad faith and intent to obstruct.

139.    SRFC also claimed it had no knowledge of misconduct and, even now—despite repeated public misconduct and red flags—contends that 1847 Holdings was not a fraudulent scheme and that no fraud occurred, certainly not by SRFC.

140.    This assertion is demonstrably false. There was no plausible way SRFC could have been unaware, because: (i) Plaintiff personally provided SRFC partner Michael Ference with detailed, contemporaneous explanations of the ongoing scheme; (ii) SRFC represented Spartan

Capital at the FINRA mediation where the misconduct was laid out in full detail. One of the emails sent directly to Mr. Ference included clear evidence of Brian Duddy referring to 1847 Holdings as "a con" and acknowledging that he "felt conned" himself, while continuing to participate in subsequent offerings. (A true and correct copy of this email correspondence is attached hereto as **Exhibit H**); (iii) SRFC represented Spartan Capital on the very October and December 2024 offerings referenced above (Section E, ¶¶90–91), whose structures made dilution and manipulation inevitable; (iv) the market-wide effects—four reverse splits in fourteen months, repeated cashless-warrant overhangs, and predictable price collapses—were publicly visible and reflected in SEC filings and press releases; and (v) SRFC's own prior association with pump-and-dump actors (including the MabVax litigation and Kesner/Honig-related matters) provided ample reason to scrutinize and halt further participation rather than facilitate new raises.

141.    Moreover, SRFC's conduct was not limited to advancing new fraudulent offerings; it also involved concealment and obstruction of prior misconduct, which itself constitutes a predicate act under 18 U.S.C. § 1512. By issuing denials, mischaracterizing settlements, and threatening sanctions against Plaintiff for raising fraud, SRFC attempted to obstruct the discovery of past criminal acts and shield the enterprise from accountability.

142.    Accordingly, SRFC is properly added as a defendant for its role in participating in financials that furthered a racketeering enterprise.

143.    SRFC aided and abetted multiple predicate acts under RICO, including wire fraud, mail fraud, securities fraud, money laundering, and bankruptcy fraud, by drafting and structuring the very offerings that sustained the enterprise.

144.    SRFC further aided and abetted additional unlawful acts in furtherance of the racketeering enterprise, including concealment of material facts from regulators, misleading disclosures, and facilitation of undisclosed related-party transactions.

145.    SRFC conspired with Spartan Capital and 1847 Holdings to perpetuate fraud by coordinating offerings, concealing toxic warrant structures, and enabling pump-and-dump tactics that devastated outside shareholders.

146.    SRFC attempted to weaponize a release agreement to insulate ongoing misconduct, contrary to the principles set forth in Section E, ¶¶96–104, by asserting that the October 16, 2024 settlement extinguished liability for new predicate acts occurring afterward.

147.    SRFC used threats and intimidation under the guise of settlement communications while lacking any actual settlement content, contrary to Rule 408's purpose, in an effort to chill Plaintiff's pursuit of accountability.

148.    SRFC persisted in dishonest denials of knowledge and fraud despite direct notice, public red flags, and its own intimate role in the transactions at issue, demonstrating willful blindness and deliberate participation rather than innocent error.

149.    For these reasons, SRFC is properly named as a defendant under this Complaint. Its conduct—structuring toxic financings, aiding and abetting predicate acts, conspiring with Spartan Capital and 1847 Holdings, attempting to misuse a release, issuing threats disguised as settlement communications, and persisting in dishonest denials—forms an integral part of the alleged racketeering enterprise and satisfies the requirements of 18 U.S.C. § 1962(c) and (d).

**I. Collapse of Polished.com**

150.    The collapse of Polished.com Inc. was not a failure of execution—it was the natural and foreseeable outcome of the same fraudulent framework used at 1847 Holdings. From 2019

through 2024, Polished operated under the direct control of 1847 Partners LLC, with Ellery W. Roberts and Louis A. Bevilacqua serving as key decision-makers.

151.    The company's financials were inflated, internal controls were ignored, and insiders extracted tens of millions of dollars through convertible debt, shell consulting agreements, and related-party payments. The same management agreement structure used at 1847 Holdings was applied to Polished, guaranteeing fees to insiders regardless of business performance and insulating them from liability.

152.    Polished's largest asset was Appliances Connection, an online appliance retailer acquired with funds from capital raises. Rather than build operational value, Defendants focused on raising capital through toxic instruments, paying themselves through guaranteed compensation, and marketing inflated top-line revenue projections.

153.    Between 2019 and 2023, Polished raised over $500 million in capital, but when its accounts were seized in early 2024, only $1.99 million remained. The capital was not lost through market pressures—it was siphoned out through a carefully structured web of insider enrichment mechanisms.

154.    By mid-2022, the cracks in the façade were too large to ignore. Polished disclosed material weaknesses, accounting errors, restatements, and executive resignations. These disclosures confirmed what Plaintiff and others had long suspected: the company's filings could not be relied upon, and the leadership structure lacked integrity.

155.    Yet in the midst of these unraveling disclosures, Defendants advanced a bizarre and implausible narrative to deflect blame. They publicly accused former CEO Albert Fouerti—who had sold the Appliances Connection business to Polished for over $200 million—of misappropriating approximately $800,000.

156.    The accusation surfaced only after the company's auditors disavowed reliance on its financials. The timing and substance indicate an attempt to shift blame to a prior owner and distract from internal fraud.

157.    More importantly, Albert Fouerti had no connection whatsoever to 1847 Holdings. Yet the same pattern of scapegoating and narrative distortion reemerged. Defendants recycled their playbook: blame a prior figurehead, manufacture theft claims when audit controls collapse, and attempt to frame insider misconduct as the fault of a past CEO or third party.

158.    The Polished bankruptcy is not merely a cautionary tale—it is evidence. It proves that the structure designed by Roberts and Bevilacqua was not theoretical, but operational. It was used to divert substantial investor capital under the guise of public company activity, only to be exposed when external institutions intervened.

## J. Retaliation, Obstruction, and The Pro Se Mediation Attempt

159.    On September 11, 2023, Plaintiff sent a formal written request to company leadership demanding a forensic audit in light of revenue inconsistencies, material control weaknesses, and the company's sudden reverse split. The request was ignored. Defendants, acting with knowing intent, deliberately withheld any acknowledgment to avoid creating a record that would expose the scheme and trigger regulatory scrutiny.

160.    Days later, Plaintiff received two retaliatory letters: one from Louis A. Bevilacqua and another from Joseph D. Wilson—both of Bevilacqua PLLC. Bevilacqua's letter accused Plaintiff of "bad faith" and "harassment," and threatened legal action without addressing a single factual allegation raised in Plaintiff's audit demand. Rather than respond substantively to Plaintiff's concerns, Bevilacqua—acting with deliberate awareness—attempted to reframe the audit request as improper, despite Plaintiff being a 10%+ beneficial owner at the time and fully

entitled to request investigative clarity. Bevilacqua further dismissed the demand by stating the company was "already audited," a misleading retort, made with knowledge of falsity, that deliberately conflated SEC-mandated financial filings with the type of forensic accounting inquiry Plaintiff had sought.

161.   The company's Form 10-K filings—which Bevilacqua relied upon as a defense— explicitly disclaimed their own reliability, citing material weaknesses and an admitted inability to detect fraud. Bevilacqua knowingly ignored this, leveraging tone and legal posture—again with willful intent—as a substitute for accountability. Notably, Bevilacqua was not responding in his capacity as neutral outside counsel for the company—he was protecting his personal financial interests as a co-owner of 1847 Partners, whose dividends and payouts were directly tied to the continued concealment of fraudulent reporting. His legal threats were not about defending corporate integrity; they were about shielding his own role in the criminal enterprise.

