UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

MATTHEW MILLER,
Individually and as Principal of
STRATEGIC RISK LLC,

                                          Plaintiff,

                        -- against --

1847 HOLDINGS LLC, 1847 PARTNERS LLC,
ELLERY W. ROBERTS, LOUIS A. BEVILACQUA,
BEVILACQUA PLLC, and VERNICE HOWARD,

                                   Defendants.

------------------------------------------------------------------------ x

Case No. 1:25-cv-08606

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiff Matthew Miller ("Mr. Miller"), individually and as principal of Strategic Risk LLC ("SR"), "Plaintiff" *infra*, through his counsel, The Galbraith Law Firm, brings this action against Defendants 1847 Holdings LLC ("1847H"), 1847 Partners LLC, ("1847P") Ellery W. Roberts ("Mr. Roberts"), Louis A. Bevilacqua ("Mr. Bevilacqua"), Bevilacqua PLLC ("Bevilacqua PLLC"), and Vernice Howard ("Ms. Howard") ("Defendants" collectively). The bases for his claims are detailed below.

## PRELIMINARY STATEMENT

       This action arises from a series of deliberate misstatements, omissions, and other manipulative practices undertaken by 1847 Holdings LLC ("1847 Holdings" or the "Company") and its Chief Executive Officer, Ellery Roberts, beginning in 2023. Throughout that year, Defendants represented to Plaintiff—both publicly and privately—that the Company was

financially stable, did not anticipate raising further equity, and was "building cash from here on out." Defendants reaffirmed public revenue guidance "in excess of $90 million" for 2023, despite having no factual basis for that projection and knowing it was materially false.

As late as September 2023, 1847 Holdings continued to publicly reaffirm its $90-million revenue guidance. Only after Plaintiff—then a 10%+ and later 19% beneficial owner—requested an internal forensic audit did the Company revise that guidance. The actual full-year revenue turned out to be approximately $68 million, more than $22 million below the figure Defendants repeatedly assured the market they would achieve.

While publicly projecting confidence and while privately assuring Plaintiff that no further dilution would be necessary, Defendants embarked on a pattern of capital actions that destroyed shareholder value, including the value of Plaintiff's investment. Since Plaintiff's initial reliance on Defendants' false statements in 2023, the Company has executed four reverse stock splits. Each split was immediately followed by highly dilutive offerings, financings, warrant issuances, and conversions that collapsed the stock back to near-zero. The pattern repeated every time: reverse split → dilution → wipeout, destroying 99% to 100% of shareholder value with each cycle.

Defendants never disclosed to Plaintiff—despite his status as a major beneficial owner and despite Plaintiff directly requesting clarity—that the Company had already planned these dilutive transactions. Nor did Defendants disclose that the $90-million revenue guidance was inflated, unachievable, and contradicted by internal data showing materially lower revenue. Instead, Defendants repeatedly provided Plaintiff with false assurances, including that the Company was "building cash," "not raising equity for operating purposes," and that the most recent offering would fund operations for a year or more.

2

Plaintiff reasonably relied on these assurances in purchasing additional shares and in holding shares he otherwise would have sold. Had the truth been disclosed—that 1847 Holdings was overstating revenue by more than 25%, and intended to engage in repeated reverse splits and dilutive offerings—Plaintiff would not have made these investment decisions.

As a direct result of Defendants' misrepresentations, omissions, and manipulative practices, Plaintiff suffered direct out-of-pocket losses of no less than $749,462.90.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5). Jurisdiction is also proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal district courts have exclusive jurisdiction over violations of the Exchange Act and the rules and regulations promulgated thereunder.

2.      This Court has jurisdiction over the common-law fraud claims under the supplemental jurisdiction provided by 28 U.S.C. § 1367.

3.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), because (i) one or more of the acts or omissions constituting the violations alleged herein occurred within this District; (ii) the securities at issue were purchased or sold within this District; and/or (iii) Defendants transact business in this District.

## THE PARTIES

4.      Plaintiff Matthew Miller is a resident of New York. He invested over $980,000 in 1847 Holdings and became its largest shareholder following his participation in the July 2023 private placement.

3

5.      Strategic Risk LLC is a New York limited liability company with its principal place of business in New York, NY. It is owned and managed by Matthew Miller and was the investing entity through which Mr. Miller acquired interests in 1847 Holdings LLC.

6.      Defendant 1847 Holdings LLC is a Delaware limited liability company formerly listed on the NYSE American. Its principal office is located at 260 Madison Avenue, 8th Floor, New York, NY 10016. 1847 Holdings is a publicly traded holding company that owns and operates multiple subsidiaries.

7.      Defendant 1847 Partners LLC is a Delaware limited liability company that serves as the external manager of 1847 Holdings LLC pursuant to a Management Services Agreement. It is managed by Ellery W. Roberts. The members of record include Mr. Roberts, Louis A. Bevilacqua, and Edward J. Tobin.

8.      Defendant Ellery W. Roberts is an individual believed to reside in or around Weston, Florida. He is the founder and Chief Executive Officer of 1847 Holdings LLC and the sole manager of 1847 Partners LLC.

9.      Defendant Louis A. Bevilacqua is an attorney residing in Naples, Florida. He is the founder and managing member of Bevilacqua PLLC and the co-founder, President, and General Counsel of Digital Offering LLC, a FINRA-registered broker-dealer.

10.     Defendant Bevilacqua PLLC is a law firm organized in the District of Columbia, with its principal office in Washington, DC. It provides legal services in the areas of securities, capital markets, and corporate transactions.

11.     Defendant Vernice Howard has served as Chief Financial Officer of 1847 Holdings LLC since approximately September 2021. Upon information and belief, she resides in the State of New York.

## STATEMENT OF FACTS

**A. Plaintiff's Reliance Begins With the Company's May 15, 2023 Press Release**

12.     Plaintiff's reliance on Defendants' statements began with the Company's May 15, 2023 press release, which publicly reaffirmed 2023 revenue guidance "in excess of $90 million." The release highlighted profitability, emphasized subsidiary strength, and represented that the Company was financially positioned for continued growth. *See* a true and correct copy of the Company's May 15, 2023, press release, attached as **Exhibit A**.

13.     Plaintiff understood this release to signal that the Company was stable, well-capitalized, and on track to achieve its stated revenue target.

14.     Because of the strength and specificity of these projections, Plaintiff sought clarification directly from the CEO rather than investing based solely on market activity. Plaintiff wanted to confirm that the Company's financial position could support the aggressive revenue guidance that management was publicly presenting.

**B. Plaintiff Contacts CEO Ellery Roberts Before Taking Any Position**

15.     Between May and June 2023, Plaintiff and CEO Ellery Roberts had two to three phone calls during which they discussed the Company's revenue trajectory, cash flow, liquidity needs, and subsidiary performance. Roberts's statements during these calls corroborated and reinforced the optimism conveyed in the May 15 press release.

16.     During these conversations, Roberts asked Plaintiff to consider providing a mezzanine loan to the Company. Plaintiff did not understand mezzanine financing and asked for clarification. Roberts presented the structure as attractive and short-term, but failed to disclose that the Company faced liquidity constraints that contradicted the optimistic public guidance.

17.     Based on the May 15 press release and Roberts' verbal assurances during these calls, Plaintiff reasonably believed the Company had credible financial projections and sufficient operational strength to support its public claims.

## C. Plaintiff Purchases 500,000 Shares Based Solely on the Company's Projections and Roberts's Statements

18.     In June 2023, Plaintiff purchased approximately 500,000 shares of 1847 Holdings, before the Company's next offering. In making this substantial investment, Plaintiff relied on the Company's public projection of $90 million in revenue and Roberts' repeated affirmations that the Company's financial outlook was strong.

## D. July 1, 2023: Defendants Assure Plaintiff No Further Equity Raises Are Planned

19.     Shortly after acquiring this position, Plaintiff asked Roberts directly whether the Company would need to engage in additional dilutive offerings. This issue critically affected—indeed, drove—Plaintiff's investment strategy and risk tolerance. Roberts assured Plaintiff that no further dilutive offerings were planned. Roberts made this statement solely to secure Plaintiff's capital with no regard for whether it was truthful. In reasonable reliance on this assurance—and believing Roberts' representations were made in good faith—Plaintiff invested approximately $365,000 in the next offering, an investment he would not have made had the truth been disclosed.

20.     On July 1, 2023, Roberts sent Plaintiff a text message stating: "Our forecast does not show us raising equity for operating purposes. As stated publicly, we see ourselves building cash from here on out." *See* a true and correct copy of Roberts' July 1, 2023, text message, attached as **Exhibit B**.

21.     This statement was materially false. At the time Roberts made it, Defendants were actively planning additional offerings and did not have the cash stability they represented. Plaintiff relied on this assurance and continued purchasing and holding his shares.

**E. Plaintiff Becomes a 10%+ Beneficial Owner, Restricting His Ability to Trade**

22.     By mid-2023, Plaintiff became a 10%+ beneficial owner, triggering SEC reporting requirements that prevented him from freely trading without filing Form 4 disclosures. Roberts was aware of Plaintiff's ownership level and later acknowledged that Plaintiff was effectively "over the wall," meaning Defendants understood that Plaintiff relied on truthful information from management and was entitled to receive it.

23.     Knowing Plaintiff could not freely exit his position, Roberts continued to assure him that no further offerings were anticipated and that the Company was instead "building cash."

**F. Plaintiff Approaches 19% Ownership; Defendants Reassure Him Again**

24.     As Plaintiff's ownership approached 19%, he again asked Roberts to confirm that the Company had sufficient cash and would not require additional equity raises.

25.     Roberts hid the truth—that the Company lacked the cash runway he represented and that further dilution was imminent. Instead, he proposed a call with counsel to "clear up what we can share," confirming Plaintiff's right to accurate information while simultaneously withholding material facts.

**G. Defendants Reaffirm the False $90-Million Revenue Guidance Through September 2023**

26.     Throughout 2023—including as late as September 2023—1847 Holdings publicly reaffirmed revenue guidance "in excess of $90 million." Roberts personally signed or authorized these statements in filings, press releases, and investor communications. *See* a true and correct copy of these statements, attached as **Exhibit C**.

7

27.     Internal financial data later confirmed that the Company's actual 2023 revenue was approximately $68 million, more than $22 million—approximately 25%—below the guidance Defendants repeatedly presented to Plaintiff and the market.

28.     Defendants had no reasonable basis for reaffirming the $90-million projection, as internal data clearly contradicted this projection.

**H. Plaintiff Requests a Forensic Audit; Defendants Retract Prior False Guidance**

29.     In late 2023, after repeatedly questioning the reliability of the Company's projections, Plaintiff requested that the Company conduct an internal forensic audit. Only after this request did Defendants quietly retract the $90-million revenue guidance. *See* a true and correct copy of Defendants' retractions, attached as **Exhibit D**.

30.     This sudden reversal revealed that the projection was not grounded in true operational performance and that Defendants knew or recklessly disregarded its falsity.

**I. Subsequent Events Confirm Defendants' Earlier Statements Were False**

31.     Following Plaintiff's reliance and investments, 1847 Holdings undertook four reverse stock splits. Each split was immediately followed by dilutive offerings, conversions, and tenuous financings that drove the stock back to near-zero.

32.     This cycle repeated four times—reverse split → dilution → total wipeout—destroying 99% to 100% of shareholder value in each cycle.

33.     Defendants never disclosed their intent to engage in this pattern, nor did they correct their prior statements about cash stability, revenue expectations, or the need for future offerings.

34.     Plaintiff's losses—$749,462.90—were the direct and foreseeable result of Defendants' misrepresentations, omissions, and manipulative conduct.

**J. July 14, 2023 Capital Raise Directly Contradicts Defendants' Assurances**

35.    In the days immediately preceding the July 14, 2023 capital raise, 1847 Holdings paid two stock-promotion firms in excess of $25,000 for marketing campaigns designed to increase trading volume and "awareness" of the Company's stock. These promotional campaigns ran from July 13, 2023 through July 14, 2023, and included paid video promotions, newsletters, and social-media content encouraging investors to buy shares of 1847 Holdings. The Company funded these promotions specifically to gin up market interest and buoy the stock price in advance of the planned offering.

36.    These paid promotions were not disclosed to Plaintiff, despite his status as a 10%+ beneficial owner and despite his direct inquiries into whether the Company was planning any offering activity. Instead, Defendants concealed the forthcoming capital raise and simultaneously funded external promotional campaigns to artificially generate trading activity and support the anticipated issuance.

37.    Only two weeks after Roberts assured Plaintiff on July 1, 2023 that the Company "did not foresee raising equity for operating purposes" and was "building cash from here on out," the Company proceeded with a capital raise on July 14, 2023. This offering materially diluted existing shareholders, including Plaintiff.

38.    The July 14 offering blindsided Plaintiff. He had expressly asked Roberts for confirmation that no additional equity raise would occur for at least a year, and Roberts gave him a direct assurance that none was expected. Plaintiff relied on that assurance when he chose not only to maintain his position but also to continue increasing it.

39.    The July 14 offering was not an isolated event. It marked the beginning of a continuous pattern. Following the July raise, 1847 Holdings conducted multiple additional

offerings, each of which further diluted shareholders and contradicted Defendants' repeated statements that the Company was financially stable and building cash.

40. On July 13, 2023, the day before the undisclosed capital raise, Plaintiff sent Roberts a detailed text message reiterating the parties' prior discussions and reminding him of his explicit assurance that "this is it for offerings" and that the Company would not expose Plaintiff to any further equity raises through at least the end of 2023 and beyond. Plaintiff explained that, as a 10%+ beneficial owner, he could not trade in and out of the stock without making public filings, and therefore required certainty that the Company would "build on cash going forward." Plaintiff emphasized—and Roberts understood—that this assurance had been the *critical factor* in Plaintiff's decision to take such a large position.

41. In this same July 13 message, Plaintiff told Roberts that public confirmation of "no more offerings" was essential because the Company's repeated dilutions were destructive to long-term investors. Plaintiff made clear that he relied on Roberts's promise that no additional offerings were forthcoming and that the Company would build cash "from here on out."

42. Despite receiving this message and acknowledging Plaintiff's reliance, Roberts hid the fact that the Company was going to conduct a capital raise *the very next morning*, July 14, 2023, nor did he correct the assurances he had previously given.

43. Instead, Plaintiff learned of the July 14 offering only after it had been executed and publicly announced. The offering directly contradicted Roberts's written and verbal commitments that the Company would not raise additional equity for at least a year.

44. On July 15, 2023, immediately after the offering, Plaintiff texted Roberts, confronting him about the undisclosed capital raise. Plaintiff explained that he had relied on Roberts's statements that the Company could "build on cash" and did not foresee any additional

10

offerings. Plaintiff expressed that he had taken Roberts at his word and had increased his position accordingly. *See* a true and correct copy of Plaintiff's July 15, 2023, text message to Roberts, attached as **Exhibit E**.

**K. August 2023: Two Lender Defaults and Forced Equity Conversions Further Hurt the Stock Price**

45.    Only weeks after the July 14, 2023, capital raise, two separate lenders declared 1847 Holdings LLC in default, issuing formal default notices on August 4, 2023, and August 9, 2023. The default notices used nearly identical language, indicating systemic financial distress rather than isolated creditor disputes. The timing and uniformity of the notices suggest that the lenders were coordinating their default declarations in tandem with 1847 Holdings, creating a predetermined outcome for shareholders who were unaware that multiple defaults were about to be triggered. *See* true and correct copies of the August 4, 2023, and August 9, 2023, default notices, attached as **Exhibits F and G**, respectively.

46.    The defaults triggered mandatory equity conversions under the Company's financing agreements. Instead of resolving the obligations in cash, 1847 Holdings elected (or perhaps was forced) to satisfy the defaults by issuing large amounts of equity at steep discounts, dramatically increasing the float and further depressing the stock price.

47.    These August defaults put the lie to Roberts's repeated claims to Plaintiff in June and July 2023 that the Company was "building cash," did not foresee raising equity for operating purposes, and had no further offerings planned for "at least a year." The receipt of two default notices within five days demonstrated that the Company's cash position was far more precarious than disclosed.

48.     Neither default was disclosed to Plaintiff in advance, despite Plaintiff's direct inquiries and despite Roberts knowing Plaintiff was relying on his assurances to maintain and increase a multi-hundred-thousand-share position.

49.     The equity issuances resulting from the defaults caused an immediate collapse in the stock price. The Company's share count ballooned, its market capitalization fell precipitously, and the stock suffered yet another round of catastrophic dilution, compounding the damage caused by the July 14 offering.

50.     These defaults revealed that Roberts's prior statements were materially false when made. A company that reaffirms guidance of $90 million in revenue and asserts that it is "building cash" does not experience back-to-back lender defaults within days. The defaults were a direct consequence of the Company's liquidity crisis—one that Roberts concealed from Plaintiff at the exact time he was soliciting Plaintiff's investment and encouraging him to hold a 10%+ position.

## L. August 28, 2023 Recorded Call: Roberts Denies Any Reverse Split Despite Knowing One Was Planned

51.     On August 28, 2023, Plaintiff convened and recorded a phone call with Roberts so he could learn the truth about the Company's liquidity, its recent defaults, and whether any further corporate actions—particularly a reverse split—were being considered. By this point, Plaintiff's position had already been severely damaged by the July 14 offering and the August 4 and August 9 default-triggered equity issuances.

52.     During this call, Plaintiff asked Roberts whether the Company was planning a reverse split or contemplating any action that would result in additional dilution or jeopardize the Company's continued listing. Plaintiff explained that he needed honesty and transparency to evaluate whether to maintain his position.

53.    Roberts became noticeably evasive, stammered, and backpedaled when responding to Plaintiff's question. He paused, restarted his sentences, and spoke haltingly.

54.    Roberts ultimately denied that any reverse split was planned. He then attempted to distance himself from any knowledge, adding that "my lawyers did not tell me that at all," and asserting that "NYSE American is different from NYSE," indicating that the Company's listing status was safe and there was no foreseeable risk that such a split might be required.

55.    Plaintiff explained that a reverse split would devastate his investment and that he needed assurance that such action was not "on the table." Roberts denied any such plan, telling Plaintiff, "I have not, Matt, I have not, I have not been told that by anybody," and encouraged Plaintiff to contact Company counsel if he needed further comfort.

56.    Roberts's representations were materially misleading. At the time of this call, the Company's financial condition—multiple defaults, ongoing liquidity crises, and the collapse of its share price from July onward—made a reverse split not only foreseeable but functionally inevitable to maintain listing compliance. Roberts's false statements were intended to induce—and did induce—Plaintiff to continue holding his position rather than selling in advance of the highly dilutive corporate actions that would soon follow.

## M. The September 1, 2023 Reverse Split Announcement Contradicted Roberts's August 28 Assurances

57.    Just three days after Roberts assured Plaintiff that the Company was not planning any reverse split, 1847 Holdings publicly announced on September 1, 2023 that it would implement a 1-for-25 reverse stock split. The Company stated that the reverse split was being undertaken to maintain compliance with NYSE American listing requirements—precisely the risk Plaintiff had raised during the call and that Roberts had denied.

58.     The September 1 announcement makes plain that the reverse split had already been approved internally and scheduled at the time Roberts spoke to Plaintiff. The press release stated that the reverse split would become effective on September 11, 2023, meaning the corporate process to approve the maneuver was well underway before the announcement date. Roberts's statement on August 28 denying knowledge of such a plan was therefore materially false when made.

59.     The 1-for-25 reverse split immediately and severely harmed Plaintiff's investment. Because 1847 Holdings simultaneously continued issuing shares through financings and default-related conversions, the reverse split failed to stabilize the stock price. Instead, it enabled further dilution, resulting in further catastrophic losses for Plaintiff.

60.     The September 1, 2023 reverse split was the first of four reverse splits, each of which wiped out more than 99% of shareholder value. These serial reverse splits—combined with constant equity issuances—formed a pattern of dilution inconsistent with the financial stability and "building cash" narrative Roberts had repeatedly offered Plaintiff.

**N. Plaintiff Is Forced to Liquidate His Position Following the Reverse Split, Realizing a $749,462.90 Loss**

61.     The 1-for-25 reverse split triggered a severe decline in the stock price. The value of Plaintiff's position, which he had built in reliance on Roberts's false assurances, collapsed almost instantly.

62.     Faced with a rapidly deteriorating share price, Plaintiff was forced to sell his position during the week of September 11, 2023, realizing a loss of $749,462.90. This loss was the direct and foreseeable result of Defendants' material misrepresentations, omissions, and scheme to conceal the Company's true financial condition. *See* a true and correct copy of Plaintiff's sale documents, attached as **Exhibit H**.

**O.  Plaintiff Requests a Forensic Audit on September 11, 2023 and Is Immediately Retaliated Against by Company Counsel**

63.    On September 11, 2023, Plaintiff formally requested that 1847 Holdings conduct an internal forensic audit. Plaintiff made this request because the Company's reaffirmed revenue guidance, liquidity representations, and disclosures were inconsistent with the financial distress that had suddenly materialized in July and August 2023. Plaintiff believed that only a forensic audit—conducted by an independent party—could uncover whether the Company's representations concerning its internal controls, revenue reporting, and cash-flow were truthful.

64.    Rather than welcoming oversight or addressing Plaintiff's concerns as a major beneficial owner of its shares, the Company retaliated against him. Company counsel, Louis A. Bevilacqua, rejected the request and sought to silence Plaintiff. At the time, Bevilacqua was not only outside counsel to 1847 Holdings—he was also an equity holder in 1847 Partners, the Company's external manager. This dual role created a structural conflict of interest: Bevilacqua's personal financial relationship with 1847 Partners meant that any forensic audit into the Company's financial practices could expose misconduct within the external manager itself.

65.    Bevilacqua, instead of addressing the substance of Plaintiff's concerns, attempted to intimidate Plaintiff. Bevilacqua falsely suggested that Plaintiff's request for an internal forensic review was improper and portrayed Plaintiff's effort to verify the accuracy of the Company's financial reporting as hostile. The only reasonable inference is that Bevilacqua intended to deter Plaintiff from uncovering financial misstatements or internal-control failures. *See* a true and correct copy of Bevilacqua's communication, attached as **Exhibit I**.

66.    Shortly after Plaintiff's audit request, attorney Joseph D. Wilson, acting on behalf of the Company and in coordination with Bevilacqua, escalated the retaliation. Wilson delivered a direct threat, telling Plaintiff that he could face jail time for having recorded a phone call—a

baseless assertion, as Plaintiff was in New York during his call with Roberts, who was also presumably in New York at the company's "office." The threat's purpose was clear: to intimidate Plaintiff into silence and prevent him from seeking an internal audit and from questioning the Company's financial representations.

67.    These retaliatory actions demonstrated that the Company and its representatives were trying to conceal information that Plaintiff, as a major investor, had a right to know. Their hostility toward a basic audit request further supports the inference that Defendants were aware of serious irregularities in their financial reporting, internal controls, and liquidity disclosures, and sought to prevent Plaintiff from uncovering the truth.

**P. 1847 Partners' Pattern of Collapse, Bankruptcies, and Federal Investigations**

68.    1847 Holdings shared the same external manager—1847 Partners LLC—with Polished.com (formerly 1847 Goedeker). Polished raised over $600 million in just three years, yet faced repeated shareholder and securities-fraud class actions during that period.

69.    Despite the substantial capital it raised, Polished ultimately collapsed and filed for bankruptcy alongside all eight of its operating subsidiaries, reflecting financial mismanagement undertaken by 1847 Partners.

70.    The same external manager also oversaw 1847 Holdings during a period in which two of its subsidiaries—ICU Eyewear and Asien's Appliance—filed for bankruptcy in 2024. This bankruptcy filing typified a recurring pattern in which entities managed by 1847 Partners raised significant sums of money before rapidly deteriorating into insolvency.

71.    Public filings and whistleblower disclosures further show that both the SEC and the U.S. Department of Justice are actively investigating Polished.com, with Ellery Roberts and 1847 Partners specifically identified in those investigations.

72.     This pattern across multiple companies managed by 1847 Partners demonstrates that the misconduct affecting Plaintiff did not occur in isolation, but was part of a consistent, multi-entity pattern of concealed financial distress, aggressive capital raising, and eventual collapse.

73.     Polished also suffered a major breakdown in financial oversight when its independent auditor resigned abruptly, citing concerns about the Company's financial disclosures and internal controls. The resignation caused Polished to delay required SEC filings and publicly acknowledge that its financial statements could no longer be relied upon.

74.     At the time of these events, Ellery Roberts served as Chairman of the Board of Polished, meaning he was responsible for overseeing the Company's financial reporting and governance. The auditor's departure—combined with Roberts's role—further illustrates the pattern of unreliable financial reporting, collapsed internal controls, and concealed distress across multiple entities managed by 1847 Partners.

## Q. February 2024 Disbursements Suggest Fraudulent Conveyance and Suspicious Money Movement

75.     On February 6, 2024, Polished.com—the former subsidiary and spin-off company managed by the same external manager, 1847 Partners LLC—had its operating accounts seized by Bank of America following lender defaults and the onset of bankruptcy-related control. This occurred less than a year after Plaintiff invested significant capital in 1847 Holdings based on Defendants' assurances regarding liquidity and financial stability. *See* a true and correct copy of documents evidencing 1847 Partners LLC's operating accounts seizure, attached as **Exhibit J**.

76.     The very next day, on February 7–8, 2024, 1847 Holdings LLC executed a series of prepaid consulting agreements totaling $2,498,000:

- $1,400,000 to TraDigital Marketing Group;

- $400,000 to Alchemy Advisory LLC;

- $333,000 to Reef Digital LLC; and

- $365,000 to SeaPath Advisory LLC.

All four agreements were prepaid, short-term, only vaguely described, and were executed immediately after Polished.com's accounts were seized, suggesting that 1847 Holdings was attempting to rapidly move funds out of reach of creditors or regulatory oversight. *See* a true and correct copy of documents evidencing the aforementioned consulting agreements, attached as **Exhibit K**.

77. These disbursements made no financial sense given the Company's condition. 1847 Holdings was burdened by significant debt, multiple recent defaults, and tenuous financings. Yet, it suddenly diverted nearly $2.5 million—funds originating from recent investor capital, including Plaintiff's—into large payments to four unrelated consulting firms with no apparent operational necessity.

78. The circumstances, structure, and timing of these payments strongly suggest fraudulent conveyance and suspicious money movement:

(1) rapid disbursement immediately after a related entity's accounts were frozen;

(2) splitting large sums across several vendors rather than a single payment;

(3) large upfront prepayments for short engagements; and

(4) vague scopes of work inconsistent with the Company's distressed financial position.

These red flags support an inference that the funds were being moved away from the reach of potential creditors and outside the scope of regulatory scrutiny.

79. Defendants never disclosed any intention to make such expenditures. They offered no explanation for why a company facing severe liquidity strain and recurring defaults would suddenly prepay millions in marketing-related contracts. The disbursements directly

contradicted Defendants' prior statements that the Company was "building cash" and financially stable when Plaintiff relied on their representations in 2023.

80.     Although these payments post-date the misstatements that caused Plaintiff's securities-fraud damages, they support the strong inference of scienter and illustrate Defendants' ongoing efforts to conceal the true state of the Company's finances. They show that Defendants were aware of liquidity problems long before such issues were publicly acknowledged.

81.     Given the Company's significant debt obligations, repeated defaults, and chronic cash shortages, there was no business justification for these prepayments. The dubious timing and structure of these payments require full discovery—including production of contracts, bank records, communications, and transfer histories—to determine where these funds ultimately went, whether they were diverted for improper purposes, and whether they were intended to evade creditor oversight, regulatory scrutiny, or internal reporting requirements.

## R. Sarbanes-Oxley Violations: Ellery Roberts and Vernice Howard Personally Certified Financial Statements They Knew Were Unreliable

82.     As CEO and Chairman, Roberts was the principal executive officer responsible for certifying 1847 Holdings' annual and quarterly financial reports under the Sarbanes-Oxley Act of 2002 ("SOX"), including the certification required by Section 906. These statutory obligations required Roberts to personally attest that the Company's financial statements were accurate, fairly presented the financial condition of the Company, and were supported by effective internal controls.

83.     Likewise, Vernice Howard, as Chief Financial Officer, served as the Company's principal financial and accounting officer during the relevant period and was required to execute the same SOX certifications. Section 906 required her to certify that each periodic report contained no untrue statement of material fact and no material omissions.

84.     Despite these obligations, Roberts and Howard jointly certified financial statements that they knew—or were reckless in not knowing—were unreliable, incomplete, and unsupported by effective internal controls.

85.     The SOX certifications signed by Roberts and Howard falsely represented that they had disclosed all material deficiencies. In reality, 1847 Holdings lacked the capacity to reliably track revenue, inventory, cash flow, or intercompany transfers. The inaccurate $90-million revenue guidance—later revealed to be approximately $22 million overstated—demonstrates that Roberts and Howard certified financials they knew were untrue.

86.     By signing SOX certifications while concealing defaults, liquidity failures, overstated revenue projections, and continuous dilution events, Roberts and Howard violated their statutory obligations and materially misled investors. Their certifications lent the appearance of legitimacy to financial statements that were, in truth, unreliable and unaudited, thereby further inducing Plaintiff to rely on false information when buying and holding shares.

**S. Additional Retaliatory Conduct: The November 2025 Lawsuit**

87.     On November 2, 2025, counsel for 1847 Holdings contacted Plaintiff regarding a potential negotiated resolution of the parties' dispute. That same day, Plaintiff reached out to an individual he reasonably believed was a *former* employee of an 1847 Holdings subsidiary, Wolo Manufacturing. Wolo's publicly listed telephone numbers were disconnected, and public reporting showed that La Nonna's Pasta had begun operating from the same warehouse address previously associated with Wolo at 1 Saxwood Street, leading Plaintiff to reasonably believe that Wolo had ceased operations.

88.     Plaintiff asked only brief, factual questions regarding whether Wolo remained operational. The outreach was polite, lawful, limited in scope, and entirely appropriate given that

1847 Holdings continued to represent to the market that Wolo was an active, functioning subsidiary.

89.    For more than two years before this inquiry, Plaintiff had publicly and truthfully warned other investors—through protected speech—about dilution, undisclosed defaults, and inconsistencies in 1847 Holdings' financial reporting. These concerns were echoed across thousands of posts from other injured investors raising the same issues. At no point during this period did Defendants dispute Plaintiff's commentary or assert that any statements were false.

90.    Defendants' own retaliatory lawsuit—*1847 Holdings LLC v. Miller et al.*[1]—reveals exactly what triggered their abrupt change in posture. After learning that Plaintiff had uncovered that Wolo Manufacturing appeared to be non-operational, 1847 Holdings and its counsel reacted with anger.

91.    Plaintiff's discovery directly contradicted their continued public representations that Wolo was an active subsidiary. In reality, 1847 Holdings had already attempted to sell Wolo's remaining inventory to Hadley Horns for pennies on the dollar, and Wolo's equipment and materials had been moved into a storage facility in Michigan, where the business was effectively dormant and doing nothing. Having misled shareholders for more than five months regarding Wolo's operational status, Defendants post hoc invented a narrative that Wolo was supposedly "transitioning to online sales"—a story crafted only after Plaintiff publicly exposed the discrepancy on social media. Defendants then filed suit less than 24 hours after learning of Plaintiff's call, strongly supporting the inference that this litigation was retaliatory and triggered by Plaintiff's discovery of the concealed non-operational state of the subsidiary.

---

[1] *1847 Holdings, LLC v. Miller, et al.*, Index No. 164432/2025 (Sup. Ct., New York County).

92.     On November 4, 2025—one day after filing their lawsuit—Defendants issued a GlobeNewswire press release repeating the same accusations without identifying a single false statement Plaintiff had made. Both the lawsuit and press release were designed to chill Plaintiff's protected speech, damage his credibility, and intimidate him into silence.

93.     While this retaliatory conduct is not the basis for Plaintiff's securities-fraud damages, it provides powerful evidence of malice and scienter. Defendants' willingness to weaponize litigation, distort a routine factual inquiry, misrepresent the status of a collapsed subsidiary, and attempt to silence a shareholder immediately after he uncovered that Wolo Manufacturing was no longer operational demonstrates a deliberate effort to conceal material facts from investors.

94.     This conduct is consistent with broader patterns already the subject of SEC and DOJ scrutiny relating to Polished.com and underscores Defendants' ongoing efforts to hide the true condition of their businesses.

95.     Moreover, it defies logic that counsel for 1847 Holdings—who was a defendant in Plaintiff's federal RICO action—contacted Plaintiff on November 2, 2025 to explore a confidential settlement because he was concerned about the imminent refiling of the RICO case, only to pivot less than twenty-four hours later into filing a retaliatory lawsuit against Plaintiff. This abrupt shift, from seeking resolution to launching litigation, is evidence of Defendants' retaliatory intent and their improper purpose in initiating this action.

## LEGAL CLAIMS

### Count One: Securities Fraud
### Violations of Section 10(b) and Rule 10b-5
### Against All Defendants

96.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

97.     Defendants made material misstatements and omitted critical facts regarding the Company's liquidity, planned capital raises, lender defaults, revenue projections, and the September 2023 reverse split.

98.     Defendants acted with scienter. Roberts and Howard certified financials they knew were unreliable; 1847 Partners oversaw the structure; and Bevilacqua, acting as both Company counsel and an equity holder of 1847 Partners, had full knowledge of the scheme and financially benefited from it.

99.     Plaintiff reasonably relied on these false statements when purchasing and holding his position.

100.    As a direct and foreseeable result of this fraud, Plaintiff suffered $749,462.90 in losses upon liquidating his investment.

**Count Two: Scheme Liability**
**Violations of Section 10(b) and Rule 10b-5(a) & (c)**
**Against All Defendants**

101.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

102.    Defendants engaged in a fraudulent scheme and course of conduct that deceived Plaintiff, including undisclosed defaults, engineered dilution, paid stock promotions before offerings, serial reverse splits, fabricated revenue projections, and retaliation when Plaintiff requested a forensic audit.

103.    This coordinated conduct operated as a fraud and deceit on Plaintiff in connection with his purchase and holding of 1847 Holdings securities.

104.    All defendants participated in the scheme. Roberts and Howard directed it, 1847 Partners oversaw it, and Bevilacqua—acting both as Company counsel and an equity holder—knowingly furthered and benefited from it.

105.    Plaintiff suffered $749,462.90 in losses as a direct and foreseeable result of this scheme.

**Count Three: Control-Person Liability**
**Against Ellery Roberts, Vernice Howard, 1847 Partners LLC,**
**Louis A. Bevilacqua, and Bevilacqua PLLC under Section 20(a) of the**
**Securities Exchange Act of 1934**

106.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

107.    Roberts (CEO/Chairman), Howard (CFO), 1847 Partners LLC (external manager), Bevilacqua, and Bevilacqua PLLC (corporate counsel and equity holder of 1847 Partners) each exercised control over 1847 Holdings' operations, disclosures, financial reporting, and responses to investors.

108.    These defendants had the power to direct, influence, and approve the statements, omissions, and scheme detailed in Counts I and II.

109.    As detailed herein, these defendants actively participated in the fraud and acted with scienter.

110.    Because 1847 Holdings committed securities fraud, and because these defendants directly controlled the conduct and decisions that caused such violations, they are liable as control persons under Section 20(a).

111.    Plaintiff suffered $749,462.90 in losses as a direct and proximate result of their control over the primary violator.

## Count Four: Common Law Fraud (Against All Defendants)

112.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

113.    Defendants made false statements of material fact or omitted a material fact when under a duty to disclose it, including but not limited to the statements identified in Paragraphs 19-21, 26-28, 31-34, 45-50, 51-56, 57-58, and 65 above.

114.    At the time these statements were made, Defendants knew they were false, or made them recklessly without regard for their truth, and intended that Plaintiff rely on them in deciding whether to purchase and hold the securities of the Company. Defendants understood that the false statements would reach and influence Plaintiff and that Plaintiff would foreseeably rely on the integrity of statements they made or controlled.

115.    Defendants intended for the Plaintiff to rely on the misrepresentations.

116.    Plaintiff reasonably and justifiably relied on Defendants' misrepresentations and omissions, including reliance on the integrity of the communications disseminated by Defendants. Had the truth been disclosed, Plaintiff would not have purchased or continued to hold the Company's securities.

117.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff suffered actual, out-of-pocket pecuniary losses in an amount no less than the $749,462.90 upon liquidating his position, and other consequential damages in an amount to be proven at trial.

118.    Accordingly, Plaintiff is entitled to compensatory damages, punitive damages where appropriate, pre- and post-judgment interest, and such other and further relief as the Court deems just and proper.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following relief:

1.  Compensatory damages in an amount no less than $749,462.80, which includes Plaintiff's realized investment losses;

2.  Punitive damages to punish Defendants' willful, malicious, and reckless misconduct and to deter others from engaging in such misconduct;

3.  Rescissory or disgorgement damages to the extent permitted under the federal securities laws;

4.  Pre-judgment and post-judgment interest at the maximum rate permitted by law;

5.  Attorney's fees, expert fees, and costs, pursuant to applicable law and the Court's equitable powers;

6.  Such other and further relief as the Court deems just and proper.


Dated: November 24, 2025
      New York, New York

                        THE GALBRAITH LAW FIRM

                        Kevin D. Galbraith, Esq.
                        Two Waterline Square
                        400 West 61st Street, Suite 1508
                        New York, NY 10023
                        Phone: (212) 203-1249

                        *Counsel for Plaintiff*