UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x
    :
    :    Case No. 1:25-cv-08606
MATTHEW MILLER,    :
Individually and as Principal of    :
STRATEGIC RISK LLC,    :    **ORAL ARGUMENT**
    :    **REQUESTED**
    Plaintiff,    :
    :
    :
    -- against --    :
    :
1847 HOLDINGS LLC, 1847 PARTNERS LLC,    :
ELLERY W. ROBERTS, LOUIS A. BEVILACQUA,    :
BEVILACQUA PLLC, and VERNICE HOWARD,    :
    :
    :
    Defendants.    :
    :
------------------------------------------------------------------------- x

### PLAINTIFF MATTHEW MILLER AND STRATEGIC RISK LLC'S MEMORANDUM IN OPPOSITION TO 1847 DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Dated: March 3, 2026
    New York, New York

    Kevin D. Galbraith, Esq.
    The Galbraith Law Firm
    Two Waterline Square
    400 West 61st Street, Suite 1508
    New York, NY 10023
    Phone: (212) 203-1249

    *Counsel for Plaintiff*

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................. 1-2

II. STATEMENT OF FACTS ................................................................... 3-13

   1. September 25, 2023 Reaffirmation of $90-Million Revenue Guidance ...................... 3-4

   2. Parallel Incentive Structure and Conduct at 1847 Holdings ........................... 4-5

   3. Interruption of the Pattern, Timing, and Why Dismissal is Unwarranted ............... 6

   4. July 1 Written Assurance of No Further Equity Raises ................................ 7-8

   5. Paid Promotions Before the July 14 Offering ........................................ 8

   6. August 2023 Lender Defaults ....................................................... 8-9

   7. Reverse Split Denial, Immediate Announcement, and Subsequent Threat Letter ......... 9-10

   8. Vernice Howard's CFO Liability .................................................... 10

      A. SOX Certifications and Revenue Representations ................................. 10

      B. Knowledge of the August 2023 Lender Defaults .................................. 11

      C. Knowledge of the February 2024 Default and Post-Default Transfers ............. 11

   9. February 2024 Transfers Following Lender Seizure ................................. 11-12

   10. Retaliatory Litigation, Attempted Injunctive Relief, and Inconsistent
       Statements Regarding Control ................................................... 12-13

III. ARGUMENT ........................................................................ 13-23

   1. The Motion Must Be Denied Because Plaintiff's Claims Are Timely .................... 13

      A. Exchange Act Claims (Section 10(b)/Rule 10b5 and Section 20(a))
         Are Governed by § 1658(b) and *Merck* Requires Discovery
         of Scienter Facts—Not Suspicion or Loss .................................... 13-14

      B. Defendants' "Admitted Fraud Discovery" Theory Improperly Collapses
         *Merck* Into "Loss and Concern" Trigger ..................................... 14

      C. The Five-Year Repose Independently Defeats Dismissal ........................ 14

      D. Common-Law Fraud Is Not Governed By a Two-Year Statute ..................... 14-15

   2. Defendants' PSLRA Safe-Harbor Argument Does Not Warrant Dismissal ............... 15

3. The SAC Adequately Pleads Material Misstatements/Omissions and Satisfies PSLRA/Rule 9(B) ............................................................ 15-16

4. Scienter Is Adequately Pleaded Under *Tellabs* and *ATSI* ........................... 16-18

5. The SAC Adequately Pleads Loss Causation and Proximate Cause .......................... 18-19

    A. 1847's Motion Fails to Address Motive, Centralized Control, and Credibility ............................................................ 19-20

6. The SAC Adequately Pleads Section 20(a) Adequately Pleads Section 20(a) Control-Person Liability ........................................................ 20-21

7. *Janus* Does Not Require Dismissal and Does Not Eliminate Scheme Liability.......................................................................................21

8. The SAC Adequately Pleads Common-Law Fraud and the Allegations Are Not Defeated by "Future Promise" Labels ........................................ 21-22

9. Bevilacqua's Own Motion Points to Roberts and 1847 Holdings as the Primary Actors ................................................................ 22-23

IV. CONCLUSION........................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*ATSI Communications, Inc. v. Shaar Fund, Ltd*.,
   493 F.3d 87 (2d Cir. 2007) ................................................................ 16, 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
   637 F.3d 169 (2d Cir. 2011)........................................................................ 14

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011).......................................................................... 21, 23

*Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................... 18

*Lama Holding Co. v. Smith Barney Inc.*,
   88 N.Y.2d 413 (1996).................................................................................. 22

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ....................................................................... 18

*Lorenzo v. SEC*,
   587 U.S. 71 (2019) ...................................................................................... 21

*Macquarie Infrastructure v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) .................................................................................... 16

*Maschhoff v. Polished.com Inc. f/k/a 1847 Goedeker Inc.*,
   No. 1:22-cv-06606 (E.D.N.Y. Oct. 31, 2022)............................................... 4

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)........................................................................... 13-14, 23

*Slayton v. American Express*,
   604 F.3d 758 (2d Cir. 2010) ...................................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,
   551 U.S. 308 (2007) ........................................... 2, 5, 16, 17, 19, 20, 23

## OTHER LEGAL AUTHORITIES

15 U.S.C. § 78j(b)................................................................................................ 2, 8

15 U.S.C. §78t(a) ................................................................................................... 20

15 U.S.C. § 78u-4(b)(1)-(2) ................................................................................ 16

15 U.S.C. §78u-5(c)(1)(A)(i) .............................................................................. 15

15 U.S.C. §78u-5(c)(1)(B) .................................................................................. 15

28 U.S.C. § 1658(b)(1)-(2) ...................................................................... 2, 13, 14

17 C.F.R. § 240.10b-5.................................................................................... 7-8

CPLR 213(8) ..................................................................................................... 15

California Penal Code § 637.2 ............................................................................ 10

Electronic Communications Privacy Act............................................................. 10

## I.    **PRELIMINARY STATEMENT**

Defendants' Motion rests primarily on two arguments—both of which fail. First, they contend Plaintiff's securities fraud claims are time-barred. Second, they argue that the Company's May 15, 2023, $90-million revenue guidance is insulated from liability because it was accompanied by forward-looking disclaimers. In advancing these arguments, Defendants largely ignore the factual chronology pled in Plaintiff's Second Amended Complaint ("SAC") and instead attempt to narrow the case to isolated statements divorced from the surrounding sequence of events.

The SAC alleges an integrated pattern of misrepresentation and concealment, including:

- A written July 1, 2023, assurance that no equity raise was forecast;

- Plaintiff's reliance on that assurance in private offerings;

- A dilutive capital raise thirteen days later;

- Paid stock promotions preceding that offering;

- August 2023 lender defaults;

- A reverse split denial followed three days later by an announcement of the reverse split;

- A September 25, 2023 reaffirmation of $90 million revenue entering Q4;

- CFO Vernice Howard's Sarbanes-Oxley certifications during this period;

- Centralized operational and capital control exercised by 1847 Partners under a Management Services Agreement; and

- The February 2024 prepaid consulting transfers immediately after the lender seizure.

Defendants' reliance on forward-looking disclaimers is misplaced. The SAC does not rest solely on the May 2023 press release. Roberts reaffirmed the $90-million revenue guidance in late 2023,

1

including during a public "fireside chat," at a time when year-end performance was materially knowable. A shortfall of more than $22 million in revenue is not a marginal forecasting error—it reflects a materially inaccurate representation of then-existing business performance. Boilerplate forward-looking language does not insulate reaffirmed guidance that was inconsistent with contemporaneous financial reality.

Defendants' statute-of-limitations argument likewise fails. They attempt to portray Plaintiff's September 2023 request for a forensic audit as an "I gotcha" moment, establishing discovery of the fraud. It was not. That request reflected an inquiry based on mounting concerns—not discovery of facts constituting the violation, including scienter.

As alleged in the SAC, what followed matters: the July 14 pump-and-dump activity preceding the offering, the coordinated August lender defaults issued within days of one another, evidence of fraudulent conveyance, the collapse and delisting, the absence of any national exchange willing to continue listing the stock, its relegation to the lowest tier of the OTC market, and the fact that it now trades at a fraction of a penny. Those events—taken together—revealed the scope of the misconduct and the underlying intent.

Section 10(b) claims are governed by 28 U.S.C. § 1658(b), which provides a two-year period from discovery and a five-year statute of repose from the violation itself. The alleged misrepresentations inducing Plaintiff's July 2023 investments fall well within the five-year repose period, and this action—filed in October 2025—is timely under both prongs of § 1658(b). When evaluated holistically under *Tellabs*, the SAC plausibly alleges violations of the U.S. Securities and Exchange Act of 1934 Sections 10(b) and 20(a), and SEC Rule 10b-5. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323-24 (2007); 15 U.S.C. 78j(b). The Motion should therefore be denied.

## II.    STATEMENT OF FACTS

### 1. September 25, 2023 Reaffirmation of $90-Million Revenue Guidance

1847 Holdings repeatedly reaffirmed the same $90-million revenue projection throughout 2023—including in late September, entering the fourth quarter. (SAC ¶¶ 12, 26, 45-47 (ECF No. 36, Page ID# 5, 7, 11).) On September 25, 2023, Defendant Ellery Roberts participated in a publicly released investor fireside chat. (*See* **Exhibit A**.) During that discussion, Roberts stated: "Based on our current trajectory we continue to reaffirm our prior guidance of revenue in excess of 90 million dollars in 2023." (*Id.*)

By September 25:

- Nine months of operational results had occurred;

- Q3 financial data was internally available;

- The Company had experienced lender defaults in August; (SAC ¶¶ 45-47 (ECF No. 36, Page ID# 11).)

- A July 14 capital raise had been completed; (SAC ¶¶ 35-37 (ECF No. 36, Page ID# 9).) and

- A 1-for-25 reverse split had become effective on September 11. (SAC ¶¶ 57-59 (ECF No. 36, Page ID# 13-14).)

The Company ultimately reported approximately $68 million in revenue for 2023—more than $22 million below the reaffirmed guidance. (SAC ¶ 27 (ECF No. 36, Page ID# 8).) A shortfall exceeding $22 million—roughly 24% of the reaffirmed projection—is not a marginal variance. Entering Q4, management necessarily knew whether the Company was tracking materially below $90 million in revenue. This was not early-year optimism. It was a late-year reaffirmation tied expressly to the Company's "current trajectory." Where a management reaffirms guidance in late September, after three quarters of performance and amid lender defaults and capital distress, the statement cannot be

dismissed as generic forward-looking optimism. (SAC ¶¶ 26-28 (ECF No. 36, Page ID# 8); ¶ 50 (ECF No. 36, Page ID# 15).)

## 2. Parallel Incentive Structure and Conduct at 1847 Holdings

Polished was not an unrelated issuer. It was a spin-off operating within the same externally managed structure controlled by 1847 Partners LLC. (SAC ¶¶ 68-70 (ECF No. 36, Page ID# 16).) Following the spin-off, Polished was sued in *Maschhoff v. Polished.com Inc. f/k/a 1847 Goedeker Inc.*, No. 1:22-cv-06606 (E.D.N.Y. Oct. 31, 2022), ECF No. 1. (the "Maschhoff Complaint"), attached hereto as **Exhibit B** ¶¶ 5, 20, 22-23, 49, 52-53, 55, 60, 64, 77-78, 123-125, 141, 143, 135, 145, and 155.

The Maschhoff Complaint alleges systemic accounting misconduct, including:

- Improper revenue recognition in violation of ASC 606;

- Inflated inventory balances;

- Manipulated vendor rebate accruals;

- Forged bills of lading and delivery confirmations;

- Understated returns allowances;

- False Sarbanes-Oxley certifications; and

- Auditor resignation and withdrawal of prior financial statements. (SAC ¶¶ 73-74 (ECF No. 36, Page ID# 16).)

The external manager governing Polished was the same external manager governing 1847 Holdings: 1847 Partners. (SAC ¶¶ 7, 68 (ECF No. 36, Page ID# 4, 16).) The incentive structure was identical. Under the Management Services Agreement:

- 1847 Partners was entitled to guaranteed quarterly compensation tied to financial scale and Adjusted Net Assets;

- Compensation was not conditioned on profitability; and

- Reported asset values and revenue performance sustained the management fee stream. (SAC ¶ 7 (ECF No. 36, Page ID# 4).)

At Polished, reported financial performance is alleged to have been materially distorted to preserve the appearance of growth and stability. (SAC ¶¶ 73-74 (ECF No. 36, Page ID# 16).) At 1847 Holdings, aggressive revenue projections were issued and reaffirmed under the same fee-dependent structure. (SAC ¶¶ 12, 26-28 (ECF No. 36, Page ID# 5, 8).)

The parallel is structural:

- Same external manager;

- Same guaranteed fee model;

- Same dependence on reported financial performance;

- Same board-level alignment with 1847 Partners;

- Same incentive to preserve scale and capital access; and

- The economic beneficiary in both enterprises was 1847 Partners. (SAC ¶¶ 7, 68 (ECF No. 36, Page ID# 4, 16).)

Polished—operating under this structure—was sued for systemic accounting manipulation, as detailed in **Exhibit B**. It illustrates how financial metrics within this externally managed model functioned as the mechanism sustaining management compensation.

The SAC does not allege isolated misjudgment. It alleges a centralized fee-extraction model operating across related entities—first at Polished and then through parallel projection practices at 1847 Holdings—which must be evaluated holistically. *See Tellabs*, 551 U.S. at 323-24. (SAC ¶¶ 68-74 (ECF No. 36, Page ID# 16-17).)

### 3. Interruption of the Pattern, Timing, and Why Dismissal Is Unwarranted

The trajectory at 1847 Holdings was interrupted. In September 2023, Plaintiff formally demanded an independent forensic audit directed to the Chairman of the Audit Committee. (SAC ¶ 63 (ECF No. 36, Page ID# 15).) The demand identified structural conflicts under the MSA, capital allocation concerns, escalating leverage, and the risks embedded in optimistic revenue projections. (SAC ¶¶ 63-65 (ECF No. 36, Page ID# 15).)

The timing is significant. At the time of the audit demand, aggressive projections remained outstanding. (SAC ¶ 26 (ECF No. 36, Page ID# 8).) Other than a single "fireside chat" in September 2025, the Company never formally revised or withdrew those projections. (SAC ¶ 29 (ECF No. 36, Page ID# 8).) Thus, for an extended period, optimistic revenue targets remained in the market despite mounting subsidiary distress and visible structural deterioration. (SAC ¶¶ 45-50 (ECF No. 36, Page ID# 11-15).)

Following the audit demand:

- The Company did not issue a revised formal projection framework;

- The financial narrative shifted from expansion to distress;

- Structural fragility became visible; and

- The enterprise entered open financial decline. (SAC ¶¶ 29-31, 45-50 (ECF No. 36, Page ID# 8-15).)

This sequence supports a cogent inference that the projections were central to sustaining the management fee structure and capital access under the MSA.

**4. July 1 Written Assurance of No Further Equity Raises**

On July 1, 2023, Defendant Ellery Roberts sent Plaintiff a text message stating: "Our forecast does not show us raising equity for operating purposes. As stated publicly, we see ourselves building cash from here on out." (SAC ¶ 20 (ECF No. 36, Page ID# 6).)

This was not generalized optimism. It was a direct and specific representation regarding the Company's present capital plans and near-term financing intentions. (SAC ¶¶ 19-21 (ECF No. 36, Page ID# 6-7).)

This exact text message is what Plaintiff relied upon. It is the paramount component of Plaintiff's inducement-based claim. (SAC ¶¶ 19-21 (ECF No. 36, Page ID# 6-7).) Plaintiff relied on this assurance in deciding to participate in a private offering, investing approximately $365,000. (SAC ¶ 19 (ECF No. 36, Page ID# 6).) Absent the representation that no further equity raise was anticipated and that the Company would be "building cash," Plaintiff would not have participated in the offering and would not have committed additional capital.

At the time Roberts made this direct written assurance, he did not disclose that he was a named defendant in other pending securities fraud actions alleging similar financial misconduct. The omission deprived Plaintiff of information directly bearing on management credibility, litigation exposure, and overall risk assessment.

Thirteen days later, on July 14, 2023, the Company conducted a dilutive capital raise. (SAC ¶¶ 35-38 (ECF No. 36, Page ID# 9-10).) The temporal proximity between the July 1 assurance and the July 14 capital raise supports a plausible inference that the statement was misleading when made. Defendants' Motion does not substantively rebut this allegation of inducement. The Memorandum references the exchange in passing but does not argue that the statement was immaterial, was an unactionable opinion, was protected by the safe harbor, or was not relied upon. When considered

7

together with undisclosed litigation exposure and contemporaneous liquidity pressures, the July 1 written assurance plausibly alleges a materially misleading statement and omission under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. *See* 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

## 5. <u>Paid Promotions Before the July 14 Offering</u>

Immediately before the July 14, 2023 offering, the Company funded stock promotions designed to increase market visibility and trading activity. (SAC ¶ 35 (ECF No. 36, Page ID# 9).) Specifically, on the eve of the offering, the Company paid two separate stock promotion firms—one approximately $15,000 and another approximately $25,000—to "cover the company." (SAC ¶ 35 (ECF No. 36, Page ID# 9).) These payments were made immediately before the dilutive capital raise. (SAC ¶ 35 (ECF No. 36, Page ID# 9).)

The timing is significant. Funding promotional coverage immediately before launching a new offering supports a plausible inference that the Company sought to increase market interest and support pricing in connection with that offering. The July 1 written assurance that no equity raise was forecast was made thirteen days earlier. (SAC ¶¶ 20, 37 (ECF No. 36, Page ID# 6, 9).) Plaintiff relied on that assurance in participating in a private offering. The subsequent promotional activity—followed by the July 14 raise—is part of the same sequence of events. Defendants' Motion does not meaningfully address these promotional payments, their timing, or their relationship to the subsequent offering.

This coordinated promotional activity increased trading attention immediately before a new issuance of shares, which diluted existing shareholders, including Plaintiff.

## 6. <u>August 2023 Lender Defaults</u>

On August 4 and August 9, 2023, two unaffiliated lenders declared the Company in default. (SAC ¶ 45 (ECF No. 36, Page ID# 11).) Each issued default notices within a five-day period, and both

notices used nearly identical language. These defaults occurred weeks after Roberts assured Plaintiff that the Company was "building cash" and did not anticipate raising equity for operating purposes. (SAC ¶¶ 20, 47 (ECF No. 36, Page ID# 6, 11).) The near-simultaneous issuance of default notices by independent lenders—using substantially identical language—raises serious questions regarding the Company's liquidity condition and internal communications at the time of the July 1 assurance and the July 14 offering.

These defaults materially altered the Company's capital structure and placed immediate downward pressure on the stock price. Convertible default provisions can permit lenders to convert at discounted prices and sell into the market, resulting in significant dilution.

**7. <u>Reverse Split Denial, Immediate Announcement, and Subsequent Threat Letter</u>**

On August 28, 2023, Roberts denied that a reverse split was planned. (SAC ¶¶ 54-55 (ECF No. 36, Page ID# 13).) On September 1, 2023—three days later—the Company announced a 1-for-25 reverse split effective September 11. (SAC ¶ 57 (ECF No. 36, Page ID# 13-14).) Corporate approval necessarily precedes public announcement. A reverse split requires board authorization, internal documentation, exchange notification, and preparation of disclosure materials. It is not an action implemented spontaneously within seventy-two hours.

The September 1 press release confirmed that the reverse split had already been authorized and that a fixed effective date had been established. (SAC ¶ 58 (ECF No. 36, Page ID# 14).) The existence of that effective date indicates the process was underway before the August 28 denial.

The sequence becomes more probative when considered alongside what occurred next. On September 14, 2023, counsel for 1847 Holdings sent Plaintiff a letter concerning his recording of the August 28 call. (SAC ¶¶ 65-66 (ECF No. 36, Page ID# 15-16).) The letter states: "You have been reported to California legal authorities for having recorded the call without Mr. Roberts' consent." It

further states: "The reporting of you to the legal authorities is without prejudice to any causes of action that Mr. Roberts or 1847 Holdings LLC may have against you for recording the call or your use or disclosure of its contents…."

The letter also warns of potential civil liability under California Penal Code § 637.2 and the federal Electronic Communications Privacy Act. The letter does not deny the reverse-split timeline. Instead, it focuses on preventing disclosure of the call and threatening legal consequences tied to its "use or disclosure." At the pleading stage, the temporal proximity between the August 28 reverse-split denial, the September 1 announcement of a pre-authorized 1-for-25 split, and the September 14 threat letter emphasizing the consequences of disclosure supports a plausible inference that the content of the call was materially sensitive. Moreover, the fact that counsel asserted Plaintiff had been "reported to California legal authorities" and emphasized potential further legal consequences for disclosure reinforces that management was concerned about the call becoming public.

## 8. Vernice Howard's CFO Liability

Defendant Vernice Howard cannot be dismissed as a passive financial officer. As CFO of a public company, she held core, non-delegable responsibilities over financial reporting, internal controls, liquidity monitoring, debt compliance, and Sarbanes–Oxley certifications.

## A. SOX Certifications and Revenue Representations

The Company reaffirmed optimistic revenue guidance while internal conditions were deteriorating. Howard signed and certified SEC filings during this period. (SAC ¶¶ 83-86 (ECF No. 36, Page ID# 19-20).) A CFO who certifies public filings cannot plausibly disclaim responsibility for the accuracy of the financial representations those filings communicate or endorse.

10

**B. Knowledge of the August 2023 Lender Defaults**

On August 4 and August 9, 2023, two separate lenders issued default notices within five days, using nearly identical language. (SAC ¶ 45 (ECF No. 36, Page ID# 11).) Loan defaults are quintessential CFO-level events, directly implicating liquidity, solvency, covenant compliance, and going-concern risk. The inference that the CFO knew of multiple defaults and their implications is far more cogent than the notion she remained unaware.

Howard did not resign after these defaults. She remained in office as the Company continued to project financial strength.

**C. Knowledge of the February 2024 Default and Post-Default Transfers**

Polished operated under the same external manager (1847 Partners), with overlapping executive control and integrated financial relationships. A $100-million secured default and account seizure at an affiliated enterprise operating under the same centralized management structure is a quintessential material event.

Immediately following the lender seizure, approximately $2.5 million was disbursed in prepaid consulting transfers under insolvency conditions. (SAC ¶¶ 75-76 (ECF No. 36, Page ID# 17-18).) Oversight of material cash disbursements during distress falls squarely within a CFO's core responsibilities, yet Howard did not resign or withdraw certifications.

**9. February 2024 Transfers Following Lender Seizure**

On February 6, 2024, Polished.com—operating under the same external manager, 1847 Partners—received a Notice of Acceleration from Bank of America demanding immediate repayment under its 2022 credit agreement. (SAC ¶ 75 (ECF No. 36, Page ID# 17).)The outstanding debt at the time of acceleration was approximately $91.25 million. (SAC ¶ 75 (ECF No. 36, Page ID# 17).)

11

Bank of America also terminated further credit commitments and set off funds from subsidiary accounts. This was a nine-figure liquidity event.

The following day, February 7, 2024, and again on February 8, 2024, 1847 Holdings entered into and prepaid consulting agreements totaling approximately $2,498,000 using proceeds from the most recent public offering. (SAC ¶ 76 (ECF No. 36, Page ID# 17-18).)

The proximity between the acceleration of a $91.25-million credit facility, the effective seizure and restriction of accounts, and the rapid prepayment of $2.5 million in consulting agreements is highly indicative of enterprise-wide liquidity distress. Polished operated under the same external manager—1847 Partners—the sole manager of which was Ellery Roberts, who also served as Chairman of the Board.

## 10. **Retaliatory Litigation, Attempted Injunctive Relief, and Inconsistent Statements Regarding Control**

After Plaintiff filed a federal civil RICO complaint, 1847 Holdings did not respond with a substantive factual rebuttal. Instead, it initiated a defamation and trade libel action against Plaintiff. (SAC ¶¶ 87-92 (ECF No. 36, Page ID# 20-22).) In that action, Defendants represented to the state court that Plaintiff's prior federal case had been dismissed as "frivolous." That characterization was false. The prior dismissal was procedural; there was no finding of frivolousness, no Rule 11 sanction, and no adjudication on the merits. The Company also sought emergency injunctive relief aimed at restricting Plaintiff's communications. The request was denied. (SAC ¶¶ 91-92 (ECF No. 36, Page ID# 21-22).)

At the time the retaliatory action was filed, counsel initiating that litigation was himself a named defendant in a separate federal civil action in the Northern District of Illinois alleging a $23-million investment scheme. The attorney who initiated the retaliatory lawsuit subsequently withdrew from representation—not only in the state defamation action they filed against Plaintiff, but also in this federal action.

Before withdrawing, counsel asserted that Ellery Roberts had no affiliation with Polished.com—a position contradicted by public filings. Roberts served as Chairman of Polished since its inception and was the sole manager of 1847 Partners, the external manager of both Polished and 1847 Holdings under the Management Services Agreement. (SAC ¶¶ 7, 74 (ECF No. 36, Page ID# 4, 16-17).) That structure reflects centralized supervisory authority.

## III.    ARGUMENT

## 1. The Motion Must Be Denied Because Plaintiff's Claims Are Timely

Defendants' lead argument is that all claims accrued no later than mid-September 2023 because Plaintiff suspected "securities violations/fraud," sold his position, and had incurred a loss by then. Defendants further argue that dismissal on limitations grounds is routinely decided on the pleadings.  That framing misstates the governing accrual rule for Exchange Act claims.

### A. Exchange Act Claims (Section 10(b)/Rule 10b-5 and Section 20(a)) Are Governed by § 1658(b), and *Merck* Requires Discovery of Scienter Facts—Not Suspicion or Loss

Section 10(b) claims are governed by 28 U.S.C. § 1658(b): two years from discovery of the facts constituting the violation and five years of repose from the violation. See 28 U.S.C. § 1658(b)(1)-(2). Under *Merck & Co. v. Reynolds*, 559 U.S. 633, 648-49 (2010), discovery means discovery of facts constituting the violation, including facts supporting scienter; not mere "inquiry notice," suspicion, or awareness of loss. Here, September 2023 marked merely escalating red flags and investigation activity, not the completed discovery of facts showing knowledge or conscious recklessness as to the challenged misstatements, omissions, and scheme conduct. Under *Merck*, suspicion, investigation, or awareness of potential wrongdoing does not constitute "discovery" of the violation. *See Merck*, 559 U.S. at 653-54 (rejecting inquiry notice as the trigger and requiring discovery of facts constituting the violation, including scienter). The SAC pleads that later developments—most importantly the coordinated default mechanics and their downstream effects, the capital-structure consequences, and the later collapse

13

trajectory—materially clarified the fraudulent alignment and scienter in a way not knowable at the time

of an audit demand. *See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d

Cir. 2011) (limitations period does not begin until facts reflecting scienter are discoverable).

    *Merck* makes clear that the limitations period does not begin until a reasonably diligent plaintiff

would have discovered facts showing the defendant acted with intent to deceive, manipulate, or defraud.

*Merck*, 559 U.S. at 653 ("the limitations period does not begin to run until the plaintiff thereafter

discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation").

That standard requires discoverable facts supporting scienter, not merely loss or concern.

## B. <u>Defendants' "Admitted Fraud Discovery" Theory Improperly Collapses *Merck* into a "Loss and Concern" Trigger</u>

    Defendants point to the September 10 audit demand language as conclusive proof that Plaintiff

"discovered" the violation. But *Merck* expressly rejects starting the clock at suspicion or generalized

awareness of potential wrongdoing; the clock begins when a reasonably diligent plaintiff could discover

facts constituting the violation, including scienter. *Merck*, 559 U.S. at 653-54.

## C. <u>The Five-Year Repose Period Independently Defeats Dismissal</u>

    To the extent Defendants attempt to convert their limitations argument into a categorical bar, §

1658(b)'s five-year repose runs from the violation. The challenged 2023 conduct (including the July

2023 inducement statement and later 2023 reaffirmations and capital/credit events) falls well within

the repose window for this 2025 filing.

## D. <u>Common-Law Fraud Is Not Governed By a Two-Year Statute</u>

    Defendants' assertion that "all claims are subject to two-year statutes of limitations" is

overbroad. New York common-law fraud is governed by CPLR 213(8) (six years from the fraud or two

years from discovery), not a blanket two-year period. For that additional reason, the Motion cannot dispose of the case "in its entirety" on a two-year limitations theory.

## 2. Defendants' PSLRA Safe-Harbor Argument Does Not Warrant Dismissal

Defendants contend the challenged revenue guidance is protected as forward-looking. The PSLRA safe harbor does not apply where (i) the statement is not meaningfully cautionary, 15 U.S.C. §78u-5(c)(1)(A)(i); (ii) it includes actionable statements of present or historical fact, or (iii) the statement was made with actual knowledge of falsity, *id.* § 78u-5(c)(1)(B). In the Second Circuit, *Slayton v. American Express*, 604 F.3d 758, 773-74 (2d Cir. 2010), confirms the safe harbor does not protect forward-looking statements made with actual knowledge they are false or misleading. Even if Defendants invoke cautionary language, the SAC independently defeats safe-harbor protection under § 78u-5(c)(1)(B) because it pleads actual knowledge of falsity. Boilerplate risk disclosures or warnings of generic business risks do not suffice where the risk had already materialized or where defendants possessed contrary information. *Id.* at 772-73. A warning that a risk "may" occur is not meaningful where the contingency has already become a present reality.

The SAC's theory is not "hindsight disagreement" over early-year optimism; it is that Defendants reaffirmed a projection while internal conditions (including debt distress and liquidity constraints) made the reaffirmation misleading when made, and that the reaffirmation was deployed within an integrated capital-raising and dilution sequence.

## 3. The SAC Adequately Pleads Material Misstatements/Omissions and Satisfies PSLRA/Rule 9(B)

Defendants argue the SAC fails to specify actionable misrepresentations for certain defendants and improperly relies on collective references. At the pleading stage, the SAC must only plead with particularity the "who, what, when, where, and why" for the challenged statements and the scheme

conduct, and must plead scienter with the PSLRA's strong-inference standard. *See* 15 U.S.C. § 78u-4(b)(1)-(2).

To the extent Defendants argue that Howard and 1847 Partners are not linked to particular statements and that "pure omissions" are non-actionable, they rely on *Macquarie Infrastructure v. Moab Partners* for the narrow proposition that "pure omissions" (*i.e.*, silence untethered to a statement that becomes misleading) are not actionable under Rule 10b-5(b). *Macquarie Infrastructure v. Moab Partners, L.P.*, 601 U.S. 257, 263-65 (2024).

Plaintiff's theory is not a free-standing silence claim. The SAC identifies specific communications, written assurances, certifications, reaffirmations, and capital-market actions that were misleading in light of contemporaneous liquidity distress, default activity, and structural incentives. The alleged omissions are actionable because they rendered those affirmative statements misleading. Moreover, *Macquarie* addressed subsection (b) only and does not foreclose liability under Rule 10b-5(a) and (c), which independently prohibit deceptive schemes and courses of conduct.

**4. Scienter Is Adequately Pleaded Under *Tellabs* and *ATSI***

Under *Tellabs*, the Court must assess scienter holistically and determine whether the inference of scienter is cogent and at least as compelling as innocent explanations. *See Tellabs*, 551 U.S. at 323-24. The inquiry is comparative and must consider the allegations collectively rather than in isolation. Under *ATSI*, scienter may be pleaded through motive and opportunity or strong circumstantial evidence of conscious recklessness. *ATSI Communications, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007). The SAC alleges a coherent motive-and-alignment theory tied to the external-manager structure and the incentives embedded in that structure, and separately pleads circumstantial evidence of conscious recklessness through the timing, sequencing, and market consequences of the challenged conduct. These allegations include the reaffirmation of guidance amid known liquidity constraints and

debt pressures in close proximity to capital-raising activity. At this stage, Defendants' request to atomize each allegation and reject them in isolation is exactly what *Tellabs* forbids. *Tellabs*, 551 U.S. at 323.

Under *Tellabs*, scienter must be evaluated holistically. The SAC alleges:

- A centralized external manager with guaranteed compensation;

- Financial metrics tied directly to that compensation;

- Documented accounting misconduct at Polished preserving reported performance;

- Parallel aggressive projections at 1847 Holdings;

- Board-level representation by Ed Tobin, a member of 1847 Partners;

- Equity participation by Louis Bevilacqua in the fee-recipient manager; and

- The absence of meaningful formal projection revision despite deteriorating conditions.

*See Tellabs*, 551 U.S. at 323-24. Viewed collectively, these allegations support a strong inference that Defendants were aware of—or recklessly disregarded—the fragility of the projections and the incentive to preserve them.

As to Howard specifically, Defendants argue that a title, board role, or signature is insufficient and that Plaintiff fails to identify particular certifications and misstatements. The SAC's theory is not "CFO-by-title." Rather, it alleges that as CFO, Howard was responsible for public-company reporting, liquidity oversight, and disclosure controls during the period in which the Company reaffirmed guidance despite mounting debt and liquidity pressures.

The CFO's role in public-company reporting, liquidity monitoring, and disclosure controls, combined with pleaded contemporaneous red flags and the Company's disclosure posture, supports at least a strong inference of conscious recklessness at the pleading stage. At minimum, the inference that

Howard knew or recklessly disregarded that the reaffirmed projection lacked a reasonable basis is at least as compelling as any competing inference of mere oversight or corporate optimism.

The inference that Howard knew of—or recklessly disregarded—the Company's deteriorating liquidity, repeated lender defaults, and distress-era transfers is at least as compelling as any competing inference that she certified filings yet remained unaware of these CFO-level red flags. Because the SAC plausibly alleges motive, structural alignment, parallel conduct, and a cogent inference of scienter, dismissal is unwarranted.

5. **The SAC Adequately Pleads Loss Causation and Proximate Cause**

Defendants seek dismissal for lack of proximate cause/loss causation by recasting the claim as an "after-the-fact dispute" and by attacking causal linkage. Under *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-46 (2005), Plaintiff must plead that the misrepresentation or deceptive conduct proximately caused the economic loss. Under *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73 (2d Cir. 2005), loss causation is adequately pleaded where the concealed risk materializes and causes loss.

Here, the SAC pleads that the concealed risks and the misleading reassurance-and-raise sequence materialized through the very mechanisms alleged—liquidity deterioration, lender defaults and default-driven dilution mechanics, capital-raising and promotional activity tied to dilution, and the ensuing collapse trajectory—such that losses were a foreseeable consequence of the misconduct rather than an unrelated market event. At the pleading stage, it is enough that Plaintiff plausibly links the alleged deception to the market deterioration that followed when the concealed liquidity and capital-structure risks manifested.

Defendants' Motion does not meaningfully address:

- The existence of two separate default notices;

- The identical language used;

- The timing of the defaults in relation to the July 1 assurance; or

- Their impact on liquidity and dilution.

At the pleading stage, the sequence—written assurances of financial strength, followed by a dilutive capital raise, followed by near-simultaneous lender defaults—supports an inference that management knew or recklessly disregarded that the Company's liquidity condition was materially weaker than represented. This sequence is probative of scienter under *Tellabs* and relevant to proximate cause, as the defaults materially affected the Company's stock price and capital structure, contributing to Plaintiff's losses. *See Tellabs*, 551 U.S. at 323-24, 326.

Defendants suggest in their Motion that the decision was fluid or not finalized at the time of the August 28 call. That explanation does not reconcile the 72-hour gap between the categorical denial and the formal announcement of an already-scheduled corporate action materially affecting shareholder equity and listing status.

This sequence—denial, announcement, and immediate legal escalation—is probative of scienter under *Tellabs*. *See Tellabs*, 551 U.S. at 323-24. Defendants' Motion does not meaningfully explain how such a significant corporate action could have been conceived, approved, documented, and publicly prepared within seventy-two hours, nor does it reconcile the subsequent effort to deter disclosure of the call's contents. At the pleading stage, these facts support a cogent inference that the August 28 statement was false or misleading when made.

## A. __1847's Motion Fails to Address Motive, Centralized Control, and Credibility__

Defendants' Motion does not address the magnitude of the accelerated $91.25-million debt, nor does it reconcile how an externally managed enterprise facing an immediate nine-figure acceleration event could simultaneously justify rapid prepaid consulting disbursements. At the pleading stage, this

19

sequence supports a plausible inference that centralized capital decisions were being made under conditions of known financial distress—further supporting scienter and control liability.

The Motion does not address a significant sequence bearing on motive, centralized control, and credibility, including:

- The retaliatory lawsuit filed after the RICO complaint;

- The unsuccessful attempt at emergency injunctive relief;

- The mischaracterization of the prior federal dismissal as "frivolous";

- The existence of pending federal litigation against initiating counsel;

- The withdrawal of both initiating attorneys from both actions; or

- The inconsistent denial of Roberts' affiliation with Polished.

These events are probative of centralized control and the enterprise's response to scrutiny.

Under *Tellabs*, such conduct may be considered as part of the holistic scienter analysis and further strengthens the inference of knowledge or conscious recklessness. *See Tellabs*, 551 U.S. at 323.

## 6. The SAC Adequately Pleads Section 20(a) Control-Person Liability

To plead control-person liability under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a), Plaintiff must allege (1) a primary violation and (2) control by the defendant over the primary violator. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108. *ATSI* recognizes that control is a fact-intensive inquiry rarely suitable for resolution on a bare pleading-stage record when the complaint plausibly alleges a control structure and the power to direct the management and policies of the primary violator.

Defendants argue 1847 Partners is not tied to misstatements and lacks scienter. But Section 20(a) does not require the control person to be the "maker" of the statement; it requires plausible allegations that the control person had the power to direct or influence the primary violator's conduct.

Nor does Section 20(a) require that the control person personally utter the challenged statements where the complaint plausibly alleges authority over the corporate decision-making that produced them. The SAC's allegations regarding the external-management model and centralized capital, including the Management Services Agreement, fee structures tied to financial scale, and centralized oversight of capital-raising and liquidity decisions, plausibly plead control at this stage. At minimum, the SAC alleges that 1847 Partners possessed the practical ability to influence the Company's financial strategy, public disclosures, and capital-market activity, which is sufficient to survive dismissal under Section 20(a). *See* 15 U.S.C. § 78t(a).

**7. *Janus* Does Not Require Dismissal and Does Not Eliminate Scheme Liability**

Defendants (and separately Bevilacqua) invoke *Janus* to argue only the "maker" of a statement can be liable under Rule 10b-5(b). *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). That is a narrowing principle for subsection (b), not an immunity doctrine. *Janus* does not bar claims grounded in a deceptive course of conduct actionable under Rule 10b-5(a) and (c).

The Supreme Court subsequently clarified that limitation in *Lorenzo v. SEC*, confirming that individuals who disseminate or participate in a deceptive course of conduct may be liable under Rule 10b-5(a) and (c) even if they are not the "maker" under *Janus*. *See Lorenzo v. SEC*, 587 U.S. 71, 79-81 (2019).

Accordingly, even where attribution is disputed under subsection (b), the SAC's course-of-conduct allegations support scheme liability under (a) and (c) at the pleading stage.

**8. The SAC Adequately Pleads Common-Law Fraud and the Allegations Are Not Defeated by "Future Promise" Labels**

To the extent Defendants argue common-law fraud fails because it rests on non-actionable future promises or lacks Rule 9(b) detail, the SAC pleads actionable misrepresentation and omission

theories with sufficient particularity, and pleads contemporaneous facts supporting an inference of falsity and intent at the time the statements were made.

Under New York law, the elements of fraud are (1) a material misrepresentation or omission of fact, (2) falsity, (3) scienter, (4) reasonable reliance, and (5) damages. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). The SAC pleads each element with particularity.

The July 1 written assurance that no equity raise was forecast was not a vague expression of future hope; it was a specific representation regarding the Company's present intent or existing plans and is actionable if made without a genuine basis or with knowledge that it will not be honored.

The SAC alleges contemporaneous liquidity pressures, lender distress, and subsequent capital-raising activity occurring within days of the assurance, facts that plausibly support falsity and intent at the time of the statement.

Moreover, common-law fraud in New York is governed by CPLR 213(8), which provides a six-year limitations period from the fraud or two years from discovery. For the reasons set forth above regarding accrual, the claim is timely.

### 9. **Bevilacqua's Own Motion Points to Roberts and 1847 Holdings as the Primary Actors**

For more than a decade, Louis A. Bevilacqua and Bevilacqua PLLC served as securities counsel to 1847 Holdings. In his Motion to Dismiss, Bevilacqua's position is straightforward: *it wasn't me—it was them.* He argues:

- He did not "make" the challenged statements;

- He lacked "ultimate authority" over those statements;

- The statements were made by Company management;

- He did not control operations; and

- He was not responsible for capital raises or reverse splits.

Relying on *Janus*, 564 U.S. at 141, Bevilacqua asserts that only the person with "ultimate authority" over a statement can be its "maker." That argument necessarily concedes that:

- The statements were made by 1847 Holdings;

- Ellery Roberts possessed ultimate authority over them; and

- The representations at issue were corporate communications issued by management.

In other words, Bevilacqua's own defense identifies Roberts and 1847 Holdings as the decision-makers. He cannot avoid liability by arguing he lacked ultimate authority without simultaneously acknowledging that ultimate authority rested with Roberts. Nor can he disclaim responsibility for capital raises, reverse splits, and operational decisions without confirming that those actions were undertaken by Company management.

If Bevilacqua's defense is credited, it strengthens the primary claims against Roberts and 1847 Holdings. His Motion does not negate the existence of actionable misstatements. It clarifies who made them. Put simply, Bevilacqua's argument is: *the statements were not mine—they were his*. That concession reinforces, rather than undermines, Plaintiff's allegations regarding primary liability at the corporate level.

### III. CONCLUSION

Defendants' Motion rests on (i) a timeliness theory that collapses *Merck* into suspicion and loss,  (ii) an overbroad safe-harbor framing, (iii) improper disaggregation barred by *Tellabs*, and (iv) misapplied "pure omissions" arguments untethered to the SAC's integrated misstatement-and-scheme theory. *See Tellabs*, 551 U.S. at 323-24.

When the allegations are evaluated holistically, as required under *Tellabs*, the SAC plausibly pleads timely Exchange Act claims, actionable misstatements and omissions, scheme liability, scienter, loss causation, control-person liability, and common-law fraud.

23

Because the SAC plausibly pleads timely claims, actionable misconduct, scienter, causation, and control-person liability, the Motion should be denied.

Dated:  New York, New York
       March 3, 2026

                                        THE GALBRAITH LAW FIRM

                                        Kevin D. Galbraith, Esq.
                                        Jonathan Hall, Esq.
                                        Two Waterline Square
                                        400 West 61st Street, Suite 1508
                                        New York, NY 10023
                                        Phone: (212) 203-1249
                                        *Counsel for Plaintiff*

24

## **Word Count Certification**

      Word Count Certification Pursuant to Section 202.8-b of the Uniform Rules for the Supreme Court and the County Court, I certify that the number of words in the foregoing Memorandum is 6,224 excluding the caption and signature block. In making this certification, I have relied upon the word count of the word processing system used to prepare this document.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 3, 2026, a copy of the foregoing was electronically filed and served on Plaintiff via CM/ECF's E-filing and notification system.

*/s/ Megan E. Craig*