162.   In his letter, Bevilacqua—acting with fraudulent intent—stated: "Among other things, the Company will not tolerate and will take swift legal and other action to address fraudulent or deceptive statements about the Company and threatening or harassing emails directed to Company officers, directors, or employees." A true and correct copy of this letter is attached hereto as **Exhibit I**.

163.   He further warned—knowingly and with the intent to chill protected communications—that Plaintiff could face legal action under federal securities laws for allegedly harming the company's stock price: "Such acts may include the spreading of falsehoods on social media…to inflate the Company's stock price or by short sellers to depress the price of the stock."

164.   Wilson's letter was even more severe. He falsely alleged that Plaintiff had committed a criminal offense by recording a phone call with CEO Ellery Roberts, citing California

Penal Code § 632 and the federal Electronic Communications Privacy Act (ECPA). In a letter dated September 14, 2023, Wilson wrote: "You have been reported to California legal authorities for having recorded the call without Mr. Roberts's consent… A person who violates Section 632 can be subject to a fine, jail time of up to a year, or both." A true and correct copy of this letter is attached hereto as **Exhibit J**.

165.    Wilson further claimed: "The reporting of you to the legal authorities is without prejudice to any causes of action that Mr. Roberts or 1847 Holdings LLC may have against you for recording the call or your use or disclosure of its contents."

166.    No supporting documentation, police report, or case number was ever disclosed. It was designed to frighten Plaintiff into silence using the specter of legal jeopardy. Wilson made no attempt to clarify whether the alleged "report" had any basis in fact and has since refused to confirm or deny whether it was ever filed, further evidencing his intent to mislead and intimidate.

167.    These letters, taken together, constituted a coordinated campaign of retaliation and intimidation under 18 U.S.C. § 1512(b) and (d), which prohibit knowingly using threats, intimidation, and corrupt persuasion to influence, delay, or prevent the communication of information to a law enforcement officer or judge about the commission of a federal offense. At the time these threats were issued, both Bevilacqua and Wilson acted with conscious wrongdoing: they were aware that Plaintiff's audit demand implicated potential securities fraud, wire fraud, money laundering, and fraudulent conveyance—predicate offenses under RICO. By attempting, with deliberate awareness, to chill Plaintiff's willingness to share evidence with regulators, their conduct constituted obstruction of justice and witness intimidation, each an independent predicate act under 18 U.S.C. § 1961(1).

168.    The supposed criminal referral by Joseph D. Wilson was never followed up with law enforcement and appears to have been nothing more than a retaliatory bluff. Meanwhile, Louis A. Bevilacqua—an attorney and equity stakeholder—refused to engage with the factual basis of the audit request at all. Bevilacqua is not only the architect of the corporate structure behind 1847 Holdings, but a direct financial beneficiary of its fraud. He received management fees, dividends, and legal payments from a company he helped create and knew to be operating unlawfully.

169.    This conduct exceeded mere negligence or ethical lapses, as Bevilacqua knowingly benefited from structures he helped design while using legal threats to deter criticism. Both Bevilacqua and Wilson acted not as independent legal professionals, but as agents of a criminal enterprise, using the veneer of legal authority—with willful intent—to obstruct accountability and sabotage the reputation of a whistleblower.

170.    On February 1, 2024, Plaintiff, acting pro se, contacted 1847 Holdings to ask whether the company would be willing to participate in confidential pre-suit mediation through Judicial Arbitration and Mediation Services. Plaintiff did not submit a formal request or provide a detailed record—he merely extended an informal opportunity to resolve the matter privately, without reputational fallout or litigation expense. A true and correct copy of this correspondence is attached hereto as **Exhibit K**.

171.    On February 5, 2024, Wilson, on behalf of 1847 Holdings, summarily rejected the mediation in a one-sentence letter: "1847 Holdings, LLC declines your request that it participate in mediation. Beyond that, your February 1, 2024 letter does not merit further response." This curt rejection served as yet another data point in Defendants' refusal to resolve the matter in good faith.

172.    The combination of threatening letters, false legal accusations, board silence, and formal mediation rejection confirmed Plaintiff's belief that the company and its representatives

were not acting in accordance with their fiduciary or ethical obligations. Their posture was not one of accountability or resolution—it was one of stonewalling, suppression, and retaliation—undertaken to impede investigation and protect the racketeering enterprise.

173.    The predicate acts alleged in this section include obstruction of justice in violation of 18 U.S.C. § 1503, witness intimidation and tampering in violation of 18 U.S.C. § 1512(b) and (d), and wire fraud through the use of electronic communications to transmit threats and false accusations. In addition to these predicate acts, Defendants engaged in non-predicate conduct that furthered the scheme, including securities fraud in violation of Rule 10b-5, breach of fiduciary duty, defamation intended to damage credibility, and abuse of legal process to intimidate and silence a shareholder whistleblower.

174.    Taken together, the acts described here include multiple predicate acts under 18 U.S.C. § 1961(1), specifically obstruction of justice and witness intimidation, committed in furtherance of a racketeering enterprise to shield ongoing fraud. The non-predicate acts, while independently actionable, further demonstrate the enterprise's intent to suppress investigation, control the narrative, and insulate its members from legal and financial accountability.

### K. Daniel Powell, Minc Law, and Escalating Retaliation

175.    In December 2024, Plaintiff received a "notice of falsity" from Daniel A. Powell of Minc Law, which included outdated personal information—such as a childhood zip code and a defunct email address not used in over two decades.

176.    Powell accused Plaintiff of extortion for seeking restitution of his stolen investment and labeled Plaintiff's public reporting as "verifiably false" without identifying any specific errors. He threatened litigation unless the content was removed, stating that "Bevilacqua has the resources and resolve to pursue judicial relief."

177.    Powell echoed Bevilacqua's defenses—dismissing Plaintiff's forensic audit demands by referencing the company's Form 10-K, despite the filings openly admitting poor internal controls and the inability to detect fraud. He also mischaracterized the company's four reverse stock splits as "regulatory necessities," when only one was required for listing compliance. The others served to facilitate insider warrant conversions.

**L. Bankruptcy Fraud as a Pattern of Racketeering Conduct**

178.    These failures are the predictable outcome of a fraudulent operating structure that relied on planned defaults, unsustainable financing, and intentional cash extraction from acquired entities. Defendants Louis Bevilacqua, Edward J. Tobin, Ellery W. Roberts, and 1847 Partners LLC each played a direct role in furthering this scheme through their positions of authority, ownership stakes, or active participation in the management decisions that precipitated these failures.

179.    Further supporting the continuity of the fraud are the federal lawsuits noted earlier. Plaintiff incorporates those cases by reference here, rather than repeating them, as they demonstrate that multiple courts and shareholder plaintiffs have already raised nearly identical allegations of fraudulent misstatements, internal control failures, misappropriation of funds, and bankruptcy-related misconduct against overlapping defendants.

180.    Defendants 1847 Holdings LLC, 1847 Partners LLC, and affiliated individuals engaged in a sustained pattern of bankruptcy fraud as part of a broader racketeering scheme. The enterprise's business model was a calculated cycle of acquisition, looting, and abandonment. The companies acquired were not intended to be grown or sustained, but to serve as cash-flow vehicles through which Defendants could extract capital via insider fees, asset-backed borrowing, and misuse of customer funds. When liquidity was depleted, Defendants initiated bankruptcy or

bankruptcy-like proceedings, shielding themselves from liability and leaving creditors and stakeholders with hollowed-out entities.

181.    This pattern is established through three distinct case studies: ICU Eyewear, Asien's Appliance, and Goedeker's/Polished.com. Each reflects the same formula: acquisition financed through debt and capital raises, imposition of insider management agreements and obligations, depletion of working capital through related-party fees and transfers, and eventual liquidation or bankruptcy once creditors and regulators closed in.

182.    These instances show that Defendants never intended to operate viable businesses. Instead, their enterprise was built on systematically draining acquired companies, hiding the looting through accounting tricks and legal structures, and then discarding the shells through bankruptcy to cleanse liability.

183.    This conduct constitutes bankruptcy fraud under 18 U.S.C. §§ 152(1), (2) and 157, which criminalize prepetition concealment of assets and schemes to defraud creditors through bankruptcy proceedings. These acts further support RICO liability under 18 U.S.C. § 1962(c), as bankruptcy fraud is an enumerated predicate act under 18 U.S.C. § 1961(1). Additionally, the uncontested alter ego allegations in the Asien's litigation demonstrate that 1847 Holdings may be directly liable for debts incurred by its subsidiaries due to corporate disregard and misuse.

184.    From ICU to Asien's to Goedeker's to Polished.com, the pattern is clear: Defendants acquired viable businesses, burdened them with insider obligations, diverted their assets, concealed the looting through corporate shell games including reverse mergers, and exited through bankruptcy. The losses to creditors, former owners, and the public were the predictable and intended result of a fraudulent scheme.

185.    In total, Defendants raised in excess of $500 million between 2019 and 2024 through loans, securities offerings, and other financings related to Polished.com alone. Yet by February 6, 2024, when Bank of America seized Polished.com's accounts following its payment default, only $1.99 million remained—underscoring the scale of value extraction and asset dissipation preceding bankruptcy.

186.    The predicate acts alleged in this section include bankruptcy fraud in violation of 18 U.S.C. §§ 152(1), 152(2), and 157, as well as wire fraud through the use of interstate communications to further fraudulent transfers pre-bankruptcy. In addition, fraudulent conveyance, when tied to bankruptcy proceedings, forms part of the overall bankruptcy fraud scheme.

187.    In addition to these predicate acts, Defendants engaged in non-predicate conduct that furthered the scheme, including securities fraud in violation of Rule 10b-5, breach of fiduciary duty, corporate waste, and fraudulent misrepresentation to vendors, lenders, and investors.

188.    The conduct described here involves multiple enumerated predicate acts under 18 U.S.C. § 1961(1), committed in furtherance of a coordinated racketeering enterprise. The consistent pattern—acquisition, looting, concealment, and bankruptcy—demonstrates continuity and relatedness sufficient to establish both a closed-ended and open-ended pattern of racketeering activity under 18 U.S.C. § 1962(c).

## M. Additional Bankruptcy-Related Conduct as a Systematic Tool of the Enterprise

189.    The bankruptcy abuse carried out by 1847 Holdings and its affiliates is illustrated by their insider dealings with Dynamic Marketing Inc. ("DMI"), a dealer cooperative and marketing organization in which Polished.com (f/k/a 1847 Goedeker Inc.) held an equity interest.

DMI was also a related party because Polished.com's former Chief Executive Officer, Albert Fouerti, served on its board until November 2022.

190.    DMI was not a neutral, arm's-length counterparty. Polished.com held an equity interest in DMI and was a DMI member. DMI was simultaneously (i) a key supplier cooperative, (ii) a landlord/sublandlord to Polished subsidiaries, and (iii) a lender-like counterparty via collateral agreements and rebate programs. Even after Polished's collapse and the bankruptcy filings of multiple subsidiaries, the remaining Polished subsidiaries continued to pay rent to DMI—meaning that an entity in which Polished had an ownership stake, and in which a former accused executive sat on the board, was still financially benefiting post-collapse.

191.    At the center of these arrangements was Albert Fouerti, who resigned from Polished.com following allegations of theft. Plaintiff is not alleging scienter on the part of Fouerti in connection with the bankruptcy fraud described here; rather, the focus is on the incongruity of continuing business and financial ties with him after such allegations.

192.    This inconsistency underscores the fundamental irregularities in 1847 Holdings' and Polished.com's post-collapse dealings—continuing to pay substantial rent and maintain contractual obligations to an entity tied to a former executive they had publicly accused of theft.

193.    On November 20, 2023, Polished subsidiary 1 Stop Electronics Center, Inc. executed the "Lamberton Sublease" with DMI for a warehouse at 1369 Lamberton Road, Hamilton, NJ, running through September 30, 2030. Base rent ranged from $245,241.34 to $317,359.74 per month, plus utilities, taxes, other charges, and a "management fee," with rent due at least five business days before each month. Less than four months later, on March 7, 2024, the debtors filed Chapter 7.

194.    Post-petition use without payment. The estates used both the Lamberton and Cabot premises post-petition to store and stage inventory the Chapter 7 trustee sold under a June 27, 2024 Sale Order. The Lamberton Sublease was deemed rejected effective June 28, 2024, and the Cabot Sublease (400 Cabot Dr., Hamilton, NJ) was rejected effective April 30, 2024.

195.    At the Cabot premises, DMI reported substantial abandoned property—trucks, trailers, a car, oil, chemicals, drums, tires, appliances, office equipment, and trash—requiring $50,350.00 in removal and $109,031.40 in repairs and restoration. The trustee performed no cleanup before vacating.

196.    The relationship was further tangled by a November 15, 2022 Collateral Agreement between DMI and 1 Stop, under which DMI held as of May 1, 2025:

- 1 Stop equity account: $393,865.64

- 1 Stop cash holdbacks: $155,432.28

- 1 Stop volume rebates: $774,096.06

- 1 Stop open invoice balance credit: ($2,937.77)

- Polished.com equity account: $566.13

- Superior Marketing open invoice balance: $\geq$ $81,152.51

197.    DMI also asserted setoff and recoupment rights. To outside creditors, this lattice of member accounts, rebates, equity credits, setoffs, and subleases made it nearly impossible to trace value and easy to shift losses—precisely the kind of confusion that facilitates looting and hides who benefits.

198.    Timeline showing intent of bankruptcy abuse:

- Nov. 20, 2023: Debtors bind themselves to a seven-year, $300,000+/month lease, with $381,234.73 in additional rent for build-out.

- Mar. 7, 2024: Chapter 7 filed.

- Apr.–Jun. 2024: No post-petition rent paid on either premises before rejection.

- Apr. 30 / Jun. 28, 2024: Rejection of Cabot and Lamberton, dumping rent, cleanup, and repairs on the landlord.

199.    The proximity of the 2030 lease to the bankruptcy filing, paired with deliberate nonpayment and fast rejection, supports the inference that performance was never intended— bankruptcy was part of the plan.

200.    By making DMI simultaneously landlord, supplier cooperative, equity affiliate, and creditor with setoff rights, Defendants ensured that: (a) obligations could be layered and netted in ways outsiders cannot easily untangle; (b) cash could be redirected through rebates and holdbacks while rent and restoration costs fell to the estate or landlord; and (c) the appearance of legitimate commercial dealings masked self-dealing, confusing investors, trade creditors, and even the court about where the money went.

201.    Signing a multi-million-dollar lease through 2030 shortly before a planned liquidation, exploiting the premises post-petition without paying rent, abandoning and damaging property to offload cleanup and restoration, and then rejecting the leases—while the landlord is also an insider affiliate—is classic bankruptcy fraud (18 U.S.C. §§ 152, 157) and supports predicate acts under RICO.

## N. Consumer and Vendor Fraud at Appliances Connection and Asien's Appliance

202.    The fraudulent conduct perpetrated by the defendants extended well beyond securities violations and shareholder abuse—it infiltrated day-to-day consumer commerce. Both Asien's Appliance and Appliances Connection, subsidiaries of 1847 Holdings LLC and Polished.com, respectively, engaged in coordinated consumer and vendor fraud. These companies,

acting with scienter, took payments for products and services they never intended to deliver, including in the days and weeks leading up to bankruptcy.

203.    Customers who had paid thousands were left without appliances or recourse— many of them elderly individuals on fixed incomes.

204.    Similarly, at Appliances Connection, the scheme followed the same pattern and was executed with scienter. A Reddit user described being called just one week before the company filed for bankruptcy, asking if they would like to purchase extended warranties for major appliances: "Appliances Connection called me about 2 weeks ago asking if I wanted to purchase an extended warranty for my refrigerator… they literally tried to sell us a service that they had zero intention of honoring." A true and correct copy of this posting is attached hereto as **Exhibit L.**

205.    This was not a one-off event—it was part of a larger pattern, with others reporting that backordered products were never shipped despite being paid in full. Defendants acted with scienter in continuing to solicit such payments while knowing bankruptcy and cessation of operations were imminent.

206.    Another Appliances Connection customer confirmed: "I was charged for an appliance on backorder several days before they closed. They had no intention on shipping this product obviously… to milk any and every dime from every customer right before closing with no intention on honoring sales is criminal at minimum."

207.    These actions mirrored those at Asien's Appliance. On January 12, 2024, Asien's abruptly fired all staff after racking up an alleged $4.5 million in vendor debt. Per a public account: "Robert 'Bob' Patterson fired everybody Monday… they had not been paying their suppliers for months… I have several customers that have been waiting for product for me to pick up and

install… some of them little old ladies on fixed incomes and now out a couple grand they don't have!"

208.   These actions were not mistakes or isolated misconduct. They occurred across two subsidiaries using identical tactics: accept money, delay shipments, misrepresent inventory status, upsell warranties, and declare bankruptcy after extracting the last possible dollar. The scienter of defendants is evident in the deliberate timing of these solicitations and the replication of the scheme across multiple entities. These are hallmarks of bust-out fraud—a racketeering pattern in which a company is used to defraud third parties before being abandoned.

209.   Defendants had full knowledge and scienter regarding these actions and directed or permitted them. These events were the logical output of an enterprise that had no intent to run legitimate operations. The calculated outreach for warranty sales within days of shutdown, across two separate subsidiaries, helps prove this was a coordinated fraud orchestrated at the executive level.

210.   The methodical collection of customer funds, vendor defaults, and manipulation of delivery timelines—combined with the legal protections built into the MSA to insulate 1847 Partners from liability—show a multi-layered, fraudulent scheme undertaken with scienter. At every level, the enterprise was structured to extract value, avoid responsibility, and collapse on command.

211.   These predicate acts, carried out with deceptive intent, constitute wire fraud under 18 U.S.C. § 1343 and support claims under RICO.

**O. Repeated Conflicts and Litigation Tied to Acquisitions**

212.   The defendants' acquisition model—funded by toxic convertible debt or money raised from the public, devoid of fairness opinions, and driven by guaranteed insider fees—

consistently led to financial distress, operational collapse, and litigation. High Mountain Door & Trim is one such example. On May 23, 2024, its former owners—Steve Parkey and Jose Garcia-Rendon—filed a lawsuit in Washoe County, Nevada (Case No. CV24-01141), alleging that 1847 Holdings LLC had defaulted on its contractual obligations under a promissory note tied to the sale of their business.

213.    The plaintiffs sought $1.54 million in unpaid consideration, asserting that 1847 Holdings had not only breached the agreement but also failed to engage in good-faith efforts to cure the default.

214.    This pattern was also seen with Kyle's Custom Wood Shop, whose representatives demanded repayment on a long-delinquent promissory note owed by 1847 Holdings for more than four years. Public records indicate that 1847 Holdings failed to pay down this obligation while continuing to extract management fees and raise funds from investors.

215.    Another example involves Neese, Inc., a provider of agricultural equipment and services based in Grand Junction, Iowa, which 1847 Holdings acquired in 2017 through a transaction that leveraged Neese's own assets to finance its purchase, leaving the company overburdened with debt.

216.    According to Plaintiff Alan Neese, 1847 Holdings "took the money and ran with it," indicating that the proceeds from the equipment financing were not reinvested into Neese's operations but were instead diverted elsewhere. Neese further stated that during this period, he was repeatedly harassed by Defendant Edward J. Tobin, whom he described in highly derogatory terms, adding that "he got loud with my wife one time and we didn't allow him back" [sic]. Neese ultimately banned Tobin from his farm after these incidents. He further reported that "all they wanted was to report topline revenue" without regard for accuracy or lawful accounting. These

statements demonstrate the defendants' scienter in pursuing inflated financial optics at the expense of operational viability, leaving Neese undercapitalized, burdened with debt, and facing severe operational challenges

217.    In April 2021, 1847 Holdings sold its 55% stake back to the Neese family for $325,000. This transaction resulted in a pro forma increase of approximately $3.4 million in 1847 Holdings' shareholders' equity, primarily due to the reduction of Neese's liabilities from its consolidated balance sheet. The sale underscores a pattern where 1847 Holdings extracts value from acquisitions and then divests once the subsidiaries are financially strained.

218.    These disputes are not isolated. In 2023, 1847 Holdings defaulted on its obligations to the Wilhelmsen Family Trust following the acquisition of Asien's Appliance. The Trust alleged that 1847 Holdings failed to repay more than $800,000 owed under promissory notes tied to the sale, and pursued alter ego claims based on abuse of the corporate form. The matter was settled, but the alter ego allegations further support the conclusion that these defaults were part of a deliberate strategy.

219.    Similarly, consumer fraud and vendor nonpayment at Appliances Connection triggered widespread complaints and eventual bankruptcy. Each case followed the same core blueprint: close the deal, siphon funds, abandon obligations, and let counterparties absorb the fallout. These repeated failures and defaults—at High Mountain Door & Trim, Kyle's Custom Wood Shop, Neese, Inc., Asien's Appliance, and others—reveal a deliberate strategy.

220.    The recurrence of these lawsuits and promissory note disputes reflects a systemic failure to meet contractual obligations once defendants had achieved their goal of transferring value from the acquired company to themselves. The experiences of Parkey, Garcia-Rendon, the Wilhelmsen Family Trust, and other counterparties are symptoms of a larger enterprise built to

extract, default, and deny. Whether through unpaid notes, breached contracts, or weaponized bankruptcies, defendants left a trail of destroyed businesses, unpaid sellers, and shattered trust in every acquisition they touched.

**P. Paid Promotions, Stock Manipulation, and the Manufacturing of Public Legitimacy**

221.    A critical tool in the enterprise's fraudulent scheme was the coordinated use of paid stock promotions to manipulate public perception, inflate market demand, and facilitate insider profit-taking. These promotional campaigns were intentionally designed by the defendants to mislead investors and set the stage for toxic financings and insider dumping. The campaigns relied on the veneer of market enthusiasm, but behind the scenes, they were nothing more than controlled marketing pushes, carefully timed to coincide with capital-raising events or securities conversions.

222.    On the evening of July 13, 2023, 1847 Holdings paid two social media promoters— one $15,000 and the other $35,000—to publish favorable content about the company's stock across multiple platforms. Although the payments were disclosed in later filings, the content itself carried no clear indication that it was sponsored. As a result, retail investors had no idea the positive sentiment flooding their feeds was artificially generated. The promoters were compensated specifically to create buzz, increase liquidity, and prepare the ground for the next stage of the scheme. The very next day, July 14, 2023, 1847 Holdings launched a new securities offering, capitalizing on the manufactured demand that the paid promotion had sparked.

223.    This sequence was a calculated setup meant to create the illusion of robust investor interest, drive the share price upward, and then sell into that inflated market. The deception lies with the Defendants, who weaponized these paid campaigns to mislead investors and facilitate serial dilution. Once the artificially fueled momentum peaked, insiders and toxic noteholders could

convert discounted securities or unload shares into the inflated volume, draining value from the market before reality caught up.

224.    The promotional machine relied on a consistent set of tactics: headlines announcing unaudited acquisitions or so-called "transformative growth" deals; overstated or entirely fabricated projections, such as the false $90 million revenue forecast for 2023; public statements from executives like Ellery Roberts, who assured investors there would be no dilution while preparations for financing were already underway; and silence on material developments such as defaults, bankruptcies, and insider transactions. Together, these elements created a false narrative of stability and expansion, masking the financial decay and insider enrichment that was actually taking place.

225.    While such conduct constitutes securities fraud under Rule 10b-5, securities fraud by itself is not an enumerated predicate act under 18 U.S.C. § 1961(1). However, these same actions necessarily involved repeated uses of interstate wires and mail to transmit false statements, promotional materials, and offering documents to investors, thereby constituting wire fraud and mail fraud—both enumerated predicate acts. The repeated pattern of paying for undisclosed promotional content, timing it to coincide with stock offerings or conversions, and then executing capital transactions off the back of that hype demonstrates that this was a structured criminal strategy deployed between 2021 and 2024 across both 1847 Holdings and Polished.com.

**Q. Plaintiff's Formal Request for Internal Oversight and Forensic Review**

226.    In early September 2023, Plaintiff sent a formal written request to the company, addressed to a senior representative, with Chief Investment Officer Gayle Harris copied, asking for an internal forensic audit and structural governance changes in response to suspected financial misconduct. The request urged the company to: (a) initiate a forensic accounting audit covering

the years 2021–2023 to trace the sources and uses of investor funds; (b) provide access to key governing documents, including the company's operating agreement; (c) appoint an independent chairman to correct what Plaintiff believed to be a serious conflict of interest stemming from the CEO's dual role; (d) nominate Plaintiff for a governance position, such as an advisory or oversight role, to ensure shareholder interests were represented; and (e) review internal controls, financial sign-offs, and treasury practices to ensure compliance with regulatory and fiduciary standards.

227.    Plaintiff also noted the inherent conflict in the company's leadership structure, as CEO Roberts simultaneously served as Chairman of the Board of Directors, consolidating control in a way that compromised governance safeguards. Plaintiff made clear that this request was intended as a good-faith effort to avoid escalation, stating that resolving the matter professionally would avoid unnecessary distraction and cost.

228.    Immediately after this letter was delivered, attorneys Bevilacqua and Wilson inserted themselves into the situation—not to facilitate independent review, but to shut it down. Instead of allowing company representatives to investigate or respond to Plaintiff's concerns, Bevilacqua and Wilson retaliated with legal threats and obstructive behavior, cutting off any possibility of internal accountability and preventing the company from conducting any independent inquiry or honoring its obligations to investigate potential misuse of funds or governance failures.

229.    This intervention was executed in furtherance of the broader fraudulent enterprise—shielding key individuals from scrutiny and ensuring that no audit or independent action could move forward. Because the communication was sent to the company and copied to Gayle Harris, a C-level officer, this was clearly a matter of corporate concern—not just a private shareholder complaint.

230.    The retaliatory conduct described herein constitutes obstruction of justice and witness retaliation under 18 U.S.C. §§ 1503 and 1512. By threatening Plaintiff and blocking any internal inquiry into suspected racketeering activity, Defendants sought to corruptly influence, obstruct, and impede potential investigations by law enforcement and regulatory agencies. This obstruction—designed to conceal money laundering, fraudulent conveyance, and other predicate acts—forms part of the pattern of racketeering activity alleged in this complaint.

## R. SOX Violations and Repeated Asset Theft By Roberts and Howard

231.    Defendants Roberts (Chief Executive Officer of 1847 Holdings LLC) and Howard (Chief Financial Officer of 1847 Holdings LLC) knowingly enabled and facilitated a multi-entity racketeering enterprise involving 1847 Holdings and their shared external manager, 1847 Partners LLC, through repeated violations of their Sarbanes–Oxley ("SOX") duties, willful blindness to clear red flags, and active complicity in concealing predicate acts of fraud.

232.    1847 Holdings operated for years as a vehicle for systematically extracting cash from acquired companies through inflated management fees, sham consulting contracts, and insider transactions that provided no legitimate business benefit. Roberts and Howard presided over this process, signing SOX § 302 certifications attesting to the accuracy of financial statements and the adequacy of internal controls while simultaneously disclosing "material weakness" and "poor internal controls" in SEC filings.

233.    Under SOX, such admissions required them to take immediate corrective action and to ensure that improper transactions could not be authorized. Instead, Roberts and Howard used these acknowledged weaknesses as cover—weaponizing them to approve and conceal transactions that furthered the enterprise's ongoing theft of corporate resources.

234.    As set forth in Section D ¶62, Roberts and Howard, acting for 1847 Holdings, approved a series of consulting disbursements on February 7–8, 2024, immediately after Polished.com defaulted to Bank of America and had its accounts seized. These disbursements, which were prepaid, spread across multiple vendors, and executed within forty-eight hours, exhibited the classic structuring and layering characteristics of money laundering and fraudulent conveyance. By authorizing these payments at such a critical moment, Roberts and Howard ensured that millions of dollars were removed from corporate accounts and placed out of reach of creditors and the bankruptcy estate.

235.    These disbursements occurred at a moment of acute financial distress, immediately following Polished.com's bankruptcy-triggering default, and were made to entities with no legitimate operational necessity. The timing and structuring reflect deliberate misconduct designed to move funds out of reach of creditors, regulators, and the bankruptcy estate.

236.    Roberts and Howard's SOX certifications during this period were materially false. They asserted that they had evaluated and disclosed all fraud risks, while concealing that the very transactions they approved undermined corporate solvency and diverted millions away from legitimate obligations.

237.    By signing off on these agreements while admitting ineffective internal controls, Roberts and Howard demonstrated the deliberate misuse of their positions. The "material weakness" disclosure—rather than being addressed—was transformed into a shield against accountability for high-risk disbursements.

238.    This conduct was consistent with the broader pattern in which 1847 Holdings repeatedly drained its subsidiaries of cash and value, diverting proceeds to insiders through

management fees, consulting arrangements, and related-party transactions, while leaving the operating companies on a path toward collapse and bankruptcy.

239. These consulting agreements yielded no documented return on investment, operational benefit, or measurable corporate value. The only beneficiaries were the recipients of the prepaid funds and, by extension, the insiders and affiliates controlling or connected to those recipients.

240. The simultaneous disclosure of material weakness and approval of these transactions demonstrates that Roberts and Howard knew internal controls were ineffective but nonetheless chose to bypass any genuine oversight. This conduct violates SOX §§ 302, 404, and 906, and constitutes racketeering activity in furtherance of the enterprise.

241. In doing so, Roberts and Howard were active participants in a strategy to repeatedly extract and dissipate company assets under the guise of legitimate business agreements, leaving shareholders and creditors with nothing and perpetuating the racketeering enterprise's cycle of acquisition, looting, and collapse.

242. The conduct described in this section involves multiple enumerated predicate acts under 18 U.S.C. § 1961(1), including wire fraud and money laundering, committed in furtherance of a coordinated racketeering enterprise. The strategic timing of these disbursements— immediately after a bankruptcy-triggering default—combined with their lack of legitimate purpose, demonstrates the continuity and relatedness necessary to establish both a closed-ended and open-ended pattern of racketeering activity under 18 U.S.C. § 1962(c).

**S. Improper Use of Virtual Offices and Corporate Deception**

243. Defendants operated 1847 Holdings LLC and its affiliates through virtual-office arrangements that created the façade of a prestigious New York headquarters while concealing the

absence of any real operations. The listed address—260 Madison Avenue, 8th Floor, New York, NY—was not staffed by employees, was not used for business functions, and existed solely as a mail-forwarding and call-answering location. This setup allowed Defendants to portray themselves as a legitimate enterprise with a prime Manhattan office when, in truth, the space served no operational purpose.

244.    Plaintiff's efforts to verify the company's presence at 260 Madison revealed the extent of this artifice. The virtual office provider, Davinci, refused to confirm or deny whether 1847 Holdings was even a client, citing a confidentiality clause that Defendants had invoked. For a public issuer, such secrecy over its supposed principal office is extraordinary and a clear red flag. Legitimate public companies do not obscure such basic facts about their place of business.

245.    Defendants also orchestrated phone protocols to reinforce the illusion of a bustling office. Calls placed to the company's published number were routed to third-party operators instructed to answer as though they were inside the headquarters. These operators would place callers on hold, claim that the requested individual was "on another line" or had "just stepped out," and otherwise mimic the cadence of a live corporate office. This scripted theater was designed to persuade investors, regulators, and vendors that 1847 Holdings was a thriving $90-million enterprise anchored in Manhattan, when in reality it was nothing more than a ruse.

**T. Eric Van Dam, Glyn Milburn, and Vernice Howard—Operatives in the Enterprise**

246.    Eric Van Dam held the role of Chief Operating Officer of 1847 Holdings LLC as early as January 2022, overseeing day-to-day operations during a period of significant financial misrepresentation.

247.    He later resigned and assumed an executive role at ICU Eyewear, a wholly owned subsidiary of 1847 Holdings that collapsed into bankruptcy in 2024. Following ICU's failure, Van

Dam was rehired as COO of 1847 Holdings in mid-2024, shortly before the company filed false financials and disbursed concealed consulting payments.

248.    Van Dam's serial reappointments to entities under financial distress and fraud investigation strongly suggest continuity of knowledge and participation. His presence at both the subsidiary level (ICU Eyewear) and the parent level (1847 Holdings) ensured control over operational execution during fraudulent transactions and asset diversion.

249.    His repeated inclusion in executive leadership positions during critical stages of entity collapse reflects a recurring role in maintaining enterprise secrecy and insulating insiders from exposure.

250.    Glyn Milburn, serving as Vice President of Operations of 1847 Holdings and later as CEO of CMD Inc., directly authorized agreements that routed funds to insider-controlled entities. His dual role across related entities placed him at the center of management agreements designed to siphon cash, furthering the enterprise's pattern of fraudulent conveyance and concealment.

251.    Vernice Howard, as Chief Financial Officer, signed off on falsified financial statements, concealed consulting disbursements, and admitted "material weaknesses" in internal controls while simultaneously certifying financials under SOX. Her conduct provided the corporate cover necessary to push fraudulent transactions through SEC reporting cycles.

252.    Collectively, Howard, Milburn, and Van Dam held senior-level positions across companies central to the racketeering scheme.

253.    Howard signed off on falsified financials and concealed disbursements; Milburn directly authorized a management agreement as CEO of CMD Inc. that routed payments to an

insider-controlled entity; and Van Dam cycled through executive roles at both the parent and bankrupt subsidiaries during peak periods of misconduct.

254.    All three functioned as embedded operatives—high-ranking insiders who knowingly collected compensation while furthering a fraudulent enterprise through false reporting, concealed transactions, and coordinated cover-ups.

## U. Edward J. Tobin's Ownership, Prior Racketeering Allegations, and Central Role in the Enterprise

255.    Defendant Edward J. Tobin is the second-highest economic beneficiary in the racketeering enterprise alleged herein. Through his wholly owned entity, 1847 Founders Capital LLC, Tobin owns 38% of 1847 Partners Class A Member LLC and 36% of 1847 Partners Class B Member LLC—the entities that control the economic rights and management functions of 1847 Partners LLC, the external manager for 1847 Holdings LLC and its subsidiaries, including Polished.com Inc. This ownership structure grants Tobin substantial control and a direct financial stake in the management fees, related-party transactions, and investor funds extracted through the enterprise.

256.    Tobin has been named as a defendant in multiple Polished.com civil lawsuits brought by shareholders and directors, including *Wong v. Moore, et al.* (E.D.N.Y. No. 1:23-cv-00559) and *Gossett v. Barry, et al.* (E.D.N.Y. No. 1:23-cv-01166), each arising from the same course of conduct alleged in this Complaint.

257.    Prior to his role at 1847 Partners, Tobin held leadership positions at Global Emerging Markets ("GEM"). In 2013, Ridgeline Energy Services, Inc. filed a $140 million civil action in Alberta, Canada, and in related New York litigation, naming Tobin personally as a defendant.

258.    Tobin's prior involvement in RICO-related litigation, combined with his significant ownership and control within the 1847 Partners structure, places him at the core of the present racketeering enterprise.

259.    Plaintiff alleges that Tobin's role satisfies the "operation or management" test under *Reves v. Ernst & Young*, 507 U.S. 170 (1993), as he exercised substantial decision-making authority over the management of the enterprise, approved or facilitated insider transactions, and directly benefited from the diversion of investor capital to insider-controlled entities.

## V. Defendant Louis A. Bevilacqua—Securities Counsel who Abandoned His Duty to Halt Client Fraud and Profited from It

260.    Defendant Louis A. Bevilacqua, through Bevilacqua PLLC, knowingly participated in and profited from the racketeering enterprise centered on 1847 Holdings LLC and Polished.com Inc. As a securities attorney, Bevilacqua had a legal and ethical duty to act as a safeguard against fraudulent conduct by his client, to ensure compliance with the federal securities laws, and to protect the interests of investors. Instead, he used his legal position to design, advance, and personally profit from the very misconduct he was obligated to stop. He structured corporate transactions, drafted and filed SEC disclosure documents containing material misrepresentations, and disseminated false statements to investors—all while knowing that 1847 Holdings and Polished.com operated as a fraudulent scheme designed to extract funds from investors and creditors.

261.    Central to this scheme was the MSA between 1847 Holdings and its external manager, 1847 Partners LLC. As detailed in Section C, ¶¶38–46, this agreement guaranteed 1847 Partners fixed annual "management fees" regardless of performance, reimbursement of all expenses, and priority distributions before any shareholder received returns. These contractual provisions also ensured that preferred payments and dividends flowed to 1847 Partners and its

equity holders—even when portfolio companies like Polished.com were insolvent or heading toward bankruptcy.

262.    Bevilacqua was not merely counsel to this arrangement—he was an equity holder in 1847 Partners, directly entitling him to his share of the preferred payments and dividends extracted under the MSA. He also received substantial legal fees from the enterprise, further aligning his personal financial interests with the continued operation of the fraudulent scheme.

263.    By accepting both cash payments and equity-based profit rights from 1847 Partners, Bevilacqua was an active economic participant in the racketeering enterprise. His dual role as legal architect of the MSA (*see* Section C) and beneficiary of its guaranteed payout structure meets the "operation or management" test set forth in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), as he both directed and profited from the enterprise's affairs.

264.    The guaranteed nature of the preferred payments and dividends under the MSA created a perverse incentive for Bevilacqua and other insiders to prolong the scheme, conceal financial distress, and prioritize insider compensation over creditor recovery and shareholder value. Plaintiff alleges that these acts involved securities law violations, wire fraud, mail fraud, and bankruptcy fraud, as well as aiding and abetting such acts. Bevilacqua's agreement to facilitate the schemes—knowing their fraudulent nature—is independently sufficient for conspiracy liability.

265.    Bevilacqua's conduct was not merely unethical—it violated the core professional obligations imposed on attorneys representing organizational clients engaged in securities transactions. ABA Model Rule of Professional Conduct 1.13(b) requires a lawyer who knows that an officer, employee, or other person associated with the organization is engaged in fraudulent or illegal conduct that is likely to result in substantial injury to the organization to act in the best

interest of the organization, including by referring the matter to higher authority within the entity. If that authority fails to address the wrongdoing, Rule 1.13(c) authorizes (and, in securities practice, may require) the lawyer to report the violation outside the organization to prevent substantial injury.

266.    For attorneys practicing before the SEC, these duties are codified in Part 205 of the SEC's Standards of Professional Conduct for Attorneys (17 C.F.R. § 205.1 et seq.), which implements Section 307 of SOX. Under these rules, an attorney appearing before the SEC who becomes aware of evidence of a material violation of the securities laws must report the evidence to the issuer's chief legal officer or CEO, and, if an appropriate response is not obtained, must escalate to the board of directors or a committee thereof. If still unresolved, the attorney is permitted to disclose confidential information to the SEC to prevent the violation.

267.    Rather than fulfill these obligations, Bevilacqua used his legal skill set to perpetuate the fraud. He did not escalate concerns or withdraw from representation. He did not warn investors or regulators. Instead, he crafted and executed the very agreements, SEC filings, and corporate actions that concealed insolvency, misrepresented financial performance, and enabled the diversion of millions in investor funds to insiders.

268.    Accordingly, and despite his repeated denials of liability, Bevilacqua's knowing participation, acceptance of both cash and equity compensation from 1847 Partners, and his role in creating and benefiting from the MSA's guaranteed preferred payments and dividends place him squarely within the scope of liability under both the federal securities laws and the RICO statute, as established by *SEC v. National Student Marketing Corp.*, 457 F. Supp. 682 (D.D.C. 1978); *SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996); *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019); *Reves*

*v. Ernst & Young*, 507 U.S. 170 (1993); *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997); and *Salinas v. United States*, 522 U.S. 52 (1997).

### W. Pattern of Profiting from Fraudulent Public Listings

269.    Defendants Louis A. Bevilacqua, through Bevilacqua PLLC, and SRFC share a history of bringing to market or financing issuers that bear all the hallmarks of extraction-based microcap fraud. Sometimes they appear as counsel to the issuer, and other times they act on behalf of the placement agent. In both capacities, they have repeatedly structured, financed, and promoted companies with no legitimate operations, which consistently resulted in catastrophic shareholder losses while insiders enriched themselves.

270.    A telling example is Signing Day Sports, Inc. ("SGN"), a company Bevilacqua PLLC helped bring public. In 2024, Bevilacqua PLLC received 2.5 million pre-funded, cashless warrants in SGN in exchange for "deferred legal fees." SGN had no meaningful operations, yet announced a sham acquisition of Swifty Global, authored by Bevilacqua's firm, which briefly spiked the stock 300%.

271.    This pattern is not isolated. SRFC, for its part, has built a long record of working with foreign issuers that follow the same trajectory—pump-and-dumps, stock collapses, and reverse mergers. For example, BDI Holdings (JBDI)—A Singapore-based drum recycling company. In its August 2024 IPO, JBDI raised $11.25 million (2,250,000 shares at $5.00). Despite the limited business model, the stock spiked to $39.41, briefly implying a $750 million market capitalization, before collapsing by more than 95%. Similarly, Multi Ways Holdings, a Singapore-based construction equipment supplier, saw its April 2023 IPO surge 255% before falling to pennies, later completing a heavily discounted direct offering that mirrored the toxic financings used at 1847 Holdings.

272.    These issuers not only share implausible valuations and wipeouts, but also the same final-stage tactic: the sham "crypto pivot." As regulators have recognized, companies with no viable business often abruptly announce blockchain or digital asset strategies as a way to generate temporary hype, provide cover for toxic financings, and recycle failed shells.

273.    The SEC's Crypto Assets and Emerging Technologies Unit has explicitly targeted companies that suddenly "become crypto," viewing such pivots as red flags for fraud, unregistered securities offerings, and manipulation. Nasdaq's proposed $25-million IPO minimum for companies in restrictive jurisdictions reinforces this trend, aiming to shut down thinly capitalized shells that repeatedly collapse and then rebrand into "crypto" as cover.

274.    Together, Bevilacqua PLLC and SRFC act as recurring gatekeepers of this cycle. They not only prepare the offering documents and legal scaffolding but also profit directly— through warrants, fees, or insider relationships—while enabling insiders to raise millions from unsuspecting investors. For Bevilacqua, other examples include ASST; for SRFC, STSS.

275.    It would be difficult to find  an issuer these defendants have brought public or financed that did not ultimately destroy 90–99% of shareholder value. Their conduct demonstrates not mere negligence, but a business model of exploitation, in which the capital markets are used as a tool for looting rather than legitimate enterprise. Plaintiff has already identified multiple issuers following this pattern and will bring them into discovery.

## X. The Danger of Relisting—1847 Holdings' Attempt to Recycle Fraud

276.    On October 3, 2025, 1847 Holdings LLC publicly announced that it "expects to begin trading on the OTC Pink Limited tier … within the next one-to-four business days … subject to FINRA's review" and that afterward it intends to "transition to the OTCID" with the ultimate objective of relisting on a major U.S. exchange. This announcement frames the relisting as a sign

of growth and stability, highlighting "record revenue increases," "margin expansion," and ambitious 2026 guidance.

277.    In reality, this plan poses a clear and present danger to investors. Relisting would provide 1847 Holdings with the ability to reset market confidence, attract new capital, and conceal the ongoing racketeering enterprise behind the façade of renewed legitimacy. The same insiders who orchestrated serial pump-and-dump cycles, fraudulent conveyances, and asset extractions are positioning themselves to exploit the public once again.

278.    The history is unmistakable: every company touched by this enterprise has followed the same pattern—capital raise, insider fees, fabricated hype, collapse into bankruptcy, then a pivot or shell transition that erases the past. 1847 Holdings' push to relist is not a fresh start but an attempt to perpetuate that cycle.

279.    The relisting announcement itself is laced with the same type of exaggerated projections and self-congratulatory language that accompanied prior fraudulent financings. The claims of "record revenues" and "operating cash flow" are unsupported by independent audit validation and must be viewed in light of the February 2024 panic disbursements, false $90 million projections, and the dual bankruptcies of ICU Eyewear and Asien's Appliance earlier in 2024.

280.    Relisting 1847 Holdings without regulatory intervention would pose a systemic risk:

(a) it would legitimize and reward insiders who have already looted multiple issuers;

(b) it would grant them fresh access to public capital markets to repeat the same scheme;

(c) it would undermine investor confidence in U.S. exchanges by signaling that serious alleged misconduct can recur without consequence

281.    1847 Holdings has publicly signaled its intent to transition from OTC Pink to OTCQB, then target a major exchange uplist. Unless stopped, the same actors will exploit this trajectory, using manufactured hype, exaggerated forecasts, and insider-controlled transactions to enrich themselves while destroying shareholder value. The relisting is not a path to rehabilitation—it is a reset that would enable a repeat of prior patterns, one that regulators, courts, and investors must view with the highest level of scrutiny.

## Y. Conclusion

282.    Plaintiff has alleged with specificity a coordinated pattern of racketeering activity, supported by at least eight predicate acts enumerated under 18 U.S.C. § 1961(1) and multiple non-predicate acts that, while not independently qualifying as RICO predicates, furthered and concealed the enterprise's unlawful objectives.

283.    The acts of money laundering, wire fraud, mail fraud, bankruptcy fraud, obstruction of justice, and witness tampering form the backbone of this enterprise, while the fraudulent conveyances, securities fraud, tortious interference, and whistleblower retaliation demonstrate the broader scope of Defendants' misconduct.

284.    The combination of these acts—committed over multiple years, across multiple corporate entities, and involving repeated abuse of public markets—has caused substantial harm to Plaintiff and the investing public.

285.    Plaintiff seeks treble damages, punitive damages, attorney's fees, costs, and all other relief permitted under federal RICO statutes and applicable state law.

## LEGAL CLAIMS

### Count One: Violation of 18 U.S.C. § 1962(c) (Conducting a Racketeering Enterprise) Against All Defendants

286.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

287.    Each Defendant conducted or participated, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

288.    The enterprise consisted of 1847 Holdings LLC, 1847 Partners LLC, Bevilacqua PLLC, Spartan Capital Securities LLC, Sichenzia Ross Ference Carmel LLP, and individual executives and professionals, including Louis A. Bevilacqua, Joseph D. Wilson, Ellery W. Roberts, Edward J. Tobin (as an owner of 1847 Partners), Vernice Howard, Eric Van Dam, and Glyn Milburn.

289.    The predicate acts of racketeering activity include, but are not limited to, the following examples (illustrative and not exhaustive):

- Wire Fraud (18 U.S.C. § 1343): False financial statements, offering documents, and investor communications transmitted in interstate commerce.

- Mail Fraud (18 U.S.C. § 1341): Circulation of fraudulent offering materials and bankruptcy filings by interstate mail.

- Money Laundering (18 U.S.C. § 1956): February 2024 disbursements totaling $2.498 million structured to conceal the source and ownership of looted proceeds.

- Bankruptcy Fraud (18 U.S.C. §§ 152, 157): Manipulative bankruptcies involving ICU Eyewear, Asien's Appliance, and Polished.com designed to shield liability and defraud creditors.

- Obstruction of Justice (18 U.S.C. § 1503): By Louis A. Bevilacqua and Joseph D. Wilson, who attempted to silence whistleblowers and obstruct regulatory scrutiny.

290.    These predicate acts were related, continuous, and interdependent, forming part of a coordinated scheme spanning years.

291.    As a direct and proximate result, Plaintiff suffered injury to business and property, including $749,462.90 in documented losses, subject to trebling under 18 U.S.C. § 1964(c).

## Count Two: Conspiracy To Violate 18 U.S.C. § 1962(d)
### (Conspiracy to Conduct a Racketeering Enterprise) Against All Defendants

292.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

293.    Defendants knowingly agreed and conspired to conduct and participate in the affairs of the racketeering enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

294.    In furtherance of the conspiracy, Defendants agreed to commit predicate acts including wire fraud, mail fraud, money laundering, bankruptcy fraud, and obstruction of justice.

295.    Defendants also conspired to commit additional unlawful acts not enumerated as predicates but which furthered and concealed the scheme, including securities fraud, fraudulent conveyance, tortious interference, and stock manipulation through undisclosed paid promotions.

296.    This agreement is evidenced by conduct including, but not limited to, the following examples (illustrative and not exhaustive):

- Spartan Capital orchestrating pump-and-dump schemes around 1847 Holdings;

- Ellery W. Roberts lying directly to Plaintiff to induce investment;

- Brian Duddy coercing Plaintiff into signing a waiver under false pretenses;

- Bevilacqua and Wilson using legal threats to obstruct whistleblowing;

- Edward J. Tobin, as an owner of 1847 Partners, benefiting from and supporting the fraudulent structure used to loot acquired companies.

297.    Each Defendant understood the scope and purpose of the enterprise and knowingly joined in furtherance of its objectives.

298.    As a direct and proximate result, Plaintiff suffered injury to business and property, including $749,462.90 in losses, trebled under 18 U.S.C. § 1964(c).

### Count Three: Common Law Fraud
### (Against Spartan Capital, Ellery W. Roberts, and Louis A. Bevilacqua)

299.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

300.    Defendants knowingly made false representations, concealed material facts, and engaged in deceptive practices with intent to induce Plaintiff to invest.

301.    Specific fraudulent acts include, but are not limited to, the following examples (illustrative and not exhaustive):

- Spartan Capital, through its banker Brian Duddy, engineering pump-and-dump cycles while concealing dilution and coercing Plaintiff into signing a waiver under false pretenses;

- Roberts lying directly to Plaintiff to secure investment;

- Bevilacqua disrupting a financial audit by threats designed to shield misconduct from exposure, while personally benefitting from the unlawful scheme.

302.    Plaintiff relied on these misrepresentations and manipulative acts to his detriment.

303.    As a direct and proximate result, Plaintiff suffered damages of at least $749,462.90.

## Count Four: Fraudulent Conveyance
### (Against 1847 Holdings LLC, 1847 Partners LLC, Ellery W. Roberts, Edward J. Tobin, Vernice Howard, and Louis A. Bevilacqua)

304.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

305.    Defendants engaged in fraudulent transfers of assets with actual intent to hinder, delay, or defraud investors and equity holders, in violation of applicable state fraudulent conveyance statutes, including New York Debtor & Creditor Law §§ 273–276.

306.    Specific acts of fraudulent conveyance include, but are not limited to, the following examples (illustrative and not exhaustive):

- February 2024 disbursements of $2.498 million to shell consultants (TraDigital, Alchemy, Reef, SeaPath) immediately after Polished.com's default;

- Structuring multiple transfers to evade detection and frustrate accountability;

- Paying sham consulting and management fees with no legitimate business justification.

307.    As an owner of 1847 Partners, Tobin directly benefited from these fraudulent transfers and distributions of looted assets.

308.    These conveyances stripped value from the companies in which Plaintiff was a beneficial owner, deliberately frustrating shareholders' ability to realize the value of their investments.

309.    As a direct and proximate result, Plaintiff suffered damages of at least $749,462.90.

## Count Five: Aiding and Abetting Fraud
### (Against Sichenzia Ross Ference Carmel LLP, Bevilacqua PLLC, and Spartan Capital Securities LLC)

310.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

311.    Defendants knew or should have known of the fraudulent scheme and substantially assisted in its execution.

312.    Specific acts of substantial assistance include, but are not limited to, the following examples (illustrative and not exhaustive):

- SRFC, despite being placed on notice through mediation and direct communications, continuing to paper fraudulent financings and obstruct disclosure;

- Bevilacqua PLLC not only providing legal cover but also disrupting an audit through threats while profiting from the fraudulent enterprise it structured;

- Spartan Capital knowingly facilitating toxic financings while providing legitimacy to the scheme.

313.    Defendants' substantial assistance and concealment furthered the fraud and proximately caused Plaintiff's losses.

314.    As a direct and proximate result, Plaintiff suffered damages of at least $749,462.90.

## RELIEF REQUESTED

WHEREFORE, on Counts One through Five, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, jointly and severally, and grant the following relief:

**A.  Rescission and Restitution**

- Rescission of Plaintiff's $365,000 investment in the July 3, 2023 private placement;

- Restitution for the additional $384,462.90 in trading losses directly attributable to the fraudulent scheme;

- Total financial loss: **$749,462.90**.

**B.  Treble Damages**

- Treble damages under 18 U.S.C. § 1964(c): **$2,248,388.70**.

**C.  Pre-Judgment Interest**

- At the New York statutory rate of 9%, accruing from the date of loss through the date of judgment, totaling **no less than $90,000**.

**D.  Damages for Retaliation and Obstruction**

- No less than **$350,000**, arising from threats, false accusations, and suppression of Plaintiff's whistleblower activity and legal rights.

**E.  Punitive Damages**

- No less than **$500,000**, in recognition of the egregious, intentional, and systemic nature of the misconduct.

**F.  Attorneys' Fees and Costs**

- Including expert witness fees, investigative expenses, and all reasonable litigation costs under RICO and applicable federal and state law.

**G.  Post-Judgment Interest**

- At the maximum rate permitted by law from the date of judgment until paid in full.

**H.  Further Relief**

- On all counts, Plaintiff requests pre-judgment interest, attorneys' fees and costs, filing and forum fees, and such other and further relief which this Court deems just and proper under the circumstances.

Dated: October 21, 2025
      New York, New York

THE GALBRAITH LAW FIRM

Kevin D. Galbraith, Esq.
Jonathan Hall, Esq.
Two Waterline Square
400 West 61st Street, Suite 1508
New York, NY 10023
Phone: (212) 203-1249

*Counsel for Plaintiff